**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

In re:                                                      CHAPTER 11

MOSAIC MANAGEMENT GROUP, INC.,          Case No. 16-20833-EPK
MOSAIC ALTERNATIVE ASSETS LTD., and     (Jointly Administered)
PALADIN SETTLEMENTS, INC.,

          Debtors.

_____/


**OBJECTION OF THE UNITED STATES TRUSTEE TO INVESTMENT TRUSTEE'S
MOTION FOR ENTRY OF ORDER (A) DETERMINING EXTENT OF INVESTMENT
TRUST'S LIABILITY FOR POST-CONFIRMATION QUARTERLY UNITED STATES
TRUSTEE FEES AND (B) DIRECTING REIMBURSEMENT OR AUTHORIZING
CREDIT FOR OVERPAID FEES**

RAMONA D. ELLIOTT                    NANCY J. GARGULA
Deputy Director/General Counsel      United States Trustee, Region 21
P. MATTHEW SUTKO                     CHARLES R. STERBACH
Associate General Counsel            Assistant United States Trustee
                                     JILL ELLEN KELSO
ANDREW W. BEYER                      ARIEL RODRIGUEZ
WENDY COX                            Trial Attorneys
MELANIE HENDRY
BETH A. LEVENE                       Department of Justice
SUMI SAKATA                          Office of the United States Trustee
Trial Attorneys                      51 SW First Avenue, Room 1204
                                     Miami, FL 33130
Department of Justice                (305) 536-7285
Executive Office for United States   Fax: (305) 536-7360
  Trustees                           Email:  jill.kelso@usdoj.gov
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

SUMMARY ........................................................................................................ 1

FACTS .............................................................................................................. 2

ARGUMENT ..................................................................................................... 5

I.    The Motion Should Be Denied Because the Relief Mosaic Seeks Requires an
      Adversary Proceeding. ............................................................................... 5

II.   Congress Established Chapter 11 Quarterly Fees in United States Trustee Program
      Districts So that the Cost of the Bankruptcy System Is Not Borne by Taxpayers, and It
      Provided for "Equal Fees" to be Collected in Bankruptcy Administrator Districts. ............... 7

      A.   No Fewer Than 12 Times, Congress Has Carefully Recalibrated Quarterly Fees
           and Other Court Fees to Meet the Funding Needs of the Bankruptcy System. ................. 7

      B.   Any Quarterly Fees Charged in Judicial Districts in Alabama and North Carolina
           Must "Equal" Those Charged in the Rest of the Country. ................................................ 11

      C.   Congress Temporarily Increased Fees in 2017 to Protect Taxpayers from Having
           to Subsidize the Program and to Fund Additional Judgeships. ....................................... 13

III.  The 2017 Amendment Does Not Violate Any Constitutional Uniformity Requirements. ...... 17

      A.   The Tax Uniformity Clause Does Not Apply to the Quarterly Fee. ................................. 17

      B.   The Law is Uniform Because the Statute Requires Equal Fees Everywhere. .................. 18

      C.   Even If the 2017 Amendment Applied Only in United States Trustee Districts,
           Such Application Is Within the Scope of Constitutional "Uniformity." ......................... 22

      D.   The Quarterly Fee Statute Is Not a Substantive Bankruptcy Law and Thus Does
           Not Implicate the Uniformity Provision of the Bankruptcy Clause. .............................. 25

           1.   Section 1930(a)(6) is not a law "on the subject of Bankruptcies" because
                it does not adjust a failing debtor's obligations; it is an administrative
                funding mechanism authorized by the Necessary and Proper Clause. ..................... 26

           2.   Merely having an effect on a debtor in bankruptcy does not make a law
                one "on the subject of Bankruptcies." ...................................................................... 29

      E.   Even If the Law Were Unconstitutionally Non-Uniform, the Remedy Requested
           Would Be Improper. ........................................................................................................ 31

F.  The Fees Were Uniform through August of 2018 when the Judicial Conference's 2001 Directive Was Superseded by the Current Fee Schedule ........................................... 32

IV. The 2017 Amendment's Application Only to Disbursements After Its Enactment Date Is Prospective in Every Case, But Even If Retroactive, It Would Not Violate Due Process. ............................................................................................................................ 33

A.  The 2017 Amendment Applies to All Qualifying Disbursements Made After Its Enactment Date, with No Exception for Previously Filed Cases. .................................... 34

B.  The 2017 Amendment's Application to Disbursements Made After January 1, 2018 in Previously Filed Cases Is Prospective, Not Retroactive. ..................................... 38

C.  Even If the Amendment Applied Retroactively, It Would Be Constitutional. ................. 41

V.  No Refund or Credit Is Payable until Appeals Have Been Exhausted. .................................. 46

CONCLUSION ...................................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.H. Robins Co., Inc.*,
219 B.R. 145 (Bankr. E.D. Va. 1998) ...........................................................................39, 45

*Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc.*,
87 S. Ct. 1 (1966) ...........................................................................................................47

*Ashton v. Cameron Cty. Water Imp. Dist. No. 1*,
298 U.S. 513 (1936) (Cardozo, J., dissenting) ...............................................................25

*Augusta Towing Co. v. United States*,
5 Cl. Ct. 160 (Ct. Cl. 1984) ............................................................................................18

*Blanchette v. Connecticut General Ins. Corp.*,
419 U.S. 102 (1974) .........................................................................................22, 23, 24

*In re Buffets, LLC*,
597 B.R. 588 (Bankr. W.D. Tex. 2019), *appeal pending sub nom. Hobbs v.
Buffets, LLC*, No. 19-50765 (5th Cir.) ......................................................................19, 44

*Cedar Chem. Corp. v. United States*,
18 Cl. Ct. 25 (1989) ........................................................................................................47

*In re Cent. Fla. Elec., Inc.*,
197 B.R. 380 (Bankr. M.D. Fla. 1996) ............................................................................39

*In re CF&I Fabricators of Utah, Inc.*,
150 F.3d 1233 (10th Cir. 1998) ...................................................................36, 39, 44, 45

*In re Circuit City Stores, Inc.*,
606 B.R. 260 (Bankr. E.D. Va. 2019), *appeal docketed*, No. 19-2240 (4th Cir.)..........7, 39, 40

*In re Clinton Nurseries, Inc. v. Harrington (In re Clinton Nurseries, Inc.)*,
608 B.R. 96 (Bankr. D. Conn. 2019), *appeal docketed*, No. 3:19-cv-01428-
MPS (D. Conn.), *petition for direct review filed*, No. 19-4067 (2d Cir.) ...................... *passim*

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993) ..............................................................................................41, 44

iii

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
   543 U.S. 157 (2004)................................................................21

*Dixon v. United States*,
   900 F.3d 1257 (11th Cir. 2018) ...............................................47, 48

*In re Driggs*,
   206 B.R. 787 (Bankr. D. Md. 1997) .........................................39, 43

*In re Dziurgot-Farnsworth*,
   No. 14-10915, 2014 WL 7145712 (Bankr. D.R.I. Dec. 12, 2014) ...........6

*EPA v. New Orleans Pub. Serv., Inc.*,
   826 F.2d 361 (5th Cir. 1987) ..................................................39

*In re Exide Techs.*,
   No. 13-11482, 2020 WL 211400 (Bankr. D. Del. Jan. 9, 2020), *appeal*
   *docketed*, No. 1:20-cv-00076-LPS (D. Del.) ..................... *passim*

*FCC v. Beach Comms.*,
   508 U.S. 307 (1993)................................................................19

*FDIC v. Faulkner*,
   991 F.2d 262 (5th Cir. 1993) ..................................................38, 40

*Fernandez-Vargas v. Gonzales*,
   548 U.S. 30 (2006)................................................................33, 34

*In re Fisher Island Invests., Inc.*,
   778 F.3d 1172 (11th Cir. 2015) ................................................5

*In re Foxcroft Square Co.*,
   198 B.R. 99 (Bankr. E.D. Pa. 1996) .........................................39

*Gen. Motors Corp. v. Romein*,
   503 U.S. 181 (1992)................................................................41

*Hanover Nat'l Bank v. Moyses*,
   186 U.S. 181 (1902)................................................................25

*In re Harness*,
   218 B.R. 163 (D. Kan. 1998) ..................................................39

*Holywell Corp. v. Smith*,
   503 U.S. 47 (1992)................................................................45

iv

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994)........................................................................................39, 40, 41, 43

*In re Life Partners Holdings, Inc.*,
    606 B.R. 277 (Bankr. N.D. Tex. 2019), *appeal docketed*, Nos. 19-90041, 20-
    10032 (5th Cir.).........................................................................................7, 27, 37, 44

*Martin v. Hadix*,
    527 U.S. 343 (1999)...............................................................................................37, 38

*Massachusetts v. U.S.*,
    435 U.S. 444 (1978)........................................................................................................18

*In re McLean Square Assocs., G.P.*,
    201 B.R. 436 (Bankr. E.D. Va. 1996).......................................................................39

*In re Munford, Inc.*,
    216 B.R. 913 (Bankr. N.D. Ga. 1997) ......................................................................39

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018).................................................................................................36

*In re Nassau County Strip Search Cases*,
    783 F.3d 414 (2d Cir. 2015).......................................................................................47

*NCNB Texas Nat. Bank v. Cowden*,
    895 F.2d 1488 (5th Cir. 1990) ...................................................................................37

*Office of Personnel Mgmt. v. Richmond*,
    496 U.S. 414 (1990)......................................................................................................48

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984)................................................................................................44, 45

*Peony Park v. O'Malley*,
    121 F. Supp. 690 (D. Neb. 1954), *aff'd*, 223 F.2d 668 (8th Cir. 1955) ................22

*In re Post-Confirmation Fees*,
    224 B.R. 793 (E.D. Wash. 1998) ........................................................................39, 45

*In re Prines*,
    82 B.R. 110 (D.S.D. 1987)...........................................................................................39

*In re Prines*,
    867 F.2d 478 (8th Cir. 1989) ............................................................................8, 24, 36, 39

v

*In re Reese*,
    91 F.3d 37 (7th Cir. 1996) ..................................................................................27

*In re Reiman*,
    20 F. Cas. 490 (S.D.N.Y. 1874)...................................................................25, 28

*In re Rhead*,
    232 B.R. 175 (Bankr. D. Ariz. 1999) ................................................................39

*In re Richardson Serv. Corp.*,
    210 B.R. 332 (Bankr. W.D. Mo. 1997)...............................................................39

*Rosenberg v. United States*,
    72 Fed. Cl. 387 (Ct. Fed. Cl. 2006)....................................................................21

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) .........................................................................................21

*Ry. Labor Execs. Ass'n v. Gibbons*,
    455 U.S. 457 (1982) ....................................................................23, 25, 27, 29

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017)......................................................................................31

*Shady Grove Orthopedic Assocs. PA v. Allstate Ins. Co.*,
    559 U.S. 393 (2010).....................................................................................30, 31

*South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
    No. S-06-2845 LKK/JFM, 2012 WL 5387194 (E.D. Cal. Nov. 1, 2012) ..............48

*St. Angelo v. Victoria Farms, Inc.*,
    38 F.3d 1525 (9th Cir. 1994), *amended at* 46 F.3d 969 (9th Cir. 1995)...............11, 19, 22, 29

*Thomson Multimedia Inc. v. United States*,
    340 F.3d 1355 (Fed. Cir. 2003).........................................................................18

*United States Trustee v. Gryphon at the Stone Mansion, Inc.*,
    166 F.3d 552 (3d Cir. 1999)...........................................................18, 27, 39, 45

*United States v. Carlton*,
    512 U.S. 26 (1994).................................................................................41, 42, 44

*United States v. Comstock*,
    560 U.S. 126 (2010).....................................................................................27, 28

*United States v. Fisher*,
6 U.S. 358 (1805) ............................................................................................28

*United States v. Fox*,
95 U.S. 670 (1878) ......................................................................................27, 28

*United States v. Kras*,
409 US 434 (1973) ...........................................................................................41

*United States v. Mitchell*,
463 U.S. 206 (1983) .........................................................................................46

*United States v. Mottaz*,
476 U.S. 834 (1986) .........................................................................................46

*United States v. Ptasynski*,
462 U.S. 74 (1983) ......................................................................................23, 24

*United States v. Pusey*,
27 F. Cas. 631 (C.C.E.D. Mich. 1872) ....................................................25, 26, 28

*United States v. Sperry Corp.*,
493 U.S. 52 (1989) .................................................................................2, 17, 42

*Matter of Upton Printing*,
197 B.R. 616 (Bankr. E.D. La. 1996) ...............................................................39

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976) ....................................................................................41, 43, 44

*Vergos v. Uncle Bud's, Inc.*,
No. 3-97-0296, 1998 WL 652542 (M.D. Tenn. Aug. 17, 1998)..........................39

*Wright v. Union Cent. Life Ins. Co.*,
304 U.S. 502 (1948) .........................................................................................26

**Statutes**

2 U.S.C. §§ 651-658g ...........................................................................................35

11 U.S.C. § 106(a)(4) ...........................................................................................47

11 U.S.C. § 1112(b)(4) .........................................................................................29

11 U.S.C. § 1129(b)(14) .......................................................................................29

11 U.S.C. § 1129(d) ........................................................................................29

28 U.S.C. § 158(b)(6) .....................................................................................30

28 U.S.C. § 331 ........................................................................................20, 32

28 U.S.C. § 589a(a) .....................................................................................8, 9

28 U.S.C. § 589a(b) ...................................................................................8, 17

28 U.S.C. § 589a(c) .........................................................................................9

28 U.S.C. § 589a(d) .........................................................................................9

28 U.S.C. § 589a(e) .........................................................................................9

28 U.S.C. § 1930 ...................................................................................... *passim*

28 U.S.C. § 1930(a)(6) ............................................................................ *passim*

28 U.S.C. § 1930(a)(6)(B) ...........................................................1, 13, 14, 34

28 U.S.C. § 1930(a)(7) ............................................................................ *passim*

28 U.S.C. § 1931 ......................................................................................8, 12

28 U.S.C. § 2414 ...............................................................................46, 47, 48

Balanced Budget Downpayment Act, Pub. L. No. 104-91, 110 Stat. 7 (1996) &
   Pub. L. No. 104-99, 110 Stat. 26 (1996)......................................10, 38

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
   109-8, 119 Stat. 23 (2005) .............................................................10

Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of
   1986, Pub. L. No. 99–554, 100 Stat. 3088 (1986) ...............8, 11, 36, 38

Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, div. B, 131 Stat. 1224
   (2017).................................................................................. *passim*

Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978).............................7, 8

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. B, tit. II, 121
   Stat. 1844 (2007).......................................................................10

Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019) ...................................................................................................11, 13, 14, 46

Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. X, 120 Stat. 4 (2006) ...........................10

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1990, Pub. L. No. 101-162, tit. II, 103 Stat. 988 (1989) .........................9

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-140, tit. I, 105 Stat. 782 (1991) .........................10

Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-121, tit. I, 107 Stat. 1153 (1993) .......................10

Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, 119 Stat. 297 (2005) .......................10

Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, 114 Stat. 2411 (2000) .........................................................................................................10, 11, 12

Omnibus Consol. Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996) .............................................................................................................10, 37

Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121, 126 Stat. 346 (2012) ...............................................................................................10

Unfunded Mandates Reform Act, 2 U.S.C. § 1501, *et seq*. ...........................................................35

**Other Authorities**

Analytical Perspectives, Budget of the U.S. Gov't Fiscal Year 2017, available at https://www.govinfo.gov/content/pkg/BUDGET-2017-PER/pdf/BUDGET-2017-PER.pdf .................................................................................................15, 45

CBO Estimate for H.R. 2266, with an Amendment—the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, available at https://www.cbo.gov/system/files?file=115th-congress-2017-2018/costestimate/hr2266amend.pdf .................................................................16

Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017 (May 18, 2017), available at https://www.cbo.gov/system/files/2018-07/52739-hr2266.pdf .........................................................................................16

COURT INSIDER: WHAT IS A BANKRUPTCY APPELLATE PANEL?
(November 26, 2012), available at
https://www.uscourts.gov/news/2012/11/26/court-insider-what-bankruptcy-
appellate-panel ...............................................................................................30

Dep't of Justice U.S. Tr. Program FY 2016 Performance Budget Cong.
Submission, available at
https://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/01/
18._u.s._trustee_program_ustp.pdf ..............................................................14

Dep't of Justice U.S. Tr. Program FY 2017 Performance Budget Cong.
Submission, available at https://www.justice.gov/jmd/file/821021/download ......................14

Dep't of Justice U.S. Tr. Program FY 2018 Performance Budget Cong.
Submission, available at https://www.justice.gov/file/968761/download ...........................13

Dept. of Justice, U.S. Trustee Program, Chapter 11 Quarterly Fees, available at
https://www.justice.gov/ust/chapter-11-quarterly-fees ...........................................46

E.D. Va. R. 1006-1 .........................................................................................30

Fed. R. Bankr. P. 62 .......................................................................................47

Fed. R. Bankr. P. 2020 .................................................................................5, 6

Fed. R. Bankr. P. 3012 ......................................................................................5

Fed. R. Bankr. P. 7001 .................................................................................5, 6

Fed. R. Bankr. P. 7062 .....................................................................................47

Fed. R. Bankr. P. 9014 .................................................................................6, 7

Fed. R. Civ. P. 62 ...............................................................................46, 47, 48

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .................................7, 8

H.R. Rep. No. 99-764 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227 .................................9, 18

H.R. Rep. No. 115-130 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154 ........................8, 13, 15, 35

Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal
 Courts Improvement Act of 1999: Hearing before the Subcomm. on Courts
 and Intellectual Property of the H. Comm. on the Judiciary on H.R. 2112 and
 H.R. 1752, 106 Cong. 26-27 (1999) available at
 https://congressional.proquest.com/congressional/result/congresultpage:pdfev
 ent?rsId=16D543A2ABC&pdf=/app-bin/gis-hearing/b/b/4/a/hrg-1999-hjh-
 0039_from_1_to_92.pdf&uri=/app-gis/hearing/hrg-1999-hjh-0039 ...............................11, 12

N.D. Tex. R. 1007-1.........................................................................................................30

Report of the Proceedings of the Judicial Conference of the United States
 (Sept./Oct. 2001), available at
 http://www.uscourts.gov/sites/default/files/2001-09_0.pdf.....................................12

U.S. Const. art. 1, § 8, cl. 1 ...................................................................................2, 17, 21

U.S. Const. art. 1, § 8, cl. 4 ...............................................................................2, 19, 25, 31

U.S. Const. art. I, sec. 8, cl. 18................................................................................26

Nancy J. Gargula, United States Trustee for Region 21 ("United States Trustee"), files this Objection to the *Investment Trustee's Motion for Entry of Order (A) Determining Extent of Investment Trust's Liability for Post-Confirmation Quarterly United States Trustee Fees and (B) Directing Reimbursement or Authorizing Credit for Overpaid Fees*) (Dkt. No. 1228; "Motion"). In support of this objection, the United States Trustee respectfully states as follows:

## SUMMARY

1.      Under 28 U.S.C. § 1930(a)(6), a quarterly fee must be paid in every chapter 11 case, calculated on the value of disbursements during the quarter.  In 2017, Congress amended 28 U.S.C. § 1930(a)(6).  That 2017 amendment temporarily increased the quarterly fees in larger chapter 11 cases, those with disbursements of $1 million or more in a quarter.  28 U.S.C. § 1930(a)(6)(B). Congress passed the 2017 amendment to enable the Treasury to collect enough fees to fully offset the congressional appropriations that fund the United States Trustee Program and to pay for 18 additional bankruptcy judgeships, so that ordinary taxpayers would not bear the costs of the bankruptcy system.  The amendment expressly applies to disbursements made on or after January 1, 2018.

2.      The chapter 11 case of debtor Mosaic Management Group, Inc. ("Mosaic") was open when the 2017 amendment became effective on January 1, 2018.  Disbursements in the case exceeded $1 million in four subsequent quarters.  Consequently, Mosaic incurred quarterly fees under the amended fee schedule in those quarters.

3.      The Investment Trustee for the Mosaic Investment Trust ("Investment Trustee") now argues the 2017 amendment does not apply to the fees in this case, Motion ¶¶ 15-19, and if it does, it is impermissibly retroactive.  Motion ¶ 31-35.  But the 2017 amendment is not retroactive. It is prospective because it was enacted in October 2017 and only applies to disbursements made on or after January 1, 2018.  And even if the amendment were retroactive, it does not violate the

Due Process Clause because its application to both new and existing cases "is justified by a rational legislative purpose." *United States v. Sperry Corp.*, 493 U.S. 52, 64 (1989).

4.      The Investment Trustee also argues that the 2017 amendment violates either (**i**) Congress's power to "lay and collect Taxes, Duties, Imposts and Excises" so long as "all Duties, Imposts, and Excises [are] uniform throughout the United States."  U.S. Const. art. 1, § 8, cl. 1 ("tax Uniformity Clause"), or (**ii**) Congress's power to pass "uniform Laws on the subject of Bankruptcies," U.S. Const. art. 1, § 8, cl. 4 ("Bankruptcy Clause") because it is not being applied to cases filed before October 1, 2018 in the six judicial districts that do not participate in the United States Trustee Program.  Motion ¶ 20-30.  Yet, to the extent the 2017 amendment is subject to any constitutional uniformity requirement, the quarterly fee statute is constitutionally uniform.  Both before and after the 2017 amendment, federal law plainly has required that fees imposed by bankruptcy-administrator districts be "equal to those imposed" in U.S. Trustee Program districts, 28 U.S.C. § 1930(a)(7), as explained in depth by the two most recent bankruptcy courts to address this issue,  *In re Exide Techs.*, No. 13-11482, 2020 WL 211400, at *12 (Bankr. D. Del. Jan. 9, 2020) (Walrath, J.), *appeal docketed*, No. 1:20-cv-00076-LPS (D. Del.); *In re Clinton Nurseries, Inc. v. Harrington (In re Clinton Nurseries, Inc.)*, 608 B.R. 96, 113 (Bankr. D. Conn. 2019) (Tancredi, J.), *appeal docketed*, No. 3:19-cv-01428-MPS (D. Conn.), *petition for direct review filed*, No. 19-4067 (2d Cir.).  And any failure to enforce the 2017 amendment in the six judicial districts administered by bankruptcy administrators does not render the law itself constitutionally infirm for the reasons explained below.

### FACTS

5.      Mosaic filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 4, 2016.  Dkt. No. 1; *see* Motion ¶ 3.  The case is jointly administered with cases filed

by Mosaic's affiliates, Mosaic Alternative Assets Ltd. and Paladin Settlements, Inc., Dkt. No. 16, and remains open.[1]

6.    On June 6, 2017, this Court confirmed the *Plan Proponents' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Dkt. No. 488; "Plan").  Dkt. No. 1036.

7.    The disclosure statement that accompanied the Plan warned that "all forward looking statements [in the disclosure statement] are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements."  (original in all uppercase type).  Dkt. No. 489 at 5 of 222.[2]

8.    Under both federal law and the Plan, the Investment Trust ("Trust")[3] must pay the quarterly fees owed under 28 U.S.C. § 1930(a)(6) for post-confirmation quarters.  The Plan provides:

> Until the earlier of the closing of the applicable Chapter 11 Case by the issuance of a final decree by the Bankruptcy Court, or upon entry of an order of the Bankruptcy Court dismissing the applicable Chapter 11 Case, or converting the applicable Chapter 11 Case to another chapter under the Bankruptcy Code, and notwithstanding anything contained herein to the contrary, the Investment Trust shall (i) pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods for each Debtor's case within the time periods set forth in 28 U.S.C. § 1930(a)(6) and (ii) within 45 days of the end of each fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee quarterly reports and affidavits setting forth all receipts and disbursements of the Investment Trust as required by the U.S. Trustee guidelines.

---

[1] The Investment Trustee challenges fees assessed only in Mosaic's bankruptcy case.

[2] "__ of ___" refers to the pagination included in the electronic court filing "date-stamp."  Unless indicated in this manner, citations to a specific page in a record document refer to the document's internal pagination.

[3] The Trust is "the grantor trust created pursuant to the Plan to own and administer the Investment Trust Assets."  Dkt. No. 488 at 9.

3

Dkt. No. 488 at 17.

9.      The Investment Trustee reported the following disbursements in Mosaic's case for the first six quarters after January 1, 2018 and paid the following quarterly fees:

| Calendar Quarter | Disbursements | Quarterly Fee |
|---|---|---|
| 2018 Q1 | $ 2,726,138.51 | $ 27,261.39 |
| 2018 Q2 | $ 10,114,381.62 | $ 101,143.82 |
| 2018 Q3 | $ 1,061,843.10 | $ 10,618.43 |
| 2018 Q4 | $ 747,302.14 | $ 4,875.00 |
| 2019 Q1 | $ 945,933.87 | $ 4,875.00 |
| 2019 Q2 | $ 2,579,305.50 | $ 25,793.06 |

*See* Dkt. Nos. 1156, 1184, 1195, 1207, 1210, 1224 (Post-Confirmation Quarterly Operating Reports); Motion ¶ 10.

10.      On September 5, 2019, almost two years after the 2017 amendment to 28 U.S.C. § 1930(a)(6) was passed, the Investment Trustee filed the Motion challenging the constitutionality of the 2017 amendment and its application to this case.  Dkt. No. 1228.

11.      The Motion alleges the Trust paid a total of $125,816.69 more in quarterly fees for the first quarter of 2018 through the second quarter of 2019 than it would have owed for the same period if it had filed this case in a bankruptcy administrator district.  Motion ¶¶ 10-12.

12.      The Motion asks this Court to hold that the Trust is not liable for post-confirmation quarterly fees calculated under the 2017 amendment and to direct the United States Trustee to either reimburse the Trust for the excess fees it paid or issue the Trust credit against future quarterly fees to the extent of the alleged overpayment.  ¶ 14.

4

**ARGUMENT**

**I.    The Motion Should Be Denied Because the Relief Mosaic Seeks Requires an Adversary Proceeding.**

13.    Preliminarily, the Motion should be denied because it improperly seeks relief that may only be obtained through an adversary proceeding under Rule 7001.  Fed. R. Bankr. P. 7001.  Rule 7001 "lists ten types of matters which must be brought as adversary proceedings."  *In re Fisher Island Invests., Inc.*, 778 F.3d 1172, 1194 (11th Cir. 2015).  These matters include proceedings to: (a) "recover money or property," Fed. R. Bankr. P. 7001(1); (b) "determine the validity" of an "interest in property," Fed. R. Bankr. P. 7001(2), or (c) "obtain a declaratory judgment relating to any of the foregoing," Fed. R. Bankr. P. 7001(9).

14.    The Motion asks this Court to:  (1) determine that the Trust is not liable for quarterly fees based on the amendment, and (2) order the United States Trustee either to pay the Trust $125,816.69—the amount the Investment Trustee claims to have overpaid—or to credit the Trust that amount against future quarterly fees.  *Id*. at ¶ 36 & p. 12.  Thus, the Motion seeks "to recover money."  Fed. R. Bankr. P. 7001(1).  The Motion also seeks "to determine the validity" of the government's "interest in property," Fed. R. Bankr. P. 7001(2), *i.e.*, it asks this Court to determine that any amount of fees assessed beyond what the pre-amendment statute required is invalid.[4]  *See In re Clinton Nurseries, Inc*., 608 B.R. at 105.  This relief, too, may only be pursued through an adversary proceeding.  *Id*.

15.    The Investment Trustee cites no rule authorizing the Motion, and none exists.  First, it is not within the scope of Bankruptcy Rule 2020 for several reasons.  Fed. R. Bankr. P. 2020.

---

[4] The Motion does not fall within Fed. R. Bankr. P. 3012 because the parties do not merely ask the court to value a claim; the parties agree on the amounts that would be owed under both the pre-amendment fee structure and the amended fee structure.  *See In re Clinton Nurseries, Inc*., 608 B.R. at 105.  Moreover, the Motion seeks to recover money.

5

Rule 2020, which provides that "[a] proceeding to contest any act or failure to act by the United States trustee is governed by Rule 9014," contemplates proceedings to contest acts of the United States Trustee related to the administration of the case. *See* Fed. R. Bankr. P. 2020 advisory committee's note; *see also* 2 Norton Bankr. L. & Prac. 3d § 26:18 ("U.S. Trustees have discretion in the performance of administrative functions, but some of those functions are subject to judicial review" through "[t]he procedural vehicle" of Rule 2020). The rule does not apply here because the Investment Trustee—in challenging the constitutionality of the 2017 amendment to section 1930(a)—is challenging an Act of Congress, not an act or failure to act by the United States Trustee. Moreover, Rule 2020 does not permit a party to sue the United States for money by motion simply by naming the United States Trustee as a defendant.

16.     Alternatively, Rule 2020 does not apply because the Motion seeks an advance determination as to the Trust's liability for future quarterly fees. *See In re Clinton Nurseries, Inc.*, 608 B.R. at 105. However, the 1991 notes of the advisory committee state that the rule "provides for review of acts already committed by the United States trustee, but does not provide for advisory opinions in advance of the act." Fed. R. Bankr. P. 2020 advisory committee's note.

17.     Second, even if it Rule 2020 applied, it would independently require the Investment Trustee to file a Rule 7001 complaint to pursue the relief she seeks. Rule 2020 provides that "[a] proceeding to contest any act or failure to act by the United States trustee is governed by Rule 9014." Fed. R. Bankr. P. 2020. And Rule 9014(a) says that "[i]n a contested matter *not otherwise governed by these rules*, relief shall be requested by motion." Fed. R. Bankr. P. 9014(a) (emphasis added). Because proceedings required to be filed as adversary complaints under Rule 7001, like this proceeding to recover money, are "otherwise governed by these rules," Rule 9014(a) does not permit them to be brought by motion. *See, e.g., In re Dziurgot-Farnsworth*, No. 14-10915, 2014

WL 7145712, at *2 (Bankr. D.R.I. Dec. 12, 2014) ("Rule 9014 states that in 'a contested matter not otherwise governed by these rules, relief shall be requested by motion.' This contested matter is governed by Rules 7001 *et seq*., and the relief Armistead requests may not be pursued by motion.").

18.     Adversary proceedings provide procedural protections not required for motions.

19.     Other courts have declined to address similar claims by motion. *See, e.g.*, *In re Clinton Nurseries, Inc*., 608 B.R. at 106 (converting motion challenging 2017 amendment to adversary proceeding); *In re Life Partners Holdings, Inc.*, 606 B.R. 277, 283 (Bankr. N.D. Tex. 2019) (converting motion to adversary proceeding for resolution of monetary claims), *appeal docketed*, Nos. 19-90041, 20-10032 (5th Cir.); *In re Circuit City Stores, Inc.*, 606 B.R. 260, 267 (Bankr. E.D. Va. 2019) (concluding that motion to determine quarterly fees seeks the type of relief included in Bankruptcy Rule 7001 and converting to adversary proceeding), *appeal docketed*, No. 19-2240 (4th Cir.). This Court should too.

**II.     Congress Established Chapter 11 Quarterly Fees in United States Trustee Program Districts So that the Cost of the Bankruptcy System Is Not Borne by Taxpayers, and It Provided for "Equal Fees" to be Collected in Bankruptcy Administrator Districts.**

     **A.     No Fewer Than 12 Times, Congress Has Carefully Recalibrated Quarterly Fees and Other Court Fees to Meet the Funding Needs of the Bankruptcy System.**

20.     In passing the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978), Congress overhauled the bankruptcy system to free bankruptcy courts from case-specific administrative duties. H.R. Rep. No. 95-595, at 4 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5966. Congress did this by transferring those duties to a "new system of United States trustees"

in the Justice Department.[5]  *Id.* at 4, 100.  *See also In re Prines*, 867 F.2d 478, 480 (8th Cir. 1989).

United States Trustees "were given responsibility for many administrative functions, such as appointing private trustees and monitoring their performance, and monitoring cases for signs of fraud or abuse."  *Prines*, 867 F.2d at 480.  Thus, as envisioned by Congress, the United States Trustee Program was integral to the new bankruptcy system.  H.R. Rep. No. 95-595, at 88-109.

21.    To fund the Program, Congress draws upon a variety of "bankruptcy fees," including the quarterly fees required by 28 U.S.C. § 1930(a)(6).  Quarterly fees under section 1930(a)(6) and a portion of the filing fees collected by the clerk of the bankruptcy court under other provisions of section 1930[6] are deposited into the United States Trustee System Fund established in the U.S. Treasury ("Fund"), and are used to offset congressional appropriations made to directly fund the Program.[7]  *See* 28 U.S.C. § 589a(a) & (b); H.R. Rep. No. 115-130, at 7 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154, 159-160.

22.    Congress intended that the amount deposited into the Fund would "be *at least* equal to the money needed to fund the U.S. Trustee Program each year, so that the Program will be self-

---

[5]  The United States Trustee Program was established as a pilot program in 1978 and was nationalized in 1986.  *See* Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2549 (1978); Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986).

[6]  The filing fees paid to the clerk of the bankruptcy court under section 1930(a)(1) through (a)(5) are shared by the United States Trustee Program and the judiciary, among others.  28 U.S.C. § 589a(b); 28 U.S.C. § 1931 (text and notes).

[7]  Prior to the 2017 amendment, 100% of quarterly fees collected were deposited into the Fund.  The 2017 amendment temporarily reduced that to 98%, with the remaining 2% to be deposited in the general fund of the Treasury for use in funding 18 additional judgeships.  *See* Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, div. B, § 1004(b), 131 Stat. 1224, 1232 (2017) (attached as **Exhibit C**); H.R. Rep. No. 115-130, at 7-9.

funded by the users of the bankruptcy system—at no cost to the taxpayer."  H.R. Rep. No. 99-764 at 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5237-38 (emphasis added); *see also id.* at 22.

23.    If the amounts collected exceed the appropriations by Congress for a particular year, the excess remains in the Fund to offset appropriations in subsequent years.  *See* 28 U.S.C. § 589a(c).  Conversely, if the costs of operating the Program in a particular year exceed the amounts available in the Fund, monies collected from taxpayers might be required to fund part of the appropriation to the Program.  *See* 28 U.S.C. § 589a(e).

24.    Before settling on quarterly fees based on disbursements as part of the way to fund the Program, Congress "considered many different possible mechanisms . . . including fees based on a debtor's assets, fees based on a debtor's liabilities, and a flat fee for all debtors."  H.R. Rep. No. 99-764 at 26.  Congress decided to charge graduated quarterly fees based on the size of a chapter 11 case's disbursements because it determined that "[s]maller chapter 11 debtors should pay smaller additional fees than larger debtors; [and] the funding mechanism [in section 1930(a)(6)] ensures that this will be the case."  *Id.*

25.    Congress also provided that the Attorney General periodically must report on the use of amounts in the Fund and specifically delineated the purposes for which monies in the Fund could be used.  *See* 28 U.S.C. § 589a(a), (d).  This regime allows Congress easily to increase or reduce the fees paid under section 1930, so that the amount collected for deposit in the Fund will never be unacceptably small or unreasonably large.

26.    On no fewer than twelve occasions, and as recently as one month ago, Congress has amended section 1930(a) or section 589a of title 28, to adjust the amount or allocation, or both, of filing fees and quarterly fees to be deposited into the Fund:

- Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1990, Pub. L. No. 101-162, tit. II, § 406, 103 Stat. 988, 1016

9

(1989) (increasing filing fee);

- Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-140, tit. I, § 111, 105 Stat. 782, 795 (1991) (increasing filing fee and quarterly fees, and directing deposit of a percentage of fees into Fund);

- Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-121, tit. I, § 111, 107 Stat. 1153, 1164-65 (1993) (increasing filing fees, changing percentage of fees allocated to Fund, and requiring Judicial Conference to report on bankruptcy fee system and possible impact of using graduated fee system based on assets, liabilities, or both, of debtor);

- Balanced Budget Downpayment Act, Pub. L. No. 104-91, § 101, 110 Stat. 7, 10 (1996) & Pub. L. No. 104-99, § 211, 110 Stat. 26, 37-39 (1996) (enacting into law provisions of H.R. Conf. Rep. No. 104-378 (1995), including section 111(a), which extended quarterly fee payments into post-confirmation period);

- Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. I, § 109, 110 Stat. 3009, 3009-18-3009-19 (1996) (increasing quarterly fees and clarifying that quarterly fees requirement applies regardless of confirmation status of debtor's reorganization plan);

- Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, §§ 102 -105, 114 Stat. 2411 (2000) (increasing filing fee and conversion fee, and providing for fees under subsection (a)(7));

- Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, tit. III, § 325, 119 Stat. 23, 98-99 (2005), as amended by Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 6058, 119 Stat. 297 (2005) (increasing filing fees and changing percentage of fees allocated to Fund);

- Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. X, § 10101, 120 Stat. 4, 184 (2006) (increasing filing fees);

- Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. B, tit. II, §§ 212, 213, 121 Stat. 1844, 1914 (2007) (adjusting quarterly fees and directing deposit of fines into Fund);

- Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121, § 3, 126 Stat. 346, 348-349 (2012) (increasing filing fee and decreasing allocation of fees into Fund);

- Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, div. B, § 1004, 131 Stat. 1224, 1232 (2017) (increasing quarterly fees for largest chapter 11 debtors); and

- Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 219, 133 Stat. 2317, 2415 (2019) (altering precondition for increased quarterly fee).

**B.  Any Quarterly Fees Charged in Judicial Districts in Alabama and North Carolina Must "Equal" Those Charged in the Rest of the Country.**

27.  The U.S. Trustee Program currently operates in all jurisdictions except the six federal judicial districts in North Carolina and Alabama.  *See* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986); Pub. L. No. 106-518, § 501 (2000).  In those states, Judicial Branch employees known as bankruptcy administrators oversee bankruptcy cases.

28.  At first, payment of chapter 11 quarterly fees was required only in the 88 districts participating in the U.S. Trustee Program, and not in the six districts that instead have bankruptcy administrators.  But Congress later provided for quarterly fees in bankruptcy administrator districts, 28 U.S.C. § 1930(a)(7), after a divided panel of the Ninth Circuit held the law requiring quarterly fees to be paid only in United States Trustee districts but not in bankruptcy administrator districts to be unconstitutionally non-uniform.[8]  *See St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), *amended at* 46 F.3d 969 (9th Cir. 1995).

29.  After *Victoria Farms*, the Judicial Conference of the United States approached Congress and requested authority to charge quarterly fees in bankruptcy administrator districts, representing that "the Judicial Conference determined that implementing the establishment of chapter 11 quarterly fees in the bankruptcy administrator districts would eliminate any *Victoria Farms* problem."  *See* Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and

---

[8] The Ninth Circuit struck down a statute which extended the time for North Carolina and Alabama to opt-in to the United States Trustee system, but did not strike down the quarterly fees provision, instead ordering the debtor to pay all quarterly fees owed.  *Victoria Farms, Inc.*, 38 F.3d at 1534.

Federal Courts Improvement Act of 1999: Hearing before the Subcomm. on Courts and Intellectual

Property of the H. Comm. on the Judiciary on H.R. 2112 and H.R. 1752,[9] 106 Cong. (1999) ("1999

H. Subcomm. Hearing") at 26-27 (statement of Harvey F. Schlesinger, Judge, U.S. District Court

for the Middle District of Florida), available at:

 http://commdocs.house.gov/committees/judiciary/hju62501.000/hju62501_0f.htm  (attached  as

**Exhibit A**).[10]

30.    In 2000, Congress granted the Judicial Conference's request and amended the

quarterly fee statute to add section 1930(a)(7).  In keeping with the goal of eliminating any

uniformity concern, section 1930(a)(7) specifies that in the bankruptcy administrator districts "the

Judicial Conference of the United States may require the debtor in a case under chapter 11 of title

11 to pay fees *equal* to those imposed by paragraph (6) of this subsection." 28 U.S.C. § 1930(a)(7)

(emphasis added).[11]

31.    After Congress enacted section 1930(a)(7), the Judicial Conference promptly

exercised this new authority to impose quarterly fees in bankruptcy administrator districts equal to

those imposed under section 1930(a)(6).  Report of the Proceedings of the Judicial Conference of

---

[9] H.R. 1752 is the House of Representative's companion bill to the enacted Senate bill, S.2915, which became Pub. L. No. 106-518.  In that same legislation, Congress also removed the deadline for Alabama and North Carolina to merge into the United States Trustee system.  S*ee* Pub. L. No. 106-518, § 501 (2000).

[10]  Each website cited in this objection was last viewed on January 27, 2020.

[11] Quarterly fees collected in the bankruptcy administrator districts are deposited into a special fund to offset congressional appropriations for federal courts.  *See* 28 U.S.C. §§ 1930(a)(7) & 1931.

the United States (Sept./Oct. 2001) at 45-46 (emphasis added), available at http://www.uscourts.gov/sites/default/files/2001-09_0.pdf (attached as **Exhibit B**).

32.     Significantly here, the Judicial Conference took care to direct that the quarterly fees in bankruptcy administrator districts be assessed "in the amounts specified in 28 U.S.C. § 1930, *as those amounts may be amended from time to time,*" 2001 JCUS Report at 46 (emphasis added) ("2001 Directive"), thereby ensuring that if Congress changed section 1930(a)(6), fees imposed in bankruptcy administrator districts would remain within the statute's limited grant of authority to assess equal fees.

### C.    Congress Temporarily Increased Fees in 2017 to Protect Taxpayers from Having to Subsidize the Program and to Fund Additional Judgeships.

33.     In October 2017, following a seven-year decline in bankruptcy filings, Congress amended section 1930(a)(6) to temporarily increase the quarterly fees when disbursements in a case equal or exceed $1 million during a quarter and the Fund balance was below $200 million at the end of the most recent fiscal year.  *See* H.R. Rep. No. 115-130, at 7-8; Dep't of Justice U.S. Tr. Program FY 2018 Performance Budget Cong. Submission at 9, available at: https://www.justice.gov/file/968761/download ("UST FY 2018 Submission").    The new subparagraph (B) provided:

> (B) During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B).[12]  The 2017 amendment provides that it "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins

---

[12] The Consolidated Appropriations Act, 2020, enacted on December 20, 2019, changed the balance in the Fund required to trigger these increased fees in certain fiscal years.  It provides that

on or after the date of enactment" of the amendment.  Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified) (attached as **Exhibit C**).[13]  The first such quarter began more than two months after the enactment, on January 1, 2018.

34.     The need for an increase in fees became clear well before the 2017 amendment was passed.  In February 2015, because of this decrease in bankruptcy filings, the Justice Department suggested an increase in fees would be necessary in its congressional submission for fiscal year 2016.  *See* Dep't of Justice U.S. Tr. Program FY 2016 Performance Budget Cong. Submission at 7,  available at:

https://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/01/18._u.s._trustee_program_ustp.pdf ("To address the offsetting collection shortfall, the USTP plans to propose a temporary increase to the quarterly fee structure for chapter 11 cases . . . .").  The Department then proposed a temporary fee increase similar to what Congress enacted in October 2017 in its congressional submissions for each of the next two fiscal years.  *See* Dep't of Justice U.S. Tr. Program FY 2017 Performance Budget Cong. Submission, at 9, available at:

https://www.justice.gov/jmd/file/821021/download; UST FY 2018 Submission at 9.

35.     In February 2016—before Mosaic filed for bankruptcy—the President published his proposed budget for fiscal year 2017, which included the very fee increase that the Investment Trustee complains was unforeseeable:  "The quarterly fees for these large cases would be assessed

---

28 U.S.C. § 1930(a)(6)(B) "shall be applied for this fiscal year and next fiscal year by substituting '$300,000,000' for '$200,000,000.'"  Pub. L. No. 116-93, § 219, 133 Stat. 2317, 2415 (2019).

[13] Section 1004 of the amendment provides in relevant part:

> (c)  APPLICATION OF AMENDMENTS.—The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act.

at 1% of the disbursements with a $250,000 per quarter cap." Analytical Perspectives, Budget of the U.S. Gov't Fiscal Year 2017, p. 217, available at:

https://www.govinfo.gov/content/pkg/BUDGET-2017-PER/pdf/BUDGET-2017-PER.pdf.

36.    By 2017, the Fund's unrestricted balance was projected to be exhausted during fiscal year 2017. *See* UST FY 2018 Submission at 9. The Fund was thus predicted to fall $92 million short of offsetting the Program's appropriation for fiscal year 2017. *Id*.

37.    Without the Fund surplus from prior years, absent additional fees, the Fund would not have been able to fully offset appropriations to the United States Trustee Program for fiscal year 2017. *See id*. at 9. In other words, without a fee increase, taxpayers would have to fund the projected $92 million shortfall.

38.    Congress passed the 2017 amendment to avoid imposing these costs on taxpayers, and to fund additional 18 bankruptcy judgeships. *See* H.R. Rep. No. 115-130, at 7-8 (stating that the increase in quarterly fees for large chapter 11 cases was to provide needed funds for the operations of the United States Trustee Program, as well as to cover the costs of converting 14 temporary bankruptcy judgeships to permanent judgeships and adding four new bankruptcy judgeships).[14]

39.    The House Report states that the Judiciary Committee expected "based on informal estimates by [the Congressional Budget Office]" that the increased quarterly fees would increase revenues "by an amount sufficient to fully offset the increases in direct spending caused by the bill." *Id*. at 9. The day after the House Report was issued, the Congressional Budget Office gave Congress its Cost Estimate, which reflects that when it made its calculations it understood that the

---

[14] H.R. 2266 was later amended to extend the temporary judgeships rather than converting them to permanent judgeships. Pub. L. No. 115-72, div. B, § 1002 (codified at 28 U.S.C. § 152 note).

increased fees would apply to cases pending on the amendment's effective date. For example, the Cost Estimate states that the amendment would increase fees paid "by entities that are *currently* in Chapter 11 bankruptcy and that have disbursements of more than \$1 million per quarter." *See* Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 1 (May 18, 2017), available at: https://www.cbo.gov/system/files/2018-07/52739-hr2266.pdf (attached as **Exhibit D**) (emphasis added); *see also id*. ("The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases . . . ."); *id*. at 5 ("H.R. 2266 would . . . increase[e] the amount of fees paid to the DOJ by entities *that are already in bankruptcy* and that have disbursements . . . of more than \$1 million per quarter.") (emphasis added); *id*. at 6 ("Some portion of those [increased quarterly fee] collections would be from entities *already in bankruptcy* . . .") (emphasis added). *See also* CBO Estimate for H.R. 2266, with an Amendment—the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, at 2, available at: https://www.cbo.gov/system/files?file=115th-congress-2017-2018/costestimate/hr2266amend.pdf (attached as **Exhibit E**) (reiterating that the Bankruptcy Judgeship Act of 2017 would "adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases") (emphasis added).

40.     Notably, the 2017 amendment made the percentage charged in the largest chapter 11 cases more consistent with the percentages charged in smaller cases. Both before and after the 2017 amendment, in cases with disbursements of less than \$1 million, the fees range between 0.49% to more than 4% of quarterly disbursements. By contrast, before the 2017 amendment, cases with \$1 million or more in disbursements paid a fee ranging between 0.07% to 0.65%, but never *more* than 0.65%—while the fees were never *less* than 0.65% in cases with less than \$300,000 in disbursements. Even after the 2017 amendment, high-disbursement cases still never

pay a fee of more than 1% in stark contrast to the more than 4% paid in some other cases.    The

difference is illustrated in this chart:[15]

| Disbursements per quarter | $ 0 – $999,999 (pre- and post-amendment) | ≥ $ 1 million (post-amendment) | ≥ $ 1 million (pre-amendment) |
|---|---|---|---|
| Fee as % of disbursements | 0.49% – > 4.33% | 1% or less | 0.07% – 0.65% |

## III.    The 2017 Amendment Does Not Violate Any Constitutional Uniformity Requirements.

41.    The Investment Trustee has not satisfied her burden to show that Congress

exceeded its constitutional powers under either the tax Uniformity Clause or the Bankruptcy

Clause by passing the 2017 amendment.

### A.    The Tax Uniformity Clause Does Not Apply to the Quarterly Fee.

42.    The tax Uniformity Clause has no bearing on this issue because quarterly fees

imposed under section 1930(a)(6) & (7) are not "Duties," "Imposts," or "Excises."  U.S. Const.

Art. I, § 8, cl. 1.  *See* Motion ¶ 26.  Rather they are user fees, payable only by or on behalf of

debtors, for the purpose of funding the bankruptcy system they are using and benefiting from.  28

U.S.C. § 1930(a)(6).

43.    User fees are fees assessed by the government against users or beneficiaries of

government-provided services intended to reimburse the government for its costs in providing the

service or benefit.  *In re Exide Techs.*, 2020 WL 211400, at * 7; *see Sperry*, 493 U.S. at 60.

Congress established the quarterly fee "[f]or the purpose of recovering the cost of services of the

United States Trustee System" 28 U.S.C. § 589a(b), so that the U.S. Trustee Program "*will be paid*

---

[15] The chart calculates the fees due as a percentage of the disbursements as set forth in the statute, rounded to the nearest hundredth.

*for by the users of the bankruptcy system*."  H.R. Rep. No. 99-764, at 22 (emphasis added).  The quarterly fee is thus a user fee, as courts have found.  *See, e.g*, *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 554 (3d Cir. 1999); *In re Exide Techs.*, 2020 WL 211400, at * 7.  This is consistent with the quarterly fee provision's inclusion in 28 U.S.C. § 1930, which sets forth fees paid by parties in bankruptcy cases.

44.     User fees are not subject to the constitutional limitations on the Government's power to tax, and thus are "outside the scope of the [tax] Uniformity Clause's prohibitions." *Thomson Multimedia Inc. v. United States*, 340 F.3d 1355, 1363-64 (Fed. Cir. 2003).  *Accord Augusta Towing Co. v. United States*, 5 Cl. Ct. 160, 167 (Ct. Cl. 1984) (denying challenge under tax Uniformity Clause because "[a] user charge . . . is not subject to the constitutional limitations on the Government's power to tax, including the Tax Uniformity clause.").  *See Massachusetts v. U.S.*, 435 U.S. 444, 462 (1978) (explaining that the Supreme Court's decisions "have consistently recognized that the interests protected by [various taxing] Clauses are not offended by revenue measures that operate only to compensate a government for benefits supplied.").[16]  Because the quarterly fee is a user fee, the tax Uniformity Clause does not apply here.

45.     Even if this clause applies to the quarterly fee statute, Congress did not violate it.  As discussed in Section II.B *supra* and below, the statute enacted by Congress is uniform.

**B.      The Law is Uniform Because the Statute Requires Equal Fees Everywhere.**

46.     The Investment Trustee's claim of non-uniformity is erroneous because the statutes governing quarterly fees are uniform on their face.  Sections 1930(a)(6) and (7) govern the imposition of quarterly fees in chapter 11 cases.  Section 1930(a)(6) applies throughout all U.S.

---

[16] The Investment Trustee concedes as much.  Motion at ¶ 29 ("The distinction between whether the Amendment is unconstitutional under the [tax] Uniformity Clause or the Bankruptcy Clause comes down to whether UST fees are viewed as a tax or a user fee.").

Trustee Program districts, imposing the same fee schedule in every district.  Section 1930(a)(7), in turn, mandates that quarterly fees in bankruptcy administrator districts be "equal to those imposed by [section 1930(a)(6)]."  Congress thus established a regime in which the same quarterly fees are required in every federal judicial district, regardless of whether that district participates in the U.S. Trustee Program.  Thus, the "Laws" governing quarterly fees are "uniform."  *In re Exide Techs.*, 2020 WL 211400, at *12; *In re Clinton Nurseries*, 608 B.R. at 117.  *Cf.* U.S. Const. art. I, § 8, cl. 4.

47.    As *Exide* explained, Congress provided in section 1930(a)(7) that fees imposed for the bankruptcy administrator districts "had to be equal to the fees in UST districts," — a uniformity requirement "the Judicial Conference acknowledged" when it "stat[ed] that it would impose fees equal to those specified in section 1930(a)(6) 'as those amounts may be amended from time to time.'"  2020 WL 211400, at *12 (citing 2001 JCUS Report at 45-46).

48.    This statutory uniformity requirement meant the 2017 amendment increased fees equally in both UST districts and bankruptcy administrator districts beginning on January 1, 2018.  *See In re Clinton Nurseries*, 608 B.R. at 117 n.28; *In re Exide Techs.*, 2020 WL 211400, at *12.

49.    The Motion rests on the fundamentally mistaken view that "when enacted, the Amendment only applied to those judicial districts that are administered by the United States Trustee Program."[17]  Motion ¶ 21.  The 2017 amendment contained no such limitation.  The fact

---

[17] The Investment Trustee compounds this error by arguing that "'[u]nder any standard of review, when Congress "provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary.'"  Motion ¶ 28 (quoting *In re Buffets, LLC*, 597 B.R. 588, 595 (Bankr. W.D. Tex. 2019), *appeal pending sub nom. Hobbs v. Buffets, LLC*, No. 19-50765 (5th Cir.)) (quoting *Victoria Farms*, 38 F.3d at 1532).  Yet the *Victoria Farms* panel had reconsidered and amended its decision to strike that very statement, something that both *Buffets* and the Motion failed to acknowledge.  46 F.3d 969 (9th Cir. 1995).  The passage was struck for good reason.  The Supreme Court has held that Congress need not state its reasons for a law to pass rational-basis review.  *See FCC v. Beach Comms.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a

that the bankruptcy administrator districts did not promptly implement the new fees does not call the constitutionality of the legislation into question.  As two bankruptcy courts have explained in rejecting that reasoning, "[t]he 2017 Amendments did *not* increase quarterly fees in the UST districts only," because "[a]s soon as the higher fees imposed by the 2017 Amendments went into effect in UST districts, 28 U.S.C. § 1930(a)(7) *automatically* operated to mandate higher fees in [bankruptcy administrator] districts."  *In re Clinton Nurseries*, 608 B.R. at 117 n.28 (first emphasis added).  *Accord In re Exide Techs.*, 2020 WL 211400, at *12 (holding "the 2017 Amendment should have been self-executing in BA districts").

50.     Any failure of bankruptcy administrators to implement the amended fee schedule in January 2018 was inconsistent not only with the statute but also with the Judicial Conference's standing instructions that quarterly fees "be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C § 1930, as those amounts may be amended from time to time," 2001 JCUS Report at 46 (**Exhibit B**), and the administrators' duty to "promptly carry into effect" those orders.  28 U.S.C. § 331.  It is not apparent why bankruptcy administrators failed to adhere to the 2001 Directive or section 1930(a)(7).

51.     As *Clinton Nurseries* explains, the use of the term "may" in section 1930(a)(7) does not change this conclusion.  608 B.R. at 115.  "'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"  *Id*. (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  The statute authorizes the Judicial Conference to impose fees "equal to those imposed by" section

---

legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

1930(a)(6) and no others.  *Cf. Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004)

(rejecting argument that "may" should be read permissively to authorize both actions that satisfy

the subsequent condition specified in the statute and those that do not).  Any other reading would

render the words "equal to" superfluous, contrary to basic principles of statutory interpretation.

*See, e.g., Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018).  "[B]y stating that the

Judicial Conference may require equal fees, Congress implied that the Judicial Conference could

not require fees that were not equal."  *In re Clinton Nurseries*, 608 B.R. at 115.

52.    The Judicial Conference's belated decision to require bankruptcy administrator

districts to implement the increased fee schedule only as of October 1, 2018, and only for newly

filed cases, also does not implicate the constitutionality of the statute.  Nothing in the 2017

amendment authorized the Judicial Conference to take that action.  To the contrary, section

1930(a)(7) plainly requires the imposition of fees "equal to those imposed" under section

1930(a)(6).  Any non-uniformity in practice thus is attributable not to the laws enacted by

Congress, but by the differential implementation of those laws.  *See, e.g., In re Clinton Nurseries*,

608 B.R. at 113 & 115-16 (agreeing that the quarterly fee statute is "uniform on its face" and that

the different fees assessed across districts was "the consequence of the Judicial Conference's late,

and only prospective, implementation of fee increases [on] October 1, 2018," which was "contrary

to the text of 28 U.S.C. § 1930(a)(7)"); *In re Exide Techs.*, 2020 WL 211400, at *12 (holding that

the failure to properly enforce the 2017 amendment in bankruptcy administrator districts did "not

render the law itself non-uniform"); *cf. Rosenberg v. United States*, 72 Fed. Cl. 387, 395-96 (Ct.

Fed. Cl. 2006) (holding that complaint alleging that IRS engaged in "*ultra vires* and nonuniform

collection" of a tax did not allege a violation of the tax Uniformity Clause, U.S. Const., art. I, § 8,

cl. 1, because "[t]he Uniformity Clause . . . is a limitation on legislative, not executive, action");

*Peony Park v. O'Malley*, 121 F. Supp. 690 (D. Neb. 1954) (rejecting tax uniformity challenge where statute was uniform but enforcement was not), *aff'd*, 223 F.2d 668 (8th Cir. 1955).

53.    It would be particularly inappropriate to interpret the law as non-uniform given that Congress enacted section 1930(a)(7) precisely to address any perceived uniformity problem.  The enactment of section 1930(a)(7) occurred in response to the Ninth Circuit's split decision in *Victoria Farms*, which had (erroneously) held that it was unconstitutional to charge quarterly fees only in U.S. Trustee Program districts.   38 F.3d at 1531-32.  In response to that decision, rather than advocating for elimination of the bankruptcy administrator program (the remedy preferred by the Ninth Circuit), the Judicial Conference recommended that Congress authorize the imposition of quarterly fees in bankruptcy administrator districts.  *See* 1999 H. Subcomm. Hearing at 26-27.  Congress enacted section 1930(a)(7) pursuant to that recommendation.  *See In re Clinton Nurseries*, 608 B.R. at 116 ("[T]he very reason why 28 U.S.C. § 1930(a)(7) was enacted in the first place [was] to avoid the constitutional issue identified in *Victoria Farms*.").  It would subvert congressional intent to read a statutory provision specifically adopted to ensure uniformity between the bankruptcy administration systems as continuing to allow the very non-uniformity it was designed to prevent.

## C.    Even If the 2017 Amendment Applied Only in United States Trustee Districts, Such Application Is Within the Scope of Constitutional "Uniformity."

54.    As Judge Walrath recently determined in Delaware, the 2017 amendment is uniform for the separate and independent reason that section 1930(a)(6) is uniform on its own terms.  *In re Exide Techs.*, 2020 WL 211400, at *12.

55.    There is "flexibility inherent" in the Bankruptcy Clause that tolerates significant differences in application of bankruptcy laws.  *Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 158 (1974) (rejecting uniformity challenge to statute that applied only in a single

statutorily defined region because "it overlooks the flexibility inherent in the constitutional provision"). Only once in the nation's history has the Supreme Court held that a statute violated the Bankruptcy Clause. It did so because the challenged act, by its terms, applied to only one regional bankrupt railroad; therefore, the statute was "nothing more than a private bill," which the Framers sought to prevent by adopting the Bankruptcy Clause. *Ry. Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 470-72 (1982). The same flexible standard of uniformity applies under the tax Uniformity Clause. *Blanchette*, 419 U.S. at 159-60 ("Our construction of the Bankruptcy Clause's uniformity provision comports with this Court's construction of other 'uniform' provisions of the Constitution.").

56.     The Supreme Court has explained in the tax context that "[i]t was settled fairly early that the [Uniformity] Clause does not require Congress to devise a tax that falls equally or proportionately on each State." *United States v. Ptasynski*, 462 U.S. 74, 82 (1983). Rather, "a "tax is uniform when it operates with the same force and effect in every place where the subject of it is found." *Id.* (quoting the *Head Money Cases*, 112 U.S. 580, 594 (1884)).

57.     As this makes clear, constitutional uniformity does not "prevent Congress from defining the subject of a tax by drawing distinctions between similar classes." *Id.* For example, it was constitutionally permissible for Congress to tax persons who immigrated through the ports, but not those who immigrated at inland cities. *Id.* (citing *Head Money Cases*, 112 U.S. at 595). As long as the tax applied to all ports alike, then "there is substantial uniformity within the meaning and purpose of the Constitution." *Id.* (quoting *Head Money Cases*, 112 U.S. at 595).

58.     Similarly, the uniformity requirement does not prohibit Congress from writing laws that apply to a statutorily defined geographic region if the legislation addresses a geographically isolated problem. *Blanchette*, 419 U.S. at 159-60. The Supreme Court held in a bankruptcy case

23

that the Uniformity Clause "was not intended to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions." *Id.* at 159 (quotation marks and citation omitted). Rather, legislation may focus on "the evil to be remedied," *id.* at 161 (quoting the *Head Money Cases*, 112 U.S. at 595), wherever that evil exists.

59.    For these reasons, the *Exide* court held that "section 1930(a)(6) is uniform, because it applies with the same force and effect in every place where the subject of it is found—that is, in all UST districts." *In re Exide Techs.*, 2020 WL 211400, at *12. The *Exide* court also concluded that the 2017 amendment "addresses a geographically isolated problem that is confined to UST districts, namely the depletion of the UST System Fund." *Id.* Because the depletion of the Fund "is only a problem in UST districts," it was "proper for Congress to increase the fees in those districts to solve that problem." *Id.* (citing *Blanchette*, 419 U.S. at 160).

60.    *Exide's* analysis is like the Eighth Circuit's ruling in *In re Prines*, 867 F.2d 478, 485 (8th Cir. 1989). When the United States Trustee Program was gradually rolled out across the country, it was expanded with different effective dates for districts that participated in the initial pilot program than for those that did not. *Id.* at 482-83. The Eighth Circuit upheld the different effective dates, and the accompanying quarterly fees, against the debtors' constitutional attack. *Id.* at 480. The court rejected the argument that heightened scrutiny was required because of the uniformity provision of the Bankruptcy Clause and acknowledged Congress's authority to establish classifications in its legislation on a rational basis standard. *Id.* at 485. The Eighth Circuit further held that debtors were treated equally because "pending cases are subject to the quarterly fee assessment only if the [United States] trustee has authority over them." *Id.* at 485.

61.    Since quarterly fees under subsection (a)(6) operate "with the same force and effect in every place where" United States Trustees administer bankruptcy cases, *Ptasynski*, 462 U.S. at

82 (quoting the *Head Money Cases*, 112 U.S. 580, 594 (1884)), and the 2017 amendment applies in those districts to remedy a problem—the depletion of the UST System Fund—that only exists in those districts, then constitutional uniformity under either the tax Uniformity Clause or the Bankruptcy Clause is satisfied.

### D.    The Quarterly Fee Statute Is Not a Substantive Bankruptcy Law and Thus Does Not Implicate the Uniformity Provision of the Bankruptcy Clause.

62.    To be subject to the uniformity requirement of the Bankruptcy Clause, a law must be one "on the subject of Bankruptcies."  U.S. Const. art. 1, § 8, cl. 4.

63.    The Supreme Court has defined "bankruptcy" as the "'subject of the relations between [a] . . . debtor and his creditors, extending to his and their relief.'"  *Gibbons,* 455 U.S. at 466 (quoting *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1948)); *see also Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902) ("The subject of 'bankruptcies' includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligation of contracts, and this the states were forbidden to do.").  In other words, "Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'" [18]  *Gibbons,* 455 U.S. at 466 (quoting *Cont'l Ill. Nat. Bank & Trust v. Chicago, R.I. & P.R. Co.*, 294 U.S. 648, 673 (1935)).

---

[18] *See also Ashton v. Cameron Cty. Water Imp. Dist. No. 1*, 298 U.S. 513, 536-37 (1936) (explaining that the Court's consistent reading of the Bankruptcy Clause is that it says, in substance: "Congress shall have power to establish uniform laws on the subject of any person's general inability to pay his debts throughout the United States") (Cardozo, J., dissenting) (internal quotation marks omitted); *United States v. Pusey*, 27 F. Cas. 631, 632 (C.C.E.D. Mich. 1872) ("The 'subject of bankruptcy,' in a general sense, concerns the relation of debtor and creditor, and in a particular and no doubt stricter sense, concerns such relation in cases where the debtor is unwilling or unable to pay his debts.  Laws upon that subject have for their object the appropriation, either voluntarily or by compulsion, of the debtor's property to the payment of his debts, pro tanto, or in full, as the case may be, and the relief of honest debtors.") (quoting 4 Elliot, Deb. 282); *In re Reiman*, 20 F. Cas. 490, 493-94 (S.D.N.Y. 1874) ("'Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their

64.     In assessing Congress's Bankruptcy Clause powers, "it is important to bear in mind the distinction between the subject matter, bankruptcy, in regard to which congress is empowered to legislate, and the means, machinery or practice congress has prescribed for carrying that power into effect." *United States v. Pusey*, 27 F. Cas. 631, 632 (C.C.E.D. Mich. 1872).  As for the latter, the Constitution empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers."  U.S. Const. art. I, sec. 8, cl. 18.  *See also Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513 (1938) ("To this specific grant [of power by the Bankruptcy Clause], there must be added the powers of the general grant of clause eighteen. 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * * *.'"); *Pusey*, 27 F. Cas. at 633 ("The proceedings in bankruptcy do not constitute the end to be accomplished by a bankrupt act.  They constitute the machinery, so to speak, by which that end is to be obtained, viz.: the appropriation of the debtor's property to the payment of his debts.").

65.     Because section 1930 does not alter a debtor's obligations, it is not a law on the subject of bankruptcies within the scope of the Bankruptcy Clause's uniformity provision.  Instead, like other aspects of the "machinery" through which bankruptcy laws are implemented, it is authorized by Congress's broad powers under the Necessary and Proper Clause.

      **1.**    **Section 1930(a)(6) is not a law "on the subject of Bankruptcies" because it does not adjust a failing debtor's obligations; it is an administrative funding mechanism authorized by the Necessary and Proper Clause.**

66.     Section 1930(a)(6) provides a funding mechanism for the efficient administration of bankruptcy matters, including paying for additional bankruptcy judgeships—it does not alter

---

debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts.'") (quoting Story, Const. § 1113).

26

substantive bankruptcy law. *See Gibbons,* 455 U.S. at 466; *In re Reese*, 91 F.3d 37, 39-40 (7th Cir. 1996); *cf. U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 (3d Cir. 1999) ("Congress's mandate requiring payment of post-confirmation quarterly fees is not an effort to alter the terms of pre-existing debts; rather, it creates a new expense that did not exist before the plan was confirmed.") (internal quotations omitted).

67.    Rather than altering the legal relationship between a bankrupt debtor and the debtor's creditors, bankruptcy fees reflect an exercise of Congress's "broad power" under the Necessary and Proper Clause to enact laws in order to implement its constitutionally enumerated bankruptcy power. *See United States v. Comstock*, 560 U.S. 126, 133-34 (2010) ("[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'") (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 413, 418 (1819)).

68.    Bankruptcy courts that have concluded that section 1930(a)(6) is a law "on the subject of Bankruptcies" did not consider the distinction between laws that are within the enumerated power versus those that are within Congress's broad "necessary and proper" powers. *See In re Clinton Nurseries, Inc.*, 608 B.R. at 112; *In re Life Partners Holdings*, 606 B.R. 287-88. For example, the recent *Clinton Nurseries* decision's quotation of *United States v. Fox*, 95 U.S. 670, 672 (1878), to support its holding omits the first sentence of the following statement:

> There is no doubt of the competency of Congress to provide, by suitable penalties, for the enforcement of *all legislation necessary or proper* to the execution of powers with which it is intrusted.  And as it is authorized 'to establish uniform laws on the subject of bankruptcies throughout the United States,' it may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system.

*Fox*, 95 U.S. at 672 (emphasis added); *In re Clinton Nurseries, Inc.*, 608 B.R. at 112.[19]

69.     The full quote makes clear that the Supreme Court was referring to Congress's broad powers under the Necessary and Proper Clause—not its power under the Bankruptcy Clause—in stating that Congress "may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system." *Fox*, 95 U.S. at 672. *Accord Comstock*, 560 U.S. at 136 ("Congress routinely exercises its authority [under the Necessary and Proper Clause] to enact criminal laws in furtherance of, for example, its enumerated powers . . . to regulate bankruptcy . . . ."); *Pusey*, 27 F. Cas. at 632-633 (holding the Necessary and Proper Clause empowered Congress to pass a law criminalizing certain transfers made within three months before filing for bankruptcy). *Cf. United States v. Fisher*, 6 U.S. 358, 396 (1805) (holding statute granting United States priority on debts of insolvent debtors was constitutionally authorized by Necessary and Proper Clause because "[t]he government is to pay the debt of the union, and must be authorized to use the means which appear to itself most eligible to effect that object").

70.     Because section 1930(a)(6) does not alter a bankrupt debtor's obligations to his or her creditors, it is not a law "on the subject of Bankruptcies," to which the Bankruptcy Clause applies.

---

[19] The *Clinton Nurseries* court also relied on *In re Klein*. *In re Clinton Nurseries, Inc.*, 608 B.R. at 112. In that case, Justice Canton, riding circuit, stated that Congress's power under the Bankruptcy Clause "extends to all cases where the law causes to be distributed the property of the debtor among his creditors; this is its least limit. Its greatest is the discharge of a debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of Congress." *Klein*, 42 U.S. 277, 14 F. Cas. 716, 718 (C.C.D. Mo. 1843). As later explained by *In re Reiman,* another case cited by *Clinton Nurseries*, 608 B.R. at 112, "[t]he views thus set forth [in *Klein*] proceed upon the well established principle that, *in making laws necessary and proper* to carry into execution the powers vested by the constitution in the government of the United States, congress possesses the choice of means, and may use any means which are, in fact, conducive to the exercise of a power granted by the constitution." *In re Reiman*, 20 F. Cas. 490, 494 (S.D.N.Y. 1874) (emphasis added).

###        2.        Merely having an effect on a debtor in bankruptcy does not make a law one "on the subject of Bankruptcies."

71.      *Victoria Farms*' conclusion that the extension of time for districts in Alabama and North Carolina to implement the United States Trustee Program was a law "on the subject of Bankruptcies," 38 F.3d at 1530-31, does not support holding that the 2017 amendment is such a law.

72.      The *Victoria Farms*' majority erroneously focused on the effect of the statute—rather than what it regulates—to determine whether it is subject to the Bankruptcy Clause.  *See Victoria Farms*, 38 F.3d at 1530-31 (reasoning that the United States Trustee Program has a "direct effect" upon debtors and creditors and higher fees have "a concrete effect" on the relief available to creditors).  Under Supreme Court precedent, the relevant question instead is whether a statute is a law that "contemplate[s] an adjustment of a failing debtor's obligations.'"  *Gibbons*, 455 U.S. at 466 (quoting *Cont'l Ill. Nat. Bank & Trust v. Chicago, R.I. & P.R. Co.*, 294 U.S. 648, 673 (1935)).

73.      The fact that a law has an effect on a bankruptcy right or remedy cannot mean, without more, that the law is one "on the subject of Bankruptcies" within the scope of the Bankruptcy Clause.  Any statute imposing or increasing a financial obligation, such as a property tax, a license fee, or a domestic support obligation, likewise could "reduce[] the amount of funds that the debtor can ultimately pay to his creditors."  *Victoria Farms*, 38 F.3d at 1531.  Such laws also have a direct impact on bankruptcy proceedings because failure to pay taxes or domestic support obligations can be grounds to dismiss or convert a case or to deny plan confirmation.  *See* 11 U.S.C. § 1112(b)(4)(I), (P); *id*. § 1129(b)(14), (d).  The Supreme Court has never intimated that taxes or laws imposing domestic support obligations would be "on the subject of Bankruptcies."

29

74.    Likewise, no one contends that local rules of bankruptcy procedure violate the uniformity provision, although there are geographical differences in such rules and they have a direct effect on debtors' and creditors' rights.  Local rules impact parties, for example, by providing for dismissal of cases for violations of certain rules.  *See, e.g.*, Bankr. N.D. Tex. R. 1007-1 (providing that failure to file mailing list is "cause for summary dismissal"); Bankr. E.D. Va. R. 1006-1(C)(1) (providing for dismissal if filing fee is not paid within three-day cure period and no hearing is requested).

75.    Nor does anyone contend that the fact that some jurisdictions have bankruptcy appellate panels ("BAPs"), and others do not, violates the Bankruptcy Clause.  Under 28 U.S.C. § 158(b)(6), appeals may be heard by BAPs only in districts in which the district court judges authorize this by majority vote.  Currently, only five circuits have BAPs: the First, Sixth, Eighth, Ninth, and Tenth Circuits.  The availability of BAPs can affect litigants, as statistics have shown that, (i) in at least some districts, BAPs resolve appeals more quickly, and, (ii) overall, parties appeal BAP decisions to circuit courts at half the rate that they appeal decisions from district courts in bankruptcy appeals.  *See* COURT INSIDER: WHAT IS A BANKRUPTCY APPELLATE PANEL? (November 26, 2012), available at: https://www.uscourts.gov/news/2012/11/26/court-insider-what-bankruptcy-appellate-panel.  Yet, the lack of uniformity as to the availability of BAPs to appellate litigants is not in question, nor need it be.  Neither the law governing BAPs, nor the law governing fees in bankruptcy cases, are substantive bankruptcy laws that fall within the purview of the Bankruptcy Clause.

76.    Statutes establishing fees for court cases are akin to these rules of procedure; while they may have a practical effect on the parties, they do not alter the rules of decision by which courts will adjudicate debtors' or creditors' rights.  *Cf. Shady Grove Orthopedic Assocs. PA v.*

*Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (plurality opinion) (explaining that the test for whether a rule is substantive or procedural "is not whether the rule affects a litigant's substantive rights" but whether "it alters 'the rules of decision by which [the] court will adjudicate [those] rights'") (alterations in original, quoting *Mississippi Publ'g Corp. v. Murphree*, 326 U.S. 438, 445 (1946)); *see also id.* at 435 (categorizing filing fees as procedural) (Stevens, J., concurring in part and concurring in the judgment).

77.    Because section 1930(a)(6) does not modify any rights or remedies as between a bankrupt debtor and its creditors, *see supra* Part III.D.1, it is not a law "on the subject of Bankruptcies."  U.S. Const. art. I, § 8, cl. 4.

**E.    Even If the Law Were Unconstitutionally Non-Uniform, the Remedy Requested Would Be Improper.**

78.    Even assuming that the law is unconstitutionally non-uniform, this would not excuse the Trust from paying the fees required by Congress.  Of course, "[w]hen the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of equal treatment."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017) (brackets omitted).  But that result "can be accomplished" in one of two ways, and '[t]he choice between these outcomes is governed by the legislature's intent, as revealed by the statue at hand."  *Id.* at 1698-99; *see id.* at 1698 (noting, in context of government benefits, that equal treatment "can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class").

79.    It cannot be reasonably disputed which remedial "outcome[]" Congress would choose here.  *Id.* at 1698.  Any differences in the fees assessed between the 88 U.S. Trustee Program districts and the 6 bankruptcy administrator districts are the result of the latter districts' failure to follow Congress's express instruction to impose fees "equal to those imposed by [section 1930(a)(6)]," 28 U.S.C. § 1930(a)(7).  Indeed, "had the Judicial Conference implemented the

31

quarterly fees in BA districts without any change in the UST's actions, the Debtors would have nothing to complain of under the facts alleged." *In re Clinton Nurseries*, 608 B.R. at 120.  To the extent this case presents any problem of constitutional dimension, the appropriate remedy would be to require nationwide adherence to the statute as written—*not* to compel the U.S. Trustee to disregard the statute. *See id*. at 121 ("[T]he remedy does not lie in striking down the law or forcing the UST to disregard the law as written.").

**F.    The Fees Were Uniform through August of 2018 when the Judicial Conference's 2001 Directive Was Superseded by the Current Fee Schedule.**

80.    The Judicial Conference's 2001 Directive required the quarterly fees imposed in bankruptcy administrator districts to conform to all amendments to subsection 1930(a)(6).  *See* 2001 JCUS Report at 45-46 (quarterly fees to "be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, *as those amounts may be amended from time to time*.") (emphasis added) (attached as **Exhibit B**).

81.    The 2001 Directive remained in effect until the Judicial Conference, through its Executive Committee, approved the current fee policy at its August 9-10, 2018 meeting, which imposes the amended fees only in cases filed on or after October 1, 2018.  The 2001 Directive thus was in effect in October of 2017 when Congress amended section 1930(a)(6) to increase the quarterly fees in larger cases and in January of 2018 when the 2017 amendment became effective.

82.    In accordance with the 2001 Directive, the fees in the bankruptcy administrator districts automatically increased on January 1, 2018, to conform to the 2017 amendment to section 1930(a)(6), whether or not the bankruptcy administrators collected the amended fees.  As judicial employees, the bankruptcy administrators were required to comply with the 2001 Directive.  *See* 28 U.S.C. § 331.  They had no discretion not to charge the amended fees.

83. Thus, the fees, which were uniform across all judicial districts before the 2017 amendment, were still uniform after the 2017 amendment became effective on January 1, 2018. The current fee policy did not create a disparity between fees charged in United States Trustee districts and fees charged in bankruptcy administrator districts until the Judicial Conference adopted the current quarterly fee policy in August of 2018. Before that, the fees were the same in all districts. The Judicial Conference's approval of a non-uniform policy in August does not retroactively render unconstitutional the uniform fees imposed for the first two quarters of 2018.

84. Consequently, if this Court determines that the 2017 amendment runs afoul of constitutional uniformity requirements but rejects the Investment Trustee's other arguments, the Trust could recover no more than $20,161.49—the total amount allegedly overpaid for the third quarter of 2018 and the second quarter of 2019, *see* Motion ¶ 12.

## IV. The 2017 Amendment's Application Only to Disbursements After Its Enactment Date Is Prospective in Every Case, But Even If Retroactive, It Would Not Violate Due Process.

85. The Investment Trustee argues that the 2017 amendment does not apply to this case under retroactivity principles, Motion ¶¶ 15-19, and would violate the Due Process Clause of the Constitution if it did. *Id.* ¶¶ 31-35. The Investment Trustee is wrong.

86. The Supreme Court has set forth the "sequence of analysis when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute's enactment." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006). This Court must "first look to 'whether Congress has expressly prescribed the statute's proper reach,'" *id.* (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994)), or in the absence of such express language, this Court must determine the "temporal reach specifically intended" by applying "'normal rules of construction.'" *Id.* (quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). "If that effort fails," this Court must "ask whether applying the statute

33

to the person objecting would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.' " *Id.* (quoting *Landgraf*, 511 U.S. at 278).  Only "[i]f the answer is yes," must this Court "then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question."  *Id.*

87.    The 2017 amendment applies by its plain language and normal rules of statutory construction to all chapter 11 cases that have qualifying disbursements after January 1, 2018.  That application is prospective, not retroactive, because it applies only to disbursements made two months or more after the statute's enactment.  Even if the amendment's application to pending cases were considered retroactive, such application does not violate the Due Process or Clause.

**A.    The 2017 Amendment Applies to All Qualifying Disbursements Made After Its Enactment Date, with No Exception for Previously Filed Cases.**

88.    Under the 2017 amendment's plain language, it applies to disbursements in this case of $1 million or more in a quarter beginning on or after January 1, 2018.

89.    Section 1930(a)(6)(B) expressly states that it applies "[d]uring each of fiscal years 2018 through 2022."  28 U.S.C. § 1930(a)(6)(B).  In addition, the 2017 amendment expressly provides that it "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after the date of enactment" of the amendment.  Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified) (attached as **Exhibit C**)

90.    The amendment was enacted on October 26, 2017, so under the amendment's plain language, "disbursements" made on or after January 1, 2018 are subject to the 2017 amendment's temporary fee structure.

34

91.     Congress stated with precision both when the amendment became effective—roughly ten weeks after enactment—and to what it applied—disbursements made on or after January 1, 2018.  There is no statutory basis to exempt this case because it was filed prior to the enactment date of the amendment.

92.     Any attempt to re-write the 2017 amendment to exclude pending cases would be contrary to congressional intent and would undermine Congress's funding goals.  The Judiciary Committee recommended passage of the amendment to replenish the United States Trustee System Fund and to fund bankruptcy judgeships.  *See* H.R. Rep. No. 115-130, at 8.  The Committee expected the amendment to accomplish this goal in part based on an estimate from the Congressional Budget Office, *id*. at 9, which read the amendment to increase the fees paid "by entities *that are already in bankruptcy*"—not just those that file for bankruptcy after the amendment's effective date.   Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 5 (May 18, 2017) (emphasis added) (attached as **Exhibit D**); *see also id.* at 1 (stating amendment would increase fees paid "by entities that are *currently* in Chapter 11 bankruptcy and that have disbursements of more than $1 million per quarter") (emphasis added); *see also id*. ("The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases . . . .") (emphasis added).  It was based on this application to all open cases that the Congressional Budget Office concluded that the fee increase would fully offset the increases in direct spending.[20]  *Id*. at 9.

---

[20] The fact that the fee increase would apply to pending cases was essential to the Congressional Budget Office's analysis.  By statute, the Congressional Budget Office must determine whether the aggregate costs of "mandates" would be greater than certain statutory thresholds established in Unfunded Mandates Reform Act, 2 U.S.C. § 1501, *et seq*.  *See also* 2 U.S.C. §§ 651-658g (governing Congressional Budget Office duties).  According to the Congressional Budget Office's analysis, however, it was only because the fee increase applied to pending cases that it constituted a "mandate" that required this determination.  *See, e.g., id*. at 6 ("Some portion of those [increased

93.     Because Congress intended the increased fees to apply to cases pending on the amendment's effective date, it did not need to reconsider whether the increased fees were sufficient to meet its purpose. *Cf. Murphy v. NCAA*, 138 S. Ct. 1461, 1484 (2018) (holding that severing provision of law would be contrary to legislative intent where Congressional Budget Office's estimate that the law would impose no cost on the federal government "would certainly be incorrect" if the statute were severed).

94.     And, Congress was not operating on a blank slate when it amended the statute in 2017. Historically, the quarterly fee statute and amendments thereto have applied in pending cases. When Congress first enacted the quarterly fee statute in the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986), the Eighth Circuit squarely rejected the argument, similar to the one the Investment Trustee makes here, that the fees did not apply to cases pending in pilot districts on its effective date. *See In re Prines*, 867 F.2d 478, 484 (8th Cir. 1989) (rejecting debtor's argument that the quarterly fee statute enacted in Pub. L. 99-554, 100 Stat. 3088 (1986) did not apply to pending cases on its effective date, notwithstanding the relevant provision's failure to "expressly state" the fees would be assessed in pending cases, as "that is [the] plain meaning").[21]

95.     The government's reading is also consistent with the January 26, 1996 amendment to section 1930(a)(6), which applied quarterly fees to all open chapter 11 cases, including those in

---

quarterly fee] collections would be from entities *already in bankruptcy . . .* and those are the entities that would face a mandate under the act.") (emphasis added).

[21] The 1986 Act provided that in non-pilot districts the quarterly fees would not become effective until a specified period of time after the statute's general effective date. *See Prines*, 867 F.2d at 484; Pub. L. No. 99-554, § 302(d), 1986 U.S.C.C.A.N. 100 Stat. 3120-21. By contrast, for pilot districts, the Act contained no such provision for a delayed effective date. *In re Prines*, 867 F.2d at 483.

which a plan had been confirmed, but did not expressly reference pending cases.  *In re CF&I Fabricators of Utah, Inc.,* 150 F.3d 1233, 1235 (10th Cir. 1998) (regarding 1996 amendment to assess quarterly fees post-confirmation, noting 1995 House Conference Report reflected the intent to apply the fee in "both pending and new cases").

96.    That Congress enacted a clarification that the 1996 amendment applies to pending cases after some courts refused to do so does not change the fact that Congress intended the 1996 amendment to apply to pending cases in the first instance.[22]  *See NCNB Texas Nat. Bank v. Cowden*, 895 F.2d 1488, 1500 (5th Cir. 1990) (clarifying amendments to statutes simply "make what was intended all along even more unmistakably clear").  Having established that it meant what it said in the original 1996 amendment, Congress had no reason to think bankruptcy courts would again refuse to apply another quarterly fee amendment to pending cases.[23]

---

[22] *See* Omnibus Consol. Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-19 (1996) (clarifying that quarterly fees payable under 28 U.S.C. § 1930(a)(6) "shall accrue and be payable from and after January 27 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans").

[23] The *Life Partners* court also relied on a negative inference drawn from amendments to chapter 12 in the same legislation that enacted the 2017 amendment.  *See In re Life Partners Holdings*, 606 B.R. at 285 (citing Pub. L. No. 115-72, Div. B, § 1005(c), 131 Stat. at 1232-34).  But where two sections of the same legislation "address wholly distinct subject matters," as these do, no "negative inference" arises when one section "explicitly provides that it applies to pending cases" and the other section does not.  *Martin v. Hadix*, 527 U.S. 343, 355-56 (1999).  If anything, the amendment to chapter 12 supports application of the 2017 amendment to section 1930(a)(6) to all open cases because Congress expressly provided that the amendment did *not* apply to pending cases unless a plan had not yet been confirmed and there had been no discharge order.  This shows that if Congress did not want the fee increase to apply to all pending cases, it knew how to say that and would have said so explicitly, as it did with the chapter 12 amendment. It did not say that here.

**B.    The 2017 Amendment's Application to Disbursements Made After January 1, 2018 in Previously Filed Cases Is Prospective, Not Retroactive.**

97.    Contrary to the Investment Trustee's claim, Motion ¶ 19, application of the 2017 amendment to disbursements made in this case ten weeks or more after the amendment's effective date is entirely prospective.

98.    "To determine whether a statute's application in a particular situation is prospective or retroactive, we focus on the conduct which is implicated by the application of the statute.  '[A] statute's application is usually deemed prospective when it implicates conduct occurring on or after the [statute's] effective date.'"  *FDIC v. Faulkner*, 991 F.2d 262, 266 (5th Cir. 1993) (quoting *McAndrews v. Fleet Bank of Massachusetts*, 989 F.2d 13, 16 (1st Cir.1993)).

99.    In the 2017 amendment, Congress identified the relevant conduct—disbursements in a chapter 11 case—and expressly provided that the statute applied *prospectively* to such conduct on or after January 1, 2018, roughly ten weeks after its October 26, 2017 enactment.   The amendment does not affect the fees owed for any disbursements made before its effective date.

100.    Because it is triggered only by conduct that occurs after its enactment, the 2017 amendment is prospective, not retroactive.  *See Martin*, 527 U.S. at 360-61 (finding "no retroactivity problem" in applying new attorney compensation rate to attorney's work done after statutory amendment, in cases filed before the statutory amendment).

101.    This conclusion is buttressed by the vast weight of authority that reviewed similar quarterly fee challenges in the past.  These challenges arose when Congress first enacted the quarterly fee statute in 1986, *see* Pub. L. No. 99–554, § 302(d), 100 Stat. 3088 (1986), and then amended that statute in 1996 to require payment of quarterly fees after a reorganization plan was confirmed,  Pub. L. No. 104-91, § 101, (1996) & Pub. L. No. 104-99, § 211, 110 Stat. 26, 37-39 (1996).  On both occasions, challenges were brought claiming that application of the quarterly fee

requirement to pending cases would be impermissibly retroactive.  No fewer than three circuit courts, four district courts, and eight bankruptcy courts all rejected this argument.[24]  These courts agreed with the United States Trustee that the quarterly fee provision, which required payment of quarterly fees based on disbursements issued after the amendment's effective date, acted prospectively only.

102.    The Supreme Court's *Landgraf* decision undermines the Investment Trustee's contention that the amendment is retroactive as applied here.  A statute does not operate retroactively "merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law."  511 U.S. at 269 (citation omitted).  Nor is a law retroactive simply because its application requires some reference to antecedent facts.  *EPA v. New Orleans Pub. Serv., Inc.*, 826 F.2d 361, 365 (5th Cir. 1987) (holding that law altering classification of transformers for purposes of future matters is not retroactive).

103.    The 2017 amendment does not attach new legal consequences to completed transactions as the Investment Trustee argues.  Motion ¶ 17.  It is no different from a new property tax.  *In re Exide Techs.*, 2020 WL 21400, at * 5; *see In re Circuit City*, 606 B.R. at 268.  Although

---

[24]  *U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 n.7 (3d Cir. 1999) (in dictum); *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237–38 (10th Cir. 1998); *In re Prines*, 867 F.2d at 485; *In re Harness*, 218 B.R. 163, 165 (D. Kan. 1998); *In re Post-Confirmation Fees*, 224 B.R. 793, 796 (E.D. Wash. 1998); *In re Prines*, 82 B.R. 110, 112 (D.S.D. 1987); *Vergos v. Uncle Bud's, Inc.*, No. 3-97-0296, 1998 WL 652542, at *8–9 (M.D. Tenn. Aug. 17, 1998); *In re A.H. Robins Co., Inc.*, 219 B.R. 145, 148 (Bankr. E.D. Va. 1998); *In re Richardson Serv. Corp.*, 210 B.R. 332, 334–35 (Bankr. W.D. Mo. 1997); *In re Munford, Inc.*, 216 B.R. 913, 916–17 (Bankr. N.D. Ga. 1997); *In re Driggs*, 206 B.R. 787, 791 (Bankr. D. Md. 1997); *In re McLean Square Assocs., G.P.*, 201 B.R. 436, 440–41 (Bankr. E.D. Va. 1996); *In re Foxcroft Square Co.*, 198 B.R. 99, 105 (Bankr. E.D. Pa. 1996); *Matter of Upton Printing*, 197 B.R. 616, 619–20 (Bankr. E.D. La. 1996); *In re Cent. Fla. Elec., Inc.*, 197 B.R. 380, 381–82 (Bankr. M.D. Fla. 1996).  To be sure, some bankruptcy courts held applying the quarterly fee requirement to pending cases was retroactive, but this was considered a minority opinion, *see In re Rhead*, 232 B.R. 175, 180 n.3 (Bankr. D. Ariz. 1999), and no appellate court so held.

the property may have been purchased prior to enactment of the tax, a new tax on that property is "uncontroversially prospective."  *See Landgraf*, 511 U.S. at 269 n.24 ("Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property.").

104.    Thus, for example, the Fifth Circuit has held that the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990 ("TRA")—which allowed the FDIC to enjoin certain asset transfers—applied prospectively, not retroactively, when the statute was applied to a pending lawsuit filed five years before the TRA's enactment date and the FDIC's injunction request was based on conduct that occurred prior to its enactment date.  *Faulkner*, 991 F.2d at 265-66.  The Fifth Circuit explained that the statute "implicates future conduct, in the sense that the asset freeze applies only to future transfers."  *Id*. at 266.  "Consequently, the district court's injunction—issued after the TRA's effective date and which limits only future transfers of assets— involved a prospective, rather than retroactive, application of the TRA, notwithstanding the fact that conduct supporting the issuance of the injunction occurred before the TRA's effective date." *Id*.

105.    The same is true here.  The 2017 amendment does not backdate collection of increased fees from the date a case was filed or the date a plan was confirmed.  The amendment only triggers prospective assessment of the increased fees based on disbursements made after the amendment's effective date.  Therefore, it does not operate retroactively as two bankruptcy courts have held.  *In re Exide Techs.*, 2020 WL 21400, at * 5; *see In re Circuit City*, 606 B.R. at 268.

40

C.      Even If the Amendment Applied Retroactively, It Would Be Constitutional.

106.    Retroactive statutes are often constitutional because the constitutional restraint upon enacting retroactive civil legislation is a "modest" one. *Landgraf*, 511 U.S. at 272. Laws adjusting the burdens and benefits of economic life are presumed to be constitutional and the burden is on the party complaining of a due process violation to establish that Congress has acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). "Under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 639 (1993). As long as there is a legitimate legislative purpose furthered by rational means, economic legislation meets the test of due process. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (rejecting due process challenge to retroactive statute requiring nearly $25 million payment by petitioners); *United States v. Carlton*, 512 U.S. 26 (1994) (upholding amendment to estate tax deduction that operated retroactively).

107.    Congress's amendment to the quarterly-fee statute raises no due process concerns. First, there can be no dispute that Congress had a "legitimate legislative purpose" in assessing bankruptcy fees to avoid imposing costs on taxpayers. *Carlton*, 512 U.S. at 30-31. The Supreme Court long ago held that "[t]he rational basis" for bankruptcy fees "is readily apparent" because Congress "sought to make the system self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large." *United States v. Kras*, 409 US 434, 488 (1973).

108.    Second, temporarily imposing a higher quarterly fee on the largest Chapter 11 debtors who are currently availing themselves of the bankruptcy system is plainly a "rational means" of achieving that goal. *Carlton*, 512 U.S. at 31.

41

109.    Congress provided that the fees would revert to their former levels at the end of fiscal year 2022, or if the Fund balance at the end of a prior fiscal year equals or exceeds $200 million.  Congress thus carefully calibrated the amount of the increase, while also ensuring the fees would decrease again when Congress judged that funding levels would be sufficient.

110.    Congress also acted rationally in applying the temporary fee increase in all pending cases, rather than only in cases filed after its effective date.  Application to all pending cases spreads the costs among all larger chapter 11 debtors using the bankruptcy system, instead of making comparatively fewer debtors shoulder the burden.  In addition, applying the temporary fee increase to a larger number of cases allowed Congress's funding goal to be met, and met more quickly.  *See* Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 5 (May 18, 2017) (relying on application of the fee increase to pending cases for cost and revenue estimates) (attached as **Exhibit D**).

111.    The quarterly fee increase was necessitated by a shortfall in revenue that had accrued over the course of several years such that, without an increase, the costs of the bankruptcy system would fall on taxpayers.  *See supra* ¶¶ 33-38.  While Congress could have chosen to impose the additional fees necessitated by that shortfall only on new debtors, it chose also to impose them on those who had benefited from the bankruptcy system during the time that the shortfall accrued—notably, a time during which the fees in the largest cases were disproportionately low as compared to the fees in smaller cases, *see supra* ¶¶ 39-40.

112.    The Supreme Court held it is even "proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them."  *Sperry*, 493 U.S. at 64.  *See also Carlton*, 512 U.S. at 32 ("Congress, of course, might have chosen to make up the unanticipated revenue loss through general

prospective taxation, but that choice would have burdened equally 'innocent' taxpayers.  Instead, it decided to prevent the loss by denying the deduction to those who had made purely tax-motivated stock transfers.  We cannot say that its decision was unreasonable."); *Usery*, 428 U.S. at 18 ("We find . . . that the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor . . . .").

113.    Because the 2017 amendment "approaches the problem of cost spreading rationally; whether a broader"—or narrower—"cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery*, 428 U.S. at 19.  Thus, the three circuit courts, four district courts, and seven of the eight bankruptcy courts that had rejected the notion that the prior amendments to the quarterly fee provision were retroactive, *see supra* n.24, all also agreed that even if the amendments were retroactive, they were supported by a rational legislative purpose and constitutional.[25]

114.    The Investment Trustee rests her due process argument on the unproven assertion that the debtors and creditors who voted for the plan had no opportunity to make an informed choice about the viability of the case or the plan because the plan had already been confirmed before there was any notice of the amendment.  Motion ¶ 33.  But parties have no constitutional right to insist that quarterly fees remain static.  And while fair notice is one of the interests protected by the Due Process Clause, *Landgraf*, 522 U.S. at 266, that fact does not alter the test for constitutionality:  whether Congress had a legitimate legislative purpose furthered by rational

---

[25] *In re Driggs* did not address the constitutional issue after the court concluded the amendment operated prospectively. 206 B.R. at 791.

means.[26]  Thus, "[w]hile an increase in the quarterly fees may not have been anticipated . . . that is insufficient to find the statute a violation of due process."  *In re Exide*, 2020 WL 211400, at *5.

115.    If "fair notice" were the sole test, retroactive legislation frequently would be overturned.  But the Supreme Court has routinely rejected due process challenges even where the statutory change or a new liability was not expected.  *See, e.g., Carlton*, 512 U.S. at 33 ("Although Carlton's reliance is uncontested—and the reading of the original statute on which he relied appears to have been correct—his reliance alone is insufficient to establish a constitutional violation."); *Usery*, 428 U.S. at 16 ("[I]t may be that the liability imposed by the Act . . . was not anticipated at the time of actual employment.  But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."); *Concrete Pipe*, 508 U.S. at 637 (same); *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (same).

116.    "This is true even though the effect of the legislation is to impose a new duty or liability based on past acts."  *Usery*, 428 U.S. at 16.  "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches."  *R.A. Gray & Co.*, 467 U.S. at 729.  As discussed above, Congress had a rational legislative purpose here.

117.    In any event, any "assumption" that quarterly fees would never change, *id.*, was "patently unreasonable."[27]  *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d at 1239.  No debtor

---

[26] The bankruptcy courts in *Life Partners* and *Buffets* similarly erred by focusing solely on what they perceived as a lack of fair notice, instead of applying the rational basis test.  *See In re Life Partners Holdings*, 606 B.R. 288-89; *In re Buffets, LLC*, 597 B.R. at 596-97.

[27] It is also not reflected in the Disclosure Statement, which recognized that facts could change. *See, e.g.,* Dkt. No. 489 at 5 of 22.

has a reasonable expectation that fees won't increase.  *See Gryphon at Stone Mansion, Inc.*, 166 F.3d at 557 n.7 (noting quarterly fees do not violate the Takings Clause "because, due to the vagaries of the bankruptcy process, there can be no reasonable expectation that the amount of the final distribution will remain fixed throughout the process").

118.    In fact, the Disclosure Statement that accompanied the Plan expressly warned parties that things could change significantly.  *See, e.g.*, Dkt. No. 489 at 5 of 222.

119.    Such an assumption was particularly unreasonable here because, *before* the Debtors filed for bankruptcy, the President already had published a budget proposing the very fee increase that they claim was completely unexpected.  *See* Analytical Perspectives, Budget of the U.S. Gov't Fiscal Year 2017, p. 217, available at:  https://www.govinfo.gov/content/pkg/BUDGET-2017-PER/pdf/BUDGET-2017-PER.pdf.  *Cf. R.A. Gray & Co.*, 467 U.S. at 732 (holding employers had ample notice of liability imposed by retroactive statute where legislative proposals debated by Congress included retroactive effective dates).

120.    The fact that the Plan had been confirmed prior to the 2017 amendment's enactment makes no difference.  As appellate courts have recognized, a reorganization plan can no more immunize a reorganized debtor from post-confirmation fee increases than it can from increased taxes or any of the other infinite number of potential increases to its post-confirmation costs of doing business.  *See Gryphon at Stone Mansion, Inc.*, 166 F.3d at 557; *In re CF & I Fabricators*, 150 F.3d at 1238; *In re A.H. Robins Co. Inc.*, 219 B.R. at 148; *In re Postconfirmation Fees*, 224 B.R. 793, 796 (E.D. Wash. 1998).  *See also Holywell Corp. v. Smith*, 503 U.S. 47, 58 (1992) ("Even if § 1141(a) [regarding the effects of a confirmed plan] binds creditors of the corporate and individual debtors with respect to claims that arose before confirmation, we do not see how it can bind the United States or any other creditor with respect to postconfirmation claims.").

45

121.    When Congress amended section 1930(a)(6) in 2017, it did so thoughtfully and carefully.  Congress ensured that the temporary increase in fees would not be charged if the Fund balance reached a certain level.  It set caps on fees.  And it provided for the temporary increase to expire.  This is a far cry from the sort of arbitrary or irrational action that could violate the Due Process Clause.

## V.    No Refund or Credit Is Payable until Appeals Have Been Exhausted.

122.    If the Investment Trustee prevails after all levels of review on its claim that the 2017 amendment does not apply to this case or is unconstitutional, the government will refund fees to the extent they were overpaid.  Congress authorized payments of refunds from (1) deposits to the System Fund and (2) annual appropriations for the necessary expenses of the United States Trustee Program, in its most recent annual appropriation law.  Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, 133 Stat. 2317, 2398 (2019).  The annual appropriation for 2020 was over $227 million, *id.*, and the Fund balance as of September 30, 2019 approached $135 million.  *See* Dept. of Justice, U.S. Trustee Program, Chapter 11 Quarterly Fees, available at: https://www.justice.gov/ust/chapter-11-quarterly-fees.

123.    Under federal law, however, the Investment Trustee may not enforce a money judgment, nor may this Court order the United States to refund fees, before the government has had the opportunity to exhaust all avenues of review.  28 U.S.C. § 2414; Fed. R. Civ. P. 62.

124.    It is a fundamental principle of sovereign immunity that a court has no jurisdiction over claims against the United States unless Congress by statute expressly and unequivocally waives the United States' immunity to suit.  *See United States v. Mitchell*, 463 U.S. 206, 212 (1983).  Moreover, when the United States does consent to be sued, "the terms of [the] waiver of sovereign immunity define the extent of the court's jurisdiction," *United States v. Mottaz*, 476 U.S.

834, 841 (1986).  The Investment Trustee has not identified any waiver of sovereign immunity that would permit a monetary recovery from the United States.

125.    Section 106(a) waives sovereign immunity only as to specific Code provisions but even if this waiver applies here, the waiver is limited by section 106(a)(4), which provides that "[t]he enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such government unit . . . ."  11 U.S.C. § 106(a)(4).  The non-bankruptcy law that section 106(a)(4) applies makes clear that "the United States cannot be required to pay [a] money judgment against it until it has exhausted all appeals it decides to take."  *Dixon v. United States*, 900 F.3d 1257, 1268 (11th Cir. 2018).

126.    Congress has authorized the payment of judgments only after the Attorney General certifies no further review will be sought.   28 U.S.C. § 2414.  Finality under 28 U.S.C. § 2414 "protects the Government from prematurely paying a claim that might later be reversed on appeal." *Cedar Chem. Corp. v. United States*, 18 Cl. Ct. 25, 31-32 (1989).

127.    Independent of that, the Federal Rules of Bankruptcy Procedure entitle the government to stay a judgment requiring the payment of money pending appeal.  *See* Fed. R. Civ. P. 62(b), (e).[28]  Rule 62(b) entitles a private party to a stay of a monetary judgment while it appeals as a matter of right if it posts a satisfactory bond guaranteeing payment of the judgment if it loses the appeal.  *Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc.*, 87 S. Ct. 1 (1966) (Harlan, Circuit Justice); *In re Nassau County Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (per curiam).  Rule 62(e) entitles the United States to the same mandatory stay without posting a bond.  *Dixon*, 900 F.3d at 1268.

---

[28] Rule 62 applies in adversary proceedings.  Fed. R. Bankr. P. 7062.  As explained *supra* ¶¶ 13-19, the relief sought by the Motion may only be obtained in an adversary proceeding.

128.    Like section 2414, Rule 62 "ensure[s] that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed." *Dixon*, 900 F.3d at 1268.

129.    This federal statute and rule provide critical protections for the public fisc.  The Eleventh Circuit thus reversed an order requiring the government to pay a judgment within 30 days of entry of decision on appeal because the order did not account for the possibility that the government might seek further review.  *Dixon*, 900 F.3d at 1268 (citing 28 U.S.C. § 2414).  *Accord South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. S-06-2845 LKK/JFM, 2012 WL 5387194, at \*2, 4 (E.D. Cal. Nov. 1, 2012) (declining to require a date certain for payment of attorney fee award because the federal defendant does not control or administer the disbursement of judgment appropriations, and staying award pending appeal in light of section 2414).  *See also Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 416 (1990) (holding payments of money from the Federal Treasury are limited to those authorized by statute).

130.    If courts were to compel the United States to refund quarterly fees in bankruptcy cases before it has exhausted its right to appellate review, in many cases, the government would be unlikely to recoup the funds once a judgment is overturned on appeal.  Plan administrators, trustees for liquidating trusts, and reorganized debtors seeking refunds in the burgeoning number of post-confirmation cases could distribute or dissipate available assets during the appellate process, leaving the government without recourse, and could substantially impact the Fund's balance.

## CONCLUSION

For these reasons, the United States Trustee asks this Court to deny the Motion.


Date: January 28, 2020

Respectfully submitted,

NANCY J. GARGULA
United States Trustee, Region 21

By: /s/  *Jill Ellen Kelso*
      Jill Ellen Kelso
      Florida Bar No. 0578541

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
ANDREW W. BEYER
WENDY COX
MELANIE HENDRY
BETH A. LEVENE
SUMI SAKATA
Trial Attorneys

Department of Justice
Executive Office for United States
  Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397

NANCY J. GARGULA
United States Trustee, Region 21
CHARLES R. STERBACH
Assistant United States Trustee
JILL ELLEN KELSO
ARIEL RODRIGUEZ
Trial Attorneys

Department of Justice
Office of the United States Trustee
Office of the United States Trustee
51 SW First Avenue, Room 1204
Miami, FL 33130
(305) 536-7285
Fax: (305) 536-7360
Email:  jill.kelso@usdoj.gov

49

## CERTIFICATE OF SERVICE

I CERTIFY that on January 28, 2020, a true and correct copy of the foregoing Objection has been furnished via Notice of Electronic Filing to the parties registered to receive electronic service in this case as indicated on the CM/ECF Service List set forth below, including the following:

Jeffrey P. Bast, Esquire
Zakarij N. Laux, Esquire
BAST AMRON LLP
One Southeast Third Avenue, Suite 1400
Miami, FL 33131
jbast@bastamron.com
zlaux@bastamron.com

**Counsel for Investment Trustee**

/s/ *Jill Ellen Kelso*
Jill Ellen Kelso

**CM/ECF Service List**

- Ido J Alexander     ija@lsaslaw.com,
  info@lsaslaw.com;aslawpllc@ecf.inforuptcy.com;jb@lsaslaw.com;zbs@lsaslaw.com
- Joel M. Aresty     aresty@mac.com
- Kristopher Aungst     kaungst@wargofrench.com,
  lcruz@wargofrench.com;cpatterson@wargofrench.com;flservice1@wargofrench.com
- Zachary J Bancroft     zbancroft@bakerdonelson.com,
  sdenny@bakerdonelson.com,bkcts@bakerdonelson.com
- Jeffrey P. Bast     jbast@bastamron.com,
  jdepina@bastamron.com;kjones@bastamron.com;jmiranda@bastamron.com;mdesvergunat@bastamron.com
- Paul J. Battista     pbattista@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;gjbecf@ecf.courtdrive.com;vlambdin@gjb-law.com
- Leyza F. Blanco     lblanco@sequorlaw.com, jdiaz@sequorlaw.com
- Angelo M Castaldi     acastaldi@gjb-law.com
- Miguel J Chamorro     mjc@lydeckerdiaz.com
- John Chapman     jchapman@hop-law.com, jessie@hop-law.com
- Leslie Gern Cloyd     lcloyd@bergersingerman.com,
  kgoins@bergersingerman.com;cphillips@bergersingerman.com;efile@ecf.inforuptcy.com;efile@bergersingerman.com;kbeck@bergersingerman.com
- Elias Correa     eliascorreamenendez@gmail.com
- Carlos L De Zayas     cdz@lydeckerdiaz.com,
  gh@lydeckerdiaz.com;eh@lydeckerdiaz.com

- Michael Foster    mfoster@wargofrench.com,
  lcruz@wargofrench.com;cpatterson@wargofrench.com;flservice1@wargofrench.com
- Robert C Furr    ltitus@furrcohen.com,
  atty_furrcohen@bluestylus.com;cworkinger@furrcohen.com;staff1@furrcohen.com
- Mariaelena Gayo-Guitian    mguitian@gjb-law.com, gjbecf@gjb-
  law.com;vlambdin@gjb-law.com;cesser@gjb-law.com;chopkins@gjb-
  law.com;gjbecf@ecf.courtdrive.com
- Alvin S. Goldstein    agoldstein@furrcohen.com,
  atty_furrcohen@bluestylus.com;ltitus@furrcohen.com;cworkinger@furrcohen.com;staff
  1@furrcohen.com
- Joe M. Grant    jgrant@marshallgrant.com, jenna-munsey-
  6083@ecf.pacerpro.com;efile@marshallgrant.com;mg197ecfbox@gmail.com
- Steven C Jones    steven.jones@wilsonelser.com,
  anna.nowakowska@wilsonelser.com;vivian.fusco@wilsonelser.com;magali.mut@wilson
  elser.com;EService.Miami@wilsonelser.com;alan.fiedel@wilsonelser.com
- Gerard M Kouri Jr.    gmkouripaecf@gmail.com, gmkouri@bellsouth.net
- Zakarij N Laux    zlaux@bastamron.com
- Jaime Burton Leggett    jleggett@bastamron.com
- Scott R Lilly    srlilly@lilly-law.com
- David B Marks    brett.marks@akerman.com, charlene.cerda@akerman.com
- Orfelia M Mayor    omayor@ombankruptcy.com, legalservices@pbctax.com
- Jorge L Morales    jorge@jorgemoraleslawfirm.com, admin@jorgemoraleslawfirm.com
- Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov
- Alan J. Perlman    aperlman@dickinsonwright.com, mferguson@dickinson-wright.com
- Arthur H Rice    arice.ecf@rprslaw.com
- Ariel Rodriguez    ariel.rodriguez@usdoj.gov
- Bradley S Shraiberg    bss@slp.law,
  dwoodall@slp.law;bshraibergecfmail@gmail.com;dlocascio@slp.law;pmouton@slp.law
- Peter D Spindel    peterspindel@gmail.com, peterspindelcmecf@gmail.com
- Gregg A Steinman    gsteinman@sflp.law,
  dwoodall@sflp.law;ematteo@sflp.law;scusack@sflp.law
- Annette Urena Tucker    Annette.Tucker@kaplanzeena.com,
  cheryl.mingo@kaplanzeena.com,service@kaplanzeena.com,maria.escobales@kaplanzee
  na.com,elizabeth.salom@kaplanzeena.com
- Aviva L Wernick    Aviva.Wernick@hugheshubbard.com,
  pangeline.edwards@hugheshubbard.com,jeff.margolin@hugheshubbard.com,kirsten.gola
  n@hugheshubbard.com