UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

IN RE:                                                          CHAPTER 11

MOSAIC MANAGEMENT GROUP, INC.,                Case No. 16-20833-EPK
MOSAIC ALTERNATIVE ASSETS LTD., and         (Jointly Administered)
PALADIN SETTLEMENTS, INC.,

      Debtors.

_____/

### INVESTMENT TRUSTEE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF ORDER (A) DETERMINING EXTENT OF INVESTMENT TRUST'S LIABILITY FOR POST-CONFIRMATION QUARTERLY UNITED STATES TRUSTEE FEES AND (B) DIRECTING REIMBURSEMENT OR AUTHORIZING CREDIT FOR OVERPAID FEES

      Margaret J. Smith, the Investment Trustee in the above-referenced jointly administered Chapter 11 cases, files this Reply in Support of the Motion.[1]  This Reply addresses arguments raised by the United States Trustee (the "UST") in the *Objection of the United States Trustee to Investment Trustee's Motion for Entry of Order (A) Determining Extent of Investment Trust's Liability for Post-Confirmation Quarterly United States Trustee Fees and (B) Directing Reimbursement or Authorizing Credit for Overpaid Fees* [ECF No. 1261] (the "UST Objection"), and in support thereof the Investment Trustee states as follows:

      1.      The parties in interest formulated, voted on, and confirmed the Plan based on the existing statutory framework and its anticipated effect on their rights and potential distributions. Only after the Plan was confirmed was that framework changed by the Amendment to impose massive additional costs on the Investment Trust beneficiaries – to date in excess of $125,000, plus similarly substantial additional amounts going forward.  The UST has charged these

---

[1] Unless otherwise indicated, all capitalized terms shall have the meaning ascribed to them in the Motion [ECF No. 1228].

00585288.DOCX 14

increased fees to the Investment Trust even though the Amendment by its plain terms does *not* apply to pending cases.  Indeed, the longstanding presumption against retroactivity mandates that the Amendment be interpreted *not* to provide for these increased fees in this case.

2.      The UST misinterprets the Amendment to apply to pending cases and argues that the increased fees are appropriately uniform nationwide.  Yet, the Investment Trust has paid $125,000 more than it would have paid if the case was pending in one of the BA districts.  The UST also reads the corresponding statutory provision for fee increases in BA districts to be mandatory despite the provision's use of the word "may."  And the UST Objection simply disregards the fact that the BA provision has already been implemented in a purposeful way that makes the UST's interpretation of the Amendment non-uniform nationwide.

3.      Alternatively, the UST asserts that even if the increased fees are not uniform, the increase is justified by the purportedly "flexible standard" for uniformity and the need to raise funds for the UST system.  Although the uniformity case law requires a showing that the law addresses a geographically isolated problem, no such problem exists here.  Moreover, the increased fees are wholly disproportionate to both the limited benefits to the Investment Trust as well as the purported need to fund the UST system.  Indeed, the increased fees are intended to more than simply fund the UST system; the increase also funds bankruptcy judgeships (including in a BA district) and disaster relief.  They also serve a fundraising purpose, as evidenced by the expected creation of a $200 million surplus.  These considerations are wholly insufficient to overcome the settled and vested interests of the parties to this case.

## I.    THE MOTION CAN BE DETERMINED WITHOUT AN ADVERSARY PROCEEDING OR CAN BE ADJUDICATED AS ONE FOR SUMMARY JUDGMENT

4.      The UST first argues that Bankruptcy Rule 7001 requires the Motion to be brought via an adversary proceeding, because it purportedly seeks (1) to "recover" money from

the United States, (2) to determine the validity of the United States' "interest in property," and (3) a declaratory judgment on those matters.  (UST Objection at ¶13).  *See* Fed. R. Bankr. Proc. 7001(1), 7001(2), 7001(9).

5.     By the Motion, the Investment Trustee is seeking a determination of the proper amount of quarterly UST fees along with a reimbursement or credit against future fees on account of the past overpayments.  The issues are ripe for determination, and the UST nowhere alleges what additional evidence is required to rule on the Motion or what procedural protections are necessary to protect its ability to litigate the Motion.

6.     If the Court believes an adversary proceeding is necessary, the Investment Trustee requests that the Court convert this contested matter to an adversary proceeding, rule on this motion, and direct the parties to adjudicate any remaining contested issues (though the Investment Trustee is aware of none) in the adversary proceeding.  *See In re Life Partners Holdings, Inc.*, 606 B.R. 277, 283 (Bankr. N.D. Tex. 2019) ("although this Memorandum Opinion and Order resolves the statutory and constitutional issues regarding the 2017 Amendment, the Court will convert this contested matter to an adversary proceeding for the balance of the contested issues—that is, the appropriate calculation of U.S. Trustee fees owed for the Life Partners Chapter 11 Cases, and whether and how the PHT can recover any previously paid excess quarterly fees.")

7.     Alternatively, the Investment Trustee requests that the court treat the Motion as a motion for summary judgment.  *See In re Circuit City Stores, Inc.*, 606 B.R. 260, 267 and 267 n.19 (Bankr. E.D. Va. 2019) ("As the Parties represented that there were no material facts in dispute and that the matters raised in the Pleadings were purely dispositive questions of law, the Court entertained the Pleadings as cross-motions for summary judgment under Bankruptcy Rule

7056 and proceeded thereon.").   The unique facts of this case are not in dispute: the plan assumed that distributions would be reduced by the UST fee schedule in existence at that time, the claimants voted on the plan with that assumption, and the UST later began charging fees in excess of the amounts anticipated.

## II.    THE AMENDMENT DOES NOT APPLY TO PENDING CASES

8.       Section 1004 of the Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004, 131 Stat. 1224, 1232 (October 26, 2017) (the "2017 Act") amended 28 U.S.C. § 1930(a)(6) to impose an *833% increase* in quarterly UST fees (the "Amendment") for disbursements going forward.  However, the 2017 Act and the Amendment contain no language or legislative history specifying to which cases the fee increase would apply.

9.       The UST Objection argues the Amendment provided for the fee increase to be applied to pending cases but cannot point to any language in the statute providing for this, because none exists.  *See In re Buffets, LLC*, 597 B.R. 588, 596 (Bankr. W.D. Tex. 2019) ("Nothing in the statute or legislative history indicates that Congress intended the [A]mendment to apply retroactively.").   Rather, the UST points to statutory language that is silent on its retroactive effect (UST Objection at ¶33 (citing 28 U.S.C. § 1930(a) and 2017 Act)) and to reports prepared by the Congressional Budget Office ("CBO") purporting to show that the revenue estimates included fees from "ongoing" cases.  (*Id.* at ¶39).  Both the statutory silence and the CBO report are insufficient, however, to overcome the long-standing presumption against retroactive application of statutes.  *See Life Partners*, 606 B.R. at 284 ("The CBO estimate is not so clear.")

### A. The Presumption Against Retroactivity Prevents the Amendment from Applying to Pending Cases

10.     The UST has a heavy burden to prove that the Amendment overcomes the long-standing presumption against retroactivity.  "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  This bedrock principle of American jurisprudence works to ensure that newly enacted laws will apply prospectively absent a clear legislative directive for retroactive application.  *Id.*

11.     The UST Objection argues that the Amendment must rather be presumed to apply retroactively, asserting that Congress "had no reason to think" the Amendment would only apply to prospective cases.  (UST Objection ¶96).  The argument is flawed.  The fee increases are *not* retroactive unless Congress provides otherwise.  As held by the Supreme Court, "the court's first task is to determine whether Congress has *expressly* prescribed the statute's proper reach."  *Landgraf*, 511 U.S. at 245, 280 (emphasis added).  "If the statute would operate retroactively, our traditional presumption teaches that *it does not govern absent clear congressional intent favoring such as result*."  *Id.* (emphasis added).  *See also Lindh v. Murphy*, 521 U.S. 320, 325 (1997) (in *Landgraf*, "the presumption against retroactivity was reaffirmed in the traditional rule requiring retroactive application to be supported by a clear statement.")[2]

12.     The UST also asserts that the Amendment's language providing *when* the fees would apply determines *how* they would apply.  (UST Objection ¶¶88-89).  However, the Amendment simply does not state that it applies to pending cases.  *See Life Partners*, 606 B.R. at

---

[2] The Supreme Court has held that even statutory language providing that it applied "in any action brought by a prisoner who is confined [to a correctional facility]" was insufficient to "expressly mandate[] the temporal reach of [the statute]" to pending actions brought by incarcerated prisoners.  *See Martin v. Hadix*, 527 U.S. 343, 353 (1999) (declining to apply retroactive effect to statute).

283-85 (regarding language applying fee increases to "disbursements made in any calendar quarter that begins on or after the date of enactment:" "those statutory quotes simply beg the question: Disbursements in which cases?"); *Buffets*, 597 B.R. at 596 (regarding language applying fee increases "[d]uring each of fiscal years 2018 through 2022:" "this [language] does not indicate a clear intent by Congress to *retroactively* apply the fees to pending cases") (emphasis in original).

### B. Past Amendments and the 2017 Act Show That the Amendment Was Not Intended to Apply Retroactively

13.      According to the UST, "Historically, the quarterly fee statute and amendments thereto have applied in pending cases."  (UST Objection ¶94).  The UST notes that the Eighth Circuit in *In re Prines*, 867 F.2d 478 (8th Cir. 1989) held that the 1986 fee statute applied in pending cases, and the Tenth Circuit in *In re CF & I Fabricators of Utah, Inc.*¸ 150 F.3d 1233 (10th Cir. 1998) held the same for the 1996 fee statute.  Based on these two examples, the UST submits that Congress established a default rule that all fee increases apply to pending cases. (UST Objection at ¶96).

14.      These two fee increases, however, contained clear language providing for retroactivity.  In *Prines*, the quarterly UST fees were being rolled out in a staged process across the country, and the Eighth Circuit had to determine whether the fees applied to pending cases in a district after the roll out.  *Prines*, 867 F.2d at 480.  The *Prines* court held the new fees applied to pending cases, because the statutory language stated a general effective date for the amendments *and* the rules of construction for the act clarified it would not apply to any district before the fees went effective "in the district in which such case *is pending*."  *Id.* at 483 (emphasis added).  In other words, there was clear language addressing the application to pending cases, unlike the 2017 Act and the Amendment.

15.     The same is true for the decision in *CF & I Fabricators*, related to the 1996 amendment.  The original 1996 amendment deleted language ending quarterly UST fees upon plan confirmation, and courts had reached conflicting results about whether the 1996 amendment applied to confirmed cases.  *See Life Partners*, 606 B.R. at 284.  But by the time the Eighth Circuit considered the issue, the amendment had been further amended to provide that the fees would be payable "in all cases (including, without limitation, any cases pending as of that date), *regardless of confirmation status of their plans*…." *CF & I Fabricators*, 150 F.3d at 1235 (quoting Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–208, § 109(d), 110 Stat. 3009, 3009–19 (1996)) (emphasis added).  Prior to the amendment, however, numerous courts were unwilling to interpret the original statute to apply fees to confirmed cases due to the lack of clear language providing for that result.  *See Life Partners*, 606 B.R. at 284.

16.     The UST's interpretation is further belied by the 2017 Act's contemporaneous revisions to Chapter 12.  These revisions appear in the section immediately following the section enacting the Amendment.  2017 Act at 131 Stat. 1232-1234.  The 2017 Act stated that the Chapter 12 revisions would apply not only to future cases, but also to pending cases without a confirmed plan.[3] *Id.  See Life Partners*, 606 B.R. at 285 ("Congress knows how to be *crystal clear* when it wants bankruptcy legislation to apply to all pending cases (as it did in September 1996 concerning U.S. Trustee fees) or to certain pending cases (as it did in 2017 concerning Chapter 12 of the Bankruptcy Code).")  "[W]here Congress includes particular language in one

---

[3] The *Exide* decision interprets the language incorrectly.  The court reasoned that if the Amendment did not apply to pending cases, there would be no need to say it *did not* apply to post-confirmation cases.  *In re Exide Technologies*, --- B.R. ---, 2020 WL 211400 at *3.  But the statute is not written in the negative at all.  Rather, it states to which cases retroactivity *does* apply.  Thus, the opposite conclusion logically follows.  *See Martin*, 527 U.S. at 361 (interpreting statute to apply prospectively as doing otherwise "would have a retroactive effect inconsistent with our assumption that statutes are prospective").

section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted).

17.     If Congress had intended to apply the increased UST fees to cases pending at the time of enactment, "it presumably would have done so expressly as it did in the immediately following" section of the 2017 Act pertaining to fee increases. *See id.* (citing *North Haven Board of Education v. Bell*, 456 U.S. 512, 521 (1982).

**C. Applying the Amendment to Pending Cases Would Be Impermissibly Retroactive**

18.     The UST asserts that the Amendment is not retroactive, because the fees are only charged to disbursements after its effective date.  (UST Objection at ¶87).  This argument ignores the dramatic impact the increased fees can have on existing cases.

19.     The Supreme Court has held that a statute operates retroactively if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. "The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 270.  To determine whether a statute is operating retroactively, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.  See also id.* at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."); *Eastern Enterprises v. Apfel*, 524 U.S. 498, 533 (1998) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) ("Retroactive legislation.…'presents problems of

unfairness…because it can deprive citizens of legitimate expectations and upset settled transactions.'"))

20.    Here, the increased fees have had a substantial adverse impact on the estate and its creditors: over $125,000 has already been overpaid, and a retroactive reading of the Amendment would divert still further sums from creditors. *See Buffets*, 597 B.R. at 596 (the Amendment "would allow the UST to divert funds" from debtors' "already lean budget[s] to their extreme detriment.")

21.    Further, retroactivity would impair the vested rights created by the Debtors' confirmed plan.  As held in *In re Burk Devel. Co., Inc.*, 205 B.R. 778, 795 (Bankr. M.D. La. 1997) with respect to the 1996 amendments to Section 1930(a)(6):

> In light of the sanctity of the Debtors' confirmed Chapter 11 Plan and the substantive vested rights which are cemented therein, and in light of the Supreme Court's focus on substantive vested rights in its retroactivity analysis in *Landgraf*, the Court concludes that the U.S. Trustee's interpretation of the Amendment (even conceding that postconfirmation quarterly fees would be assessed only from January 27, 1996, forward) cannot withstand scrutiny.  Even a cursory glance at the Amendment reveals that the *effect* of the Amendment (and remember, under *Landgraf*, the Court is directed to examine whether the new statute has retroactive *effect*) is to rearrange retroactively the substantive vested rights that the Debtors' confirmed plan itself created and cemented.
>
> …
>
> The Amendment therefore unquestionably imposes an *additional postconfirmation legal duty* upon the Debtors because, pursuant to the Amendment, the Debtors are now argued to be responsible for paying postconfirmation quarterly fees (albeit fees accruing from January 27, 1996, forward).  As such, and in contravention of the traditional presumption against retroactivity as set forth in *Landgraf*, retroactive application of the Amendment would clearly impair the rights of the parties as cemented in the confirmed Plan (which itself is a legal and binding contract) by rearranging the allocation of funds; would increase the Debtors' liability for past conduct by imposing unexpected postconfirmation quarterly fees; and would impose new duties with respect to transactions already completed, the completed transactions being all those contained within and comprising the overall pinnacle transaction— **confirmation of a plan of reorganization**. Retroactive application of the Amendment therefore contravenes the "[e]lementary considerations of fairness ...

that individuals should have an opportunity to know what the law is and to conform their conduct accordingly" and the principle that "settled expectations should not be lightly disrupted." *Landgraf*, 511 U.S. at 265.

*Burk Devel.*, 205 B.R. at 797-98 (alteration in original).

22.     Similarly, the Plan in this case was confirmed by hundreds of constituents – many foreign and unfamiliar with the U.S. bankruptcy process – who relied on projections utilizing the existing, drastically lower, quarterly UST fees.  A six-figure increase in quarterly UST fees was never contemplated by any of the parties in interest or the documents used to solicit votes on the Plan.  The application proposed by the UST would be retroactive and is simply not supported by the plain language of the Amendment.

## III.  IF THE AMENDMENT APPLIES RETROACTIVELY, THE UST HAS FAILED TO DEMONSTRATE IT IS CONSTITUTIONALLY UNIFORM

### A.  The Uniformity Clause Applies Because the Quarterly UST Fees Are a Tax

23.     The UST argues that the quarterly UST fees are not a tax but a "user fee."  As such, the Uniformity Clause (separate from the uniformity requirement found in the Bankruptcy Clause) does not apply.  (UST Objection at ¶42).  As the UST recognizes, user fees are "intended to reimburse the government for its costs in providing the service or benefit" to the user.  (UST Objection at ¶43).  A user fee must reflect "compensation given for services [in fact] rendered." *U.S. v. U.S. Shoe Corp.*, 523 U.S. 360, 361, 369 (1998) (quoting *Pace v. Burgess*, 92 U.S. 372, 375 (1875)).  Similarly, the Supreme Court in *National Cable* wrote that "value to the recipient" is a proper measure of a user fee.  *National Cable Tel. Ass'n, Inc. v. U.S.*, 415 U.S. 336, 341-43 (1974).

24.     In *U.S. Shoe*, the Supreme Court had to determine whether an amount charged on harbor exports was a tax or user fee.  *U.S. Shoe*, 523 U.S. at 363.  The Supreme Court found "that the tax, which is imposed on an ad valorem basis, is not a fair approximation of services,

facilities, or benefits furnished to the exporters, and therefore does not qualify as a permissible user fee." *Id.*

25.     Similarly, the Amendment's exorbitant quarterly fees, calculated solely on the amount of disbursements rather than the actual use or benefit of the UST system, cannot pass the fair approximation test for benefits or services.  This is particularly true post-confirmation, when the UST has limited, if any, oversight duties.  In fact, the level of disbursements has no relationship to the level of benefit which a debtor or liquidating trust receives.

26.     Additionally, a portion of the "user fees" goes towards the government's general fund (apparently to pay for natural disaster relief) and additional bankruptcy judgeships (including one in a Bankruptcy Administrator ("BA") district),[4] rather than towards the UST program.  The 2017 Act at Section 1004(b)(2) provides that "2 percent of the fees collected under section 1930(a)(6) of such title shall be deposited in the general fund of the Treasury." Those fees are presumably funding disaster relief: the 2017 Act states its purpose as "[a]n Act Making additional supplemental appropriations for disaster relief requirements for the fiscal year ending September 30, 2018…." *Id.* at 131 Stat. 1224.  The use of the quarterly UST fees for purposes wholly unrelated to the UST system (or even UST districts) further demonstrate that the UST fee is a tax and not a user fee related to the services being used.

**B.  The Amendment Is Not Uniform as Constitutionally Required**

27.     According to the UST Objection (at ¶¶46, 52), if the statutes governing the amount of the fees for UST districts and BA districts require the same fee levels (Sections 1930(a)(6) and 1930(a)(7), respectively), then it does not matter whether the fees actually charged are the same.

---

[4] The 2017 Act provided for the extension of a temporary bankruptcy judgeship in the Eastern District of North Carolina.  2017 Act at § 1002(a)(1)(F).

28.    As a preliminary matter, the UST's argument begins with the faulty presumption that the two statutes provide for the same level of fees.  Rather, Section 1930(a)(6) requires an *833% fee increase*, while Section 1930(a)(7) merely *permits* the fees to be raised *at most* up to the levels in Section 1930(a)(6).  Stated differently, the Amendment as written provides for different fees depending on geography, impermissibly violating the uniformity requirements of both the Uniformity Clause and the Bankruptcy Clause.

29.    Section 1930(a)(7) provides: "In districts that are not part of a [UST] region …, the Judicial Conference of the United States *may* require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection."  28 U.S.C. § 1930(a)(7) (emphasis added).

30.    The UST ignores the word "may" and argues instead that the Amendment is self-executing.[5]  (UST Objection ¶49).  This argument is simply not supported by the statute.  "The statute does not say that the Judicial Conference 'shall' or 'must' require BA district debtors to pay uniform fees."  *Life Partners*, 606 B.R. at 286.  *See also Circuit City*, 606 B.R. at 269 (observing "[t]he [2017] Act offered no justification for excluding the BA Districts from the fee step-up"); *Buffets*, 597 B.R. at 595 ("The [2017 Act] violated the Constitution when it increased quarterly fees only in the UST program").  In the remainder of Section 1930(a), Congress used

---

[5] The UST Objection (at ¶49) cites *Exide* and *Clinton Nurseries* in support of the argument that Section 1930(a)(7) required the fee increases.  *Exide* held that Section 1930(a)(7) did not mandate fee increases because Congress arguably lacked the power to do so.  *Exide*, 2020 WL 211400, at *12 ("Congress ... acknowledged that it could not impose fees for the BA system, which is part of the judicial branch").  *Exide* held that the Amendment should have been "self-executing" in BA districts under a 2001 Judicial Conference directive.  As discussed more fully below, that the directive was superseded.  Thus, the conclusion is flawed.  *Clinton Nurseries* held that the words "may" and "shall" are effectively interchangeable.  *In re Clinton Nurseries, Inc.*, 608 B.R. 96, 115 (Bankr. D. Conn. 2019).  This holding is not reconcilable with Congress' non-interchangeable use of the terms in the statute (*e.g.*, the Amendment is not permissive in UST districts).

the word "shall" six times, while glaringly omitting the word from Section 1930(a)(7).  *Cf.*
*Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) ("the word 'shall' usually creates a mandate, not a
liberty … [that is] impervious to judicial discretion") (citation omitted).

31.    The correct reading of subsection (a)(7) is that *"may" modifies all of the words in
the sentence that follow it*, including the verb "require" *and* the adjective "equal to."  And
because that is so, the Judicial Conference "may" decide to charge quarterly bankruptcy fees that
are *no higher than* those specified in subsection (a)(6).  The qualifier "equal to" in subsection
(a)(7) thus establishes a ceiling for the fees that the Judicial Conference may impose.  *See*
Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)
(prepositive modifier applies to entire following series in absence of other indication; *e.g.*, an
intervening determiner like the words "the" or "a").[6]  The "series-qualifier" canon of statutory
construction requiring this result is routinely applied by courts to interpret statutes.  *See*, *e.g.*,
*Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920); *U.S. v. McDaniel*, 631
F.3d 1204, 1209 (11th Cir. 2011); *U.S. v. Mills*, 378 F. Supp. 3d 563, 579 (E.D. Mich. 2019);
*Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 817 (E.D. Mo. 2018) (citing cases).
There is no indication that Congress intended an all-or-nothing outcome where Chapter 11
debtors in BA districts could pay either fees in the subsection (a)(6) amounts or zero.

32.    In fact, the Seventh Circuit – emphasizing the statute's use of the term "may" –
recently observed that "[t]he plain language of § 1930(a)(7) is permissive, not mandatory,
allowing the Judicial Conference to implement fee increases commensurate with § 1930(a)(6) as

---

[6] By way of example, the word "charitable" in the following sentence modifies both "persons"
and societies: "the charitable persons or societies."  If the word "the" is added before "societies,"
then the "charitable" modifier no longer applies to "societies:" "the charitable persons or the
societies."  Scalia & Garner at 147-48 ("the presence of the second 'the' suggests that the
societies need not be charitable").

it deems appropriate." *Cranberry Growers Coop. v. Layng*, 930 F.3d 844, 856 n.51 (7th Cir. 2019) (emphasis added; internal quotation omitted).  As *Cranberry Growers* recognized, the UST's construction of subsection (a)(7) is irreconcilable with its plain language.

33.    The Judicial Conference itself understood that Section 1930(a)(7) was not mandatory or self-effectuating.  As explained by the court in *Buffets*: "[T]his increase did *not* immediately apply to the BA districts.  The BA districts petitioned the Committee [] to apply the amendment to all districts, the Committee agreed and the [Judicial Conference] approved." *Buffets*, 597 B.R. at 594.  As a result, the fee increase began applying in BA districts nine months after the effective date in UST districts.  *Id.*  Prior to that time, the fee increase did not apply in the BA districts.

34.    The legislative history also compels this result.  Congress first proposed to add subsection (a)(7) to Section 1930 in 1999 (via H.R. 1752, the Federal Courts Improvement Act of 1999),[7] and heard testimony in support of the amendment from a representative of the Judicial Conference (U.S. District Judge Harvey F. Schlesinger) about the amendment's effect.  This testimony explained that the amendment "authorizes" (as opposed to "mandates") increased fees "similar to" the fees in UST districts:

> Thus, the proposed language *authorizes* the Judicial Conference to implement fees in the bankruptcy administrator program in the judicial districts in the state of Alabama and North Carolina *similar to* those currently imposed by 28 U.S.C. § 1930(a)(6).

Multidistrict, Multiparty, Multiform Trial Jurisdiction Act of 1999 and Federal Courts Improvement Act of 1999: Hearing on H.R. 2112 and H.R. 1752 Before the Subcommittee on Courts and Intellectual Property of the H. Comm. on the Judiciary, 106 Cong. 26-27 (June 16,

---

[7] This bill was not passed, but the subsection (a)(7) language was later added to Section 1930 via the Federal Courts Improvement Act of 2000. Pub. L. No. 106-518, § 105, 114 Stat. 2410, 2412 (November 13, 2000).

1999) (statement of Judge Harvey F. Schlesinger) (emphasis added) (excerpt attached as Exhibit 1).

35.     The Judicial Conference understood that the amendment was permissive ("authorizes") both with respect to the fees and their amount ("similar to").  Its interpretation of that statute is entitled to "great deference."[8]  *See, e.g., In re Riverside Inv. P'ship*, 674 F.2d 634, 636 (7th Cir. 1982) (quoting *Mesa Farm Co. v. United States*, 475 F.2d 1004, 1007 (9th Cir. 1973)).

36.     As implemented, the two statutes are likewise impermissibly non-uniform. Indeed, the Judicial Conference decided not to apply the increase retroactively in BA districts. *See* Judicial Conference of the United States, Report of the Judicial Conference Committee, at 11-12 (2018) (applying fee increase in BA districts to cases filed on or after October 1, 2018). While the UST asserts that this non-uniformity is irrelevant on the grounds that the "Laws" themselves require uniformity (UST Objection ¶46, 52), this assertion ignores that 28 U.S.C. section 331 provides for the directives the Judicial Conference to be "promptly" carried out by "[a]ll judicial officers and employees of the United States."  *See* 28 U.S.C. § 331.  Moreover, the Judicial Conference's interpretation of the statute is persuasive precedent of its interpretation. *See, e.g., Riverside Inv. P'ship*, 674 F.2d at 636.

**C.  The Lack of Uniformity Is Not Constitutionally Permissible**

37.     The UST next argues that Section 1930(a)(6) is uniform because the subsection applies to all UST districts to fund needs unique to those districts.  (UST Objection ¶¶54, 59).

---

[8] The UST Objection notes that the Judicial Conference believed that the amendment would remedy the non-uniformity issues (UST Objection at ¶29), but unlike their statutory interpretation, their constitutional analysis is not entitled to similar deference. *See, e.g., Citizens for Responsibility and Ethics in Wash. v. Fed. Election Comm'n*, 209 F. Supp. 3d 77, 87 (D.D.C. 2016) ("In case after case, courts have affirmed this fairly intuitive principle, that courts need not, and should not, defer to agency interpretations of opinions written by courts.") (citing cases).

The UST asserts a "flexible standard of uniformity" (*id.* at ¶55), but the case cited in support (*Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102 (1974)) does not provide for any such flexible standard.   Rather, *Blanchette* held that "[t]he uniformity provision does not deny Congress power to take into account differences that exist between different parts of the county, and to fashion legislation to resolve *geographically isolated problems*." *Id.* at 159.  *See also St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1531 (9th Cir. 1994) ("The Uniformity Clause requires that the bankruptcy laws enacted by Congress be geographically uniform.") (citing cases).

38.    The dichotomy between the UST and BA systems is not the result of geographically isolated problems.  *See Victoria Farms*, 38 F.3d at 1531 ("Congress has provided no indication that the exemption in question was intended to deal with a problem specific to [the BA districts] North Carolina and Alabama…")   The separate systems have been explained "either [as] the result of lobbying or with to respect to fees only, the possible result of an oversight, according to the Administrative Office of the United States Courts."  Schulman, Dan J., *The Constitution, Interest Groups, and the Requirements of Uniformity: The United States Trustee and the Bankruptcy Administrator Programs*, 74 NEB. L. REV. 91, 132 (1995) (citing U.S. GAO, Pub. No. GAO/GGD-92-133, Bankruptcy Administration: Justification Lacking for Continuing Two Parallel Programs (1992), at 40-41) (multiple citations omitted).  Additionally, as noted above, the quarterly UST fees fund *national* needs not related to the UST program, such as natural disaster relief and bankruptcy judges.  *See* 2017 Act at 131 Stat. 1224 and § 1002(a)(1)(F).

39.    The UST asserts, by analogy to *Prines*, 867 F.2d at 485, that the geographical differences are permitted.  (UST Objection ¶60).  The decision in *Prines* is in no way analogous.

The *Prines* court held that there was a rational basis for the differing fees because the fees were being rolled out nationwide in support of "the legitimate governmental interest of establishing a *nationwide* self-supporting trustee system." *Id.* (emphasis added). Here, however, the quarterly UST fees were not increased to support that interest and, in fact, no such interest can be identified given the lack of a rational basis for the two disparate systems.

**D.  The Bankruptcy Clause and Its Uniformity Requirement Apply to the Amendment**

40.    The UST argues that the Amendment does not implicate the Bankruptcy Clause, because it "does not alter a debtor's obligations." According to the UST, the Amendment is therefore not a law on the "subject of bankruptcies." Instead, the UST argues that Congress was empowered to enact the Amendment under the Necessary and Proper Clause without implicating the Bankruptcy Clause. (UST Objection at ¶¶65, 67).

41.    Numerous courts, including those allowing the UST's application of the Amendment to pending cases, have held that Section 1930 is a law on "the subject of bankruptcies." *Victoria Farms*, 38 F.3d at 1530 ("[T]he U.S. Trustee's activities have a direct effect upon the rights and liabilities of both debtors and creditors. … Because debtors in states other than North Carolina and Alabama must pay higher fees for the supervision of bankruptcy proceedings, the current system reduces the amount of funds that the debtor can ultimately pay to his creditors in the other 48 states."); *In re Clinton Nurseries, Inc.*, 608 B.R. 96, 113 (Bankr. D. Conn. 2019) ("Given the Supreme Court's stated liberal interpretation of the Bankruptcy Clause and Congress's explicit invocation of the Bankruptcy Clause in passing 28 U.S.C. § 1930, the quarterly fee system, and creating the UST Program, the Court holds that 28 U.S.C. § 1930, particularly subsections (a)(6) and (7), and as amended by the 2017 Amendments, are laws on the subject of bankruptcies."); *In re Exide Technologies*, --- B.R. ---, 2020 WL 211400, at *9-*10 (Bankr. D. Del. Jan. 9, 2020) ("'The subject of bankruptcies is incapable of final definition.'

… The UST's argument that a law on the subject of bankruptcies is limited to laws that specifically govern relations between debtors and creditors or relate to the debtor's discharge is too narrow a reading of the bankruptcy power.") (quoting *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 513-14 (1938)); *In re Precision Autocraft, Inc.*, 197 B.R. 901, 907 (Bankr. W.D. Wash. 1996), *rev'd on other grounds*, 207 B.R. 692 (W.D. Wash. 1997).

42.    The UST's citation to *Ry. Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457 (1982) does not overcome this defect: "*Gibbons* does indeed say that bankruptcy is the 'subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors extending to his and their relief[,]' but in the very same sentence, which the UST omits, states that '[t]he subject of bankruptcies is incapable of final definition[.]'" *Clinton Nurseries*, 608 B.R. at 111 (quoting *Gibbons*, 455 U.S. at 466).

43.    The UST also asserts – without any citations – that "no one contends" that bankruptcy local rules and bankruptcy appellate panels violate the uniformity requirement of the Bankruptcy Clause.   (UST Objection at ¶¶74, 75).   These examples are both procedural mechanisms by which the courts manage cases and adjudicate appeals.   They are not substantive laws that affect the rights and liabilities of debtors and creditors.   Moreover, the lack of a challenge does not establish that no challenge exists.   In any event, the argument ignores that (1) parties to a bankruptcy appeal have a statutory right to elect out of the bankruptcy appellate panel system, *see* 28 U.S.C. § 158(c)(1), and (2) the courts have the inherent authority to regulate the practice of persons appearing before them.   *See Heckers v. Fowler*, 69 U.S. 123, 128 (1864) ("Circuit Courts, as well as all other federal courts, have authority to make and establish all necessary rules for the orderly conducting of business in the said courts, provided such rules are not repugnant to the laws of the United States.")

**E.  The Appropriate Remedy Is to Apply the Amendment Prospectively Only**

44.     The UST also argues that the remedy sought for non-uniformity is inappropriate, suggesting that the proper remedy is enforcement of the fee increase in the BA districts.

45.     This argument assumes that the Amendment is retroactive, which the Investment Trustee obviously disputes.  Even assuming that the Court had the power to enforce the increases in BA districts and the BA districts were able to collect the fees after the fact, doing so would still violate the due process rights of debtors in the BA districts.  The remedy sought by the Investment Trustee is both appropriate and within the power and jurisdiction of this Court.

**F.  The Fees Were Not Uniform Through August 2018**

46.     The UST Objection attempts to partially remedy these issues by arguing that the fees as charged were the same until August 2018, when the Judicial Conference determined to charge the increased fees in BA districts only to cases filed after October 1, 2018.  (UST Objection at ¶¶80-84).  According to the UST, the Judicial Conference in 2001 mandated that the fees in BA districts be charged at the same amount as in UST districts "as those amounts may be amended from time to time," such that the Amendment's increase should have been applied from the start in BA districts.[9]

47.     The UST's argument ignores the fact that the increased fees were not charged before August 2018 in BA districts.  As such, the 2001 directive did not have the equalizing effect claimed by the UST.  Indeed, the Judicial Conference determined in 2018 *not* to charge *any* increased fees before October 1, 2018.[10]  This later directive controls, because it is specific

---

[9] Per the UST Objection, the amount of the overpayments would therefore be reduced from $125,816.69 to $20,161.49, the amounts overcharged after August 2018.

[10] The Judicial Conference has the statutory power to require the Amendment be implemented in bankruptcy administrator districts.  *See* 28 U.S.C. § 331 ("All judicial officers and employees of the United States shall promptly carry into effect all orders of the Judicial Conference …."); *see*

to the implementation of the Amendment, unlike the 2001 directive applying to bankruptcy fees generally.  *See*, *e.g.*, *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("it is a commonplace of statutory construction that the specific governs the general.") (internal quotations omitted).  There is no basis to disregard the 2018 directive simply because the UST prefers the result that would obtain under the earlier, superseded 2001 directive on the same topic.

48.     The Judicial Conference *could have* exercised its discretion to increase fees in complete lockstep with the UST Program districts, but it did not.  Despite the UST's attempt to fend off a facial challenge to the Amendment by blaming the Bankruptcy Administrators and the Judicial Conference, the UST forgets that a law can be declared unconstitutional where "its application to a particular person under particular circumstances deprived that person of a constitutional right."  *U.S. v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010).  Here, there is no disagreement as to the impact of the Amendment's application on the Investment Trustee.  The UST does not dispute that the quarterly UST fees paid by the Investment Trust increased by $125,816.69 on account of the Amendment.

## IV.  THE AMENDMENT VIOLATES DUE PROCESS

49.     The UST Objection (at ¶¶97, 107-108) argues that due process is not violated, because the increased fees only apply to future disbursements and are a rational means to achieve Congress' funding goal.  The former argument was rebutted above (at Section II) in the context of showing why the Amendment should not be interpreted to apply to pending cases at all due to the statute's clear language and the presumption against retroactivity.  If – as the UST argues –

---

*also Fultz v. Waldron*, No. 93-891, 1994 WL 146361, at *6 (D.N.J. Apr. 19, 1994) (observing that "the Judicial Conference … is empowered to promulgate the rules and procedures governing the administration of the federal court system").

the Amendment does apply to pending cases, then those same retroactivity concerns would apply. *See Burk Devel.*, 205 B.R. at 798 (holding payment of post-confirmation quarterly UST fees violated due process because it "would clearly impair the rights of the parties as cemented in the confirmed Plan.") (discussed above in Section II).

50.    In the face of those retroactivity concerns, the UST asserts that the need and intention to raise funds to make the UST system self-sustaining satisfies the rational basis test. (UST Objection at ¶107).  This argument fails, because the quarterly UST fees were increased without a connection to the use of the system.  As discussed above (at Section III.A), part of the increased fees are paid into the general fund and none of the fees is based on a debtor's, or in this case investment trust's, actual use of the UST system.  The fee increase also contemplates the creation of a $200 million surplus, with the fees reverting to prior levels once this occurs. *See* 28 U.S.C. § 1930(a)(6)(B).  The Amendment therefore has a revenue generating purpose that is excessive as compared to the needs for the UST system.

51.    Despite the stated need for funding, due process was a core concern of the Judicial Conference when it provided for the delayed and prospective application of the fee increase in BA districts. *See* Summary of the Report of the Judicial Conference Committee on the Administration of the Bankruptcy System, September 2018, at pp. 18-20 (copy attached as Exhibit 2).  The Executive Committee of the Judicial Conference approved the bankruptcy administration committee's recommendation to delay application of the increase so that debtors in BA districts would have proper notice of the new fees.[11]  *Id.*

---

[11] This Court can take judicial notice of the events and documents drafted by the Judicial Conference as they are "not subject to reasonable dispute" and, indeed, were produced by the same branch of government of which this Court is a part.  Fed. R. Evid. 201(b)(2) (made applicable by Fed. R. Bankr. P. 9017).  *See also Schnapper v. Foley*, 667 F.2d 102, 106 (D.C. Cir. 1981) (taking judicial notice of actions taken by Judicial Conference of the United States).

52. The *Buffets* and *Life Partners* courts both held that the fee increases could not pass rational basis review. The *Buffets* court found the Amendment "imposes new duties and liabilities on the Reorganized Debtors with respect to transactions already completed." 597 B.R. at 596. The court then held that the lack of notice rendered the Amendment constitutionally infirm:

> With the knowledge of the increased fees, future debtors may select pre-packaged plans or choose to restructure debts outside of bankruptcy to avoid the quarterly fees. The Reorganized Debtors in this case had no such opportunity. … The Reorganized Debtors are required to make quarterly-fee payments of $ 30,000 per quarter for the first three quarters of calendar year 2018, in adherence with the old statute in order to avoid constitutional violations and retroactive application of the statute.

*Buffets*, 597 B.R. at 597.

53. Likewise, if the parties in interest here had received notice of the Amendment, they could have negotiated a different plan to avoid the increased fees. By way of example only, the parties could have arranged for the life insurance policy proceeds funding the disbursements to be paid directly from the insurance companies to the beneficiaries. *See* Confirmation Order [ECF No. 707] in *In re Magnum Constr. Mgmt., LLC*, Case No. 19-12821-AJC at ¶42 (providing that quarterly UST fees would not be paid on post-confirmation distributions made from insurance policies placed in trust to trust beneficiary personal injury claimants).

54. The court in *Life Partners* agreed with the due process analysis in *Buffets* and further held that:

> Congress crossed the line when (as the U.S. Trustee interprets the amendment) it applied an 833% increase in maximum quarterly fees to the Life Partners Chapter 11 Cases after the creditors and parties in interest heavily negotiated the terms of the Plan, after the Plan was confirmed, and after the three successor entities under the Plan … were charged with monetizing the reorganized debtors' remaining assets and making distributions to creditors.

606 B.R. at 288.  *See also Nat'l Petrochemical & Refiners Ass'n v. Environmental Protection Agency*, 630 F.3d 145, 159 (D.C. Cir. 2010) (law that "upsets expectations [] is secondarily retroactive" and invalid if it is "arbitrary and capricious"); *Assoc. of Private Colleges and Univs. v. Duncan*, 870 F. Supp. 2d 133, 152 (D.D.C. 2012) ("[i]mpermissible secondary retroactivity can arise when a regulation impairs the future value of a past bargain, by, for instance, altering the value of a contract or license entered into under a prior regulatory scheme.") (citation omitted).

55.    Finally, the UST asserts that the parties in interest actually did have notice.  First, the UST Objection (at ¶119) points to an unenacted 399-page Presidential budget proposing at page 217 to increase quarterly UST fees and to the CBO reports with unclear language. *Compare Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 718, 732 (1984) (noting that all of the legislative proposals "debated by Congress" "uniformly included retroactive effective dates") (cited by UST Objection at ¶119).  The UST cites to no case or other law to suggest that such an obscure reference can somehow serve as notice that the Amendment was forthcoming, much less that its application would be retroactive.  Indeed, as discussed above, the legislative history shows that retroactive effect *was not* intended by Congress.

56.    Second, the UST Objection (at ¶7) refers to the boilerplate language in the Disclosure Statement inserted to disclaim liability under the Private Securities Litigation Reform Act by stating that "all forward looking statements are necessarily speculative" (ECF No. 489 at p. 5 of 222).  The UST cannot, however, point to any language actually disclosing any risk that the quarterly UST fees may increase at all, much less by more than 800%.  No such language exists.  The creditors in this case had no notice of the impending increase.

**WHEREFORE**, the Investment Trustee respectfully requests that this Court enter an order: (a) granting the Motion, (b) determining that the Investment Trust is not liable for post-confirmation quarterly UST fees based on the Amendment, (c) directing the UST to reimburse the Investment Trust or alternatively issue credit against future UST fees to the extent of overpayment, and (d) granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

**BAST AMRON LLP**
*Attorneys for Investment Trustee*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: jbast@bastamron.com
Email: jleggett@bastamron.com

By: */s/ Jaime B. Leggett*
    Jeffrey P. Bast (FBN 996343)
    Jaime B. Leggett (FBN 1016485)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court on February 12, 2020 and served electronically on all interested parties registered to receive notifications in this case via CM/ECF as indicated on the attached service list.

*/s/ Jaime B. Leggett*
    Jaime B. Leggett (FBN 1016485)

## SERVICE LIST

**VIA CM/ECF:**

- Ido J Alexander     ija@lsaslaw.com, info@lsaslaw.com;aslawpllc@ecf.inforuptcy.com;jb@lsaslaw.com;zbs@lsaslaw.com
- Joel M. Aresty     aresty@mac.com
- Kristopher Aungst     kaungst@wargofrench.com, lcruz@wargofrench.com;cpatterson@wargofrench.com;flservice1@wargofrench.com
- Zachary J Bancroft     zbancroft@bakerdonelson.com, sdenny@bakerdonelson.com,bkcts@bakerdonelson.com
- Paul J. Battista     pbattista@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;gjbecf@ecf.courtdrive.com;vlambdin@gjb-law.com
- Leyza F. Blanco     lblanco@sequorlaw.com, jdiaz@sequorlaw.com
- Angelo M Castaldi     acastaldi@gjb-law.com
- Miguel J Chamorro     mjc@lydeckerdiaz.com
- John Chapman     jchapman@hop-law.com, jessie@hop-law.com
- Leslie Gern Cloyd     lcloyd@bergersingerman.com, kgoins@bergersingerman.com;cphillips@bergersingerman.com;efile@ecf.inforuptcy.com;efile@bergersingerman.com;kbeck@bergersingerman.com
- Elias Correa     eliascorreamenendez@gmail.com
- Carlos L De Zayas     cdz@lydeckerdiaz.com, gh@lydeckerdiaz.com;eh@lydeckerdiaz.com
- Michael Foster     mfoster@wargofrench.com, lcruz@wargofrench.com;cpatterson@wargofrench.com;flservice1@wargofrench.com
- Robert C Furr     ltitus@furrcohen.com, atty_furrcohen@bluestylus.com;cworkinger@furrcohen.com;staff1@furrcohen.com
- Mariaelena Gayo-Guitian     mguitian@gjb-law.com, gjbecf@gjb-law.com;vlambdin@gjb-law.com;cesser@gjb-law.com;chopkins@gjb-law.com;gjbecf@ecf.courtdrive.com
- Alvin S. Goldstein     agoldstein@furrcohen.com, atty_furrcohen@bluestylus.com;ltitus@furrcohen.com;cworkinger@furrcohen.com;staff1@furrcohen.com
- Joe M. Grant     jgrant@marshallgrant.com, jenna-munsey-6083@ecf.pacerpro.com;efile@marshallgrant.com;mg197ecfbox@gmail.com
- Steven C Jones     steven.jones@wilsonelser.com, anna.nowakowska@wilsonelser.com;vivian.fusco@wilsonelser.com;magali.mut@wilsonelser.com;EService.Miami@wilsonelser.com;alan.fiedel@wilsonelser.com
- Jill E Kelso     jill.kelso@usdoj.gov
- Gerard M Kouri Jr.     gmkouripaecf@gmail.com, gmkouri@bellsouth.net
- Scott R Lilly     srlilly@lilly-law.com
- David B Marks     brett.marks@akerman.com, charlene.cerda@akerman.com
- Orfelia M Mayor     omayor@ombankruptcy.com, legalservices@pbctax.com
- Jorge L Morales     jorge@jorgemoraleslawfirm.com, admin@jorgemoraleslawfirm.com
- Office of the US Trustee     USTPRegion21.MM.ECF@usdoj.gov
- Alan J. Perlman     aperlman@dickinsonwright.com, mferguson@dickinson-wright.com
- Arthur H Rice     arice.ecf@rprslaw.com
- Ariel Rodriguez     ariel.rodriguez@usdoj.gov

- Bradley S Shraiberg    bss@slp.law,
  dwoodall@slp.law;bshraibergecfmail@gmail.com;dlocascio@slp.law;pmouton@slp.law
- Peter D Spindel    peterspindel@gmail.com, peterspindelcmecf@gmail.com
- Gregg A Steinman    gsteinman@sflp.law, dwoodall@sflp.law;
  ematteo@sflp.law;scusack@sflp.law
- Annette Urena Tucker    Annette.Tucker@kaplanzeena.com,
  cheryl.mingo@kaplanzeena.com,service@kaplanzeena.com,maria.escobales@kaplanzeena.com,elizabeth.salom@kaplanzeena.com
- Aviva L Wernick    Aviva.Wernick@hugheshubbard.com,
  pangeline.edwards@hugheshubbard.com,jeff.margolin@hugheshubbard.com,kirsten.golan@hugheshubbard.com

# EXHIBIT 1

E
J 89/1:106/24

# MULTIDISTRICT, MULTIPARTY, MULTIFORUM TRIAL JURISDICTION ACT OF 1999 AND FEDERAL COURTS IMPROVEMENT ACT OF 1999

PURDUE UNIVERSITY

MAY 1 9 2000

U.S. DEPOSITORY

## HEARING

BEFORE THE

## SUBCOMMITTEE ON COURTS AND INTELLECTUAL PROPERTY

OF THE

## COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTH CONGRESS

FIRST SESSION

ON

## H.R. 2112 and H.R. 1752

JUNE 16, 1999

## Serial No. 24



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE
62–501                        WASHINGTON : 2000

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-060484-2

Digitized by Google

Original from
PURDUE UNIVERSITY

## COMMITTEE ON THE JUDICIARY

### HENRY J. HYDE, Illinois, *Chairman*

F. JAMES SENSENBRENNER, JR.,
 Wisconsin
BILL McCOLLUM, Florida
GEORGE W. GEKAS, Pennsylvania
HOWARD COBLE, North Carolina
LAMAR S. SMITH, Texas
ELTON GALLEGLY, California
CHARLES T. CANADY, Florida
BOB GOODLATTE, Virginia
ED BRYANT, Tennessee
STEVE CHABOT, Ohio
BOB BARR, Georgia
WILLIAM L. JENKINS, Tennessee
ASA HUTCHINSON, Arkansas
EDWARD A. PEASE, Indiana
CHRIS CANNON, Utah
JAMES E. ROGAN, California
LINDSEY O. GRAHAM, South Carolina
MARY BONO, California
SPENCER BACHUS, Alabama
JOE SCARBOROUGH, Florida

JOHN CONYERS, JR., Michigan
BARNEY FRANK, Massachusetts
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
STEVEN R. ROTHMAN, New Jersey
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York

THOMAS E. MOONEY, SR., *General Counsel-Chief of Staff*
JULIAN EPSTEIN, *Minority Chief Counsel and Staff Director*

---

### SUBCOMMITTEE ON COURTS AND INTELLECTUAL PROPERTY

### HOWARD COBLE, North Carolina, *Chairman*

F. JAMES SENSENBRENNER, JR.,
 Wisconsin
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
WILLIAM L. JENKINS, Tennessee
EDWARD A. PEASE, Indiana
CHRIS CANNON, Utah
JAMES E. ROGAN, California
MARY BONO, California

HOWARD L. BERMAN, California
JOHN CONYERS, JR., Michigan
RICK BOUCHER, Virginia
ZOE LOFGREN, California
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida

MITCH GLAZIER, *Chief Counsel*
BLAINE MERRITT, *Counsel*
VINCE GARLOCK, *Counsel*
DEBBIE K. LAMAN, *Counsel*
ROBERT RABEN, *Minority Counsel*
EUNICE GOLDRING, *Staff Assistant*



LIBRARIES



Digitized by Google

Original from
PURDUE UNIVERSITY

Generated on 2019-08-30 19:21 GMT / http://hdl.handle.net/2027/pur1.32754071547271
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

2

case. Set forth as section 2 of H.R. 2112, this language would simply amend the multidistrict litigation statute by explicitly allowing a transferee court to retain jurisdiction over referred cases for trial or refer them to other districts as it sees fit.

This change, it seems to me, makes sense in light of past judicial practice under the multidistrict litigation statute and will promote judicial administrative efficiency. Furthermore, section 3 of H.R. 2112 incorporates the language of H.R. 967. It offers what, I believe, are modest but necessary improvements to a specific type of multidistrict litigation, that involving mass torts such as airline or train accidents in which several individuals from different States are killed or injured.

[The text of bills H.R. 1752 and H.R. 2112 follows:]

106TH CONGRESS
1ST SESSION

# H. R. 1752

To make improvements in the operation and administration of the Federal courts, and for other purposes.

---

IN THE HOUSE OF REPRESENTATIVES

MAY 11, 1999

Mr. COBLE (for himself and Mr. BERMAN) (both by request) introduced the following bill; which was referred to the Committee on the Judiciary

---

# A BILL

To make improvements in the operation and administration of the Federal courts, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Federal Courts Improvement Act of 1999".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

TITLE I—FEDERAL COURTS STUDY COMMITTEE RECOMMENDATIONS

Sec. 101. Parties' consent to bankruptcy judge's findings and conclusions of law.

TITLE II—JUDICIAL FINANCIAL ADMINISTRATION

Sec. 201. Reimbursement of judiciary for civil and criminal forfeiture expenses.
Sec. 202. Transfer of retirement funds.
Sec. 203. Judiciary Information Technology Fund.
Sec. 204. Bankruptcy fees.
Sec. 205. Disposition of miscellaneous fees.
Sec. 206. Repeal of statute setting Court of Federal Claims filing fee.
Sec. 207. Renumbering of Bankruptcy Court fee schedule.
Sec. 208. Increase in fee for converting a Chapter 7 or Chapter 13 bankruptcy case to a Chapter 11 bankruptcy case.
Sec. 209. Increase in Chapter 9 Bankruptcy filing fee.
Sec. 210. Creation of certifying officers in the judicial branch.
Sec. 211. Fee authority for technology resources in the courts.

TITLE III—JUDICIAL PROCESS IMPROVEMENTS

Sec. 301. Removal of cases under the Employee Retirement Income Security Act.
Sec. 302. Elimination of in-state plaintiff diversity jurisdiction.


Digitized by Google

Original from
PURDUE UNIVERSITY

Generated on 2019-08-30 19:22 GMT  /  http://hdl.handle.net/2027/purl.32754071547271
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

5

### SEC. 203. JUDICIARY INFORMATION TECHNOLOGY FUND.

Section 612 of title 28, United States Code, is amended—
(1) by striking "equipment" each place it appears and inserting "resources";
(2) by striking subsection (f) and redesignating subsequent subsections accordingly;
(3) in subsection (g), as so redesignated, by striking paragraph (3); and
(4) in subsection (i), as so redesignated—
(A) by striking "Judiciary" and inserting "judiciary";
(B) by striking "subparagraph (c)(1)(B)" and inserting "subsection (c)(1)(B)"; and
(C) by striking "under (c)(1)(B)" and inserting "under subsection (c)(1)(B)".

### SEC. 204. BANKRUPTCY FEES.

Subsection (a) of section 1930 of title 28, United States Code, is amended by adding the following new subsection:
"(7) In districts that are not part of a United States trustee region as defined in section 581 of this title, the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph 6 of this subsection. Such fees shall be deposited as offsetting receipts to the fund established under section 1931 of this title and shall remain available until expended.".

### SEC. 205. DISPOSITION OF MISCELLANEOUS FEES.

For fiscal year 2000 and thereafter, any portion of miscellaneous fees collected as prescribed by the Judicial Conference of the United States pursuant to sections 1913, 1914(b), 1926(a), 1930(b), and 1932 of title 28, United States Code exceeding the amount of such fees established on the date of enactment of this provision shall be deposited into the special fund of the Treasury established under section 1931 of title 28, United States Code.

### SEC. 206. REPEAL OF STATUTE SETTING COURT OF FEDERAL CLAIMS FILING FEE.

Section 2520 of title 28, United States Code, and the item relating to such section in the table of contents for chapter 165 of such title, are repealed.

### SEC. 207. RENUMBERING OF BANKRUPTCY COURT FEE SCHEDULE.

Section 406(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (Public Law 101–162; 103 Stat. 1016) is amended in the first sentence by striking "for any service enumerated after item 18" and inserting "for any fee implemented after November 21, 1989".

### SEC. 208. INCREASE IN FEE FOR CONVERTING A CHAPTER 7 OR CHAPTER 13 BANKRUPTCY CASE TO A CHAPTER 11 BANKRUPTCY CASE.

(a) CONVERSION FEE INCREASE.—Section 1930(a) of title 28, United States Code, is amended by striking "$400" at the end of subsection (6) and inserting in lieu thereof: "an amount equal to the difference between the filing fee paid under the original chapter and the amount of the filing fee prescribed in section 1930(a)(3) of title 28, for filing a case under chapter 11".

### SEC. 209. INCREASE IN CHAPTER 9 BANKRUPTCY FILING FEE.

(a) FILING FEE INCREASE.—Section 1930(a)(2) of title 28, United States Code, is amended by striking "$300" and inserting in lieu thereof "the same amount as the filing fee prescribed in section 1930(a)(3) of title 28, for filing a case under chapter 11. Any portion of the fee exceeding $300 shall be deposited into the special fund of the Treasury established under section 1931 of title 28, United States Code".

### SEC. 210. CREATION OF CERTIFYING OFFICERS IN THE JUDICIAL BRANCH.

(a) APPOINTMENT OF DISBURSING AND CERTIFYING OFFICERS.—Chapter 41 of title 28, United States Code, is amended by adding at the end the following new section:

### "§ 613. Disbursing and certifying officers

"(a) DISBURSING OFFICERS.—The Director may designate in writing officers and employees of the judicial branch of the Government, including the courts as defined in section 610 other than the Supreme Court, to be disbursing officers in such numbers and locations as the Director considers necessary. Such dispersing officers shall—
"(1) disburse moneys appropriated to the judicial branch and other funds only in strict accordance with payment requests certified by the Director or in accordance with subsection (b);


Digitized by Google

Original from
PURDUE UNIVERSITY

21

Mr. BERMAN. No, I haven't.

Mr. COBLE. I am confident that we will be interrupted at least once or perhaps twice for votes. So when the red light does illuminate, if you could, wrap it up. We have examined your written statements. We will examine them again. It is good to have you with us.

Mr. COBLE. Judge Rosen, why don't you commence.

Mr. ROSEN. It is a pleasure, Mr. Chairman, members of the committee. If there is no objection, I would like to defer to Judge Schlesinger who is the chair of the Magistrate Judge Association.

## STATEMENT OF HARVEY F. SCHLESINGER, JUDGE, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA

Mr. SCHLESINGER. Thank you, Mr. Chairman. It is an honor to appear this afternoon along with my distinguished colleagues. Judge Nangle will be on the second panel to discuss the multidistrict litigation legislation.

Since October of last year, I have had the honor of chairing the Judicial Conference Committee on the administration of the Magistrate Judges' System. What I would like to do this afternoon is to discuss briefly a few of the provisions of the pending legislation, Judge Rosen will then speak on the sections most important to them dealing with consent and also with the question of contempt.

Mr. Chairman, each of the 42 sections of H.R. 1752 have been thoroughly studied by at least one of the 23 committees of the Judicial Conference of the United States and have been deemed important enough by the Judicial Conference of the United States to be included in this court improvements bill. I want to thank you, Mr. Chairman, and the Ranking Member for introducing the bill and scheduling these hearings.

Some of the provisions of this bill have been before you before. Twenty-nine of these passed in the House, H.R. 2294, last year. Each of the provisions of this bill are important because they are contributing in some measure to the efficiency of the judicial branch of the government by saving time, money, and resources. And the Judicial Conference sincerely appreciates this subcommittee's continued interest in the legislation that is needed for the Federal court system.

With your permission, Mr. Chairman, I have included as appendix A to my written statement an additional recommendation of the Board of the Federal Judicial Center. This proposal deals with the elimination of the mandatory retirement age of the Director of the Federal Judicial Center which currently is at age 70.

I hope that you might be able to add this provision when you consider the bill in your mark up. Also with respect to the written statement that I have submitted, there is one typographical error, and that is on page 8 in the first sentence of the first full paragraph. It should read bill 1752, not last year's 2294 as stated therein.

Now, with respect to my statement, and then I will be happy to respond to questions, let me address section 305 which would confer limited contempt authority on magistrate judges, and as chairman of that committee, I have a particularly strong interest in this

 Digitized by Google

Original from
PURDUE UNIVERSITY

22

issue. Presently, the lack of adequate contempt authority by magistrate judges undermines both the magistrate judge's and the district court's authority when confronted with misconduct or failure to obey court orders.

This section of the bill would provide magistrate judges with limited summary criminal contempt authority to punish egregious misbehavior occurring in their presence. The bill would confer such authority on magistrate judges whenever a magistrate judge presides for the district court regardless of the litigants consent such as conducting initial appearances, bail hearings, or pretrial matters in both civil and criminal cases.

The bill would also provide magistrate judges with additional contempt authority in cases in which the parties have consented fully to proceed before the magistrate judge in civil matters under 636 C of title 28 or in misdemeanor cases under title 18 of the United States Code, section 3401. In those cases, magistrate judges enter final judgments and such contempt authority as necessary to enable magistrate judges to enforce compliance with court orders.

Importantly, section 305 would establish limits on the penalties that magistrate judges may impose for this contempt. Punishment could not exceed 30 days incarceration and a fine not to exceed $5,000 which is consistent with the magistrate judge's authority having for imprisonment and fines in the imposition of class C misdemeanor cases.

This provision was carefully crafted to avoid any Constitutional issue which the Department of Justice commented on in last year's bill in nonconsent cases. Since magistrate judges currently have that sentencing authority, this bill would give magistrate judges no more sentencing authority than they currently have.

The limited contempt penalties are intended to provide magistrate judges with an effective tool to impose order in courtrooms immediately when faced with disruptive behavior and at the same time distinguishing that authority from the more expansive criminal contempt power of article III judges. I know Judge Rosen is going to address that in just a minute and in a little bit more detail.

I would like also to address section 306 about the consent proceeding, and basically what this portion of the bill does is give the magistrate judges authority to hear all petty offense cases without the consent of the parties, and Judge Rosen will go into that in just a minute.

If I might take one moment, Mr. Chairman, to comment on section 405. This portion of the bill deals with authorizing Federal judges to carry firearms for the purpose of personal security. This bill would require that firearms training programs be required for each judge who chooses to carry a concealed weapon and to comply with training requirements established by the Judicial Conference of the United States. We anticipate that that would be the United States Marshal Service.

I would like to emphasize that this proposed legislation does not require judges to carry weapons or even suggest that they should. It is permissible only and leaves to the discretion of the individual judge when he or she feels that circumstances warrant carrying a weapon when they have undergone training and when they have



23

been threatened. Of course, a judge in most districts can do that today by having a local permit, but the problem is that Federal legislation is needed to preempt both State and local law to the extent that it would ensure that a judge who crosses out of one municipality or State to another on a daily basis not running afoul of any State or local laws in carrying the concealed weapon.

I see that my time, as I mentioned, before is completed so I that concludes my oral remarks. I would be more than happy to answer questions after the oral presentations.

Mr. COBLE. Thank you, Your Honor.

[The prepared statement of Judge Schlesinger follows:]

PREPARED STATEMENT OF HARVEY F. SCHLESINGER, JUDGE, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA

INTRODUCTION

Mr. Chairman and members of the Subcommittee, I am Harvey Schlesinger, Judge of the United States District Court for the Middle District of Florida, and Chair of the Judicial Conference Committee on Magistrate Judges. I am pleased to be here this afternoon to testify on behalf of the Judicial Conference of the United States on H.R. 1752, the "Federal Courts Improvement Act of 1999."

On behalf of the Judicial Conference, I want to thank you, Mr. Chairman, for introducing H.R. 1752, and for scheduling this hearing today.

H.R. 1752 contains forty-two separate provisions and touches upon a wide range of issues including federal court jurisdiction, the authority of judicial officers and Judicial Branch personnel and administrative programs. Of the forty-two provisions in this bill, twenty-nine passed the House last Congress in the form of H.R. 2294. I would like to express the sincere appreciation of the Judicial Conference for your continued interest in the legislative needs of the federal court system.

This bill reflects the ongoing commitment of the Judicial Conference, and the 23 committees of judges which support the Judicial Conference, to improve the effectiveness and efficiency of the federal judiciary.

With your permission, Mr. Chairman, I have included as Appendix A to this statement, an additional recommendation of the Board of the Federal Judicial Center (FJC). This proposal would eliminate the mandatory retirement age for the Director of the Federal Judicial Center. The present law requires a Director of the FJC to step down at age 70. I would hope that you can add the provision to the bill when it is considered in mark up.

I would also like to take this opportunity to comment upon H.R. 1281, a bill pending before this Subcommittee that would allow photographing, electronic recording, or televising court proceedings at the discretion of the respective appellate or district court. With regard to such media coverage of district court proceedings, the Judicial Conference in September 1994, after experimenting with and studying the effects of the presence of cameras during federal civil proceedings, determined that the potentially intimidating effect of cameras on some witnesses and jurors was cause for considerable concern. Because the paramount responsibility of a United States Judge is to guarantee citizens a right to a fair and impartial trial, the Conference concluded that it was not in the interests of justice to permit cameras in federal district courtrooms.

With regard to appellate proceedings, in March 1996 the Judicial Conference adopted a policy that allows each federal court of appeals to determine whether or not to permit such media coverage. Currently, two of the thirteen appellate courts permit such coverage of their proceedings.

This afternoon I will focus my remarks on two sections of the bill: Section 305, and Section 405. Both of these provisions were contained in H.R. 2294 when it passed the House in the last Congress.

*Magistrate Judge Contempt Authority (Sec. 305)*

Section 305 of the bill would expand the contempt authority of magistrate judges. As Chair of the Committee on the Administration of the Magistrate Judges System, I have a particularly strong interest in this issue. Presently, the lack of adequate contempt authority by magistrate judges undermines both the magistrate judge's and the court's authority when confronted with misconduct or failure to obey court orders.

 Digitized by Google

Original from
PURDUE UNIVERSITY

24

This section of the bill would provide magistrate judges with summary criminal contempt authority to punish any misbehavior occurring in their presence. Summary criminal contempt authority is necessary to maintain order and to protect the court's dignity in response to contumacious behavior by witnesses, parties, counsel, and others present at court proceedings. The need for power to immediately vindicate the court's authority in the face of disruptive behavior exists whenever a magistrate judge presides for the district court regardless of litigant consent. Felony initial appearances under Fed. R. Crim. P. 5, detention hearings under the Bail Reform Act, 18 U.S.C. §3142, and evidentiary proceedings in case-dispositive matters under 28 U.S.C. §636(b)(1)(B) are typical examples where magistrate judges preside routinely on behalf of the district court without the litigants' consent.

The bill would also provide magistrate judges with additional criminal and civil contempt authority in civil consent cases under 28 U.S.C. §636(c) and in misdemeanor cases under 18 U.S.C. §3401. Since magistrate judges serve as the final dispositional judicial officer for the district court in these cases, this authority is necessary to enable magistrate judges to enforce compliance with the court's orders. Such authority does not constitute a significant expansion of magistrate judge authority, but provides them with a tool needed to perform effectively their existing statutory duties for the district court.

The bill would also establish limits on the penalties magistrate judges may impose for criminal contempts. Imprisonment for a summary contempt committed in the presence of the magistrate judge, or for a criminal contempt occurring in a civil consent or misdemeanor case outside the magistrate judge's presence, would not exceed 30 days incarceration (the maximum term of imprisonment for a Class C misdemeanor set forth in 18 U.S.C. §3581(b)(8), and a fine could not exceed $5,000 (the maximum fine that may be imposed on an individual for a Class C misdemeanor under 18 U.S.C. §3571(b)(6). The restricted contempt penalties are intended to provide magistrate judges with an effective tool to impose order in the courtroom that is distinguishable from the criminal contempt power of article III judges.

Potential constitutional concerns about providing magistrate judges with criminal contempt authority are resolved by placing appropriate limits on the penalties magistrate judges may impose. Limitations on penalties differentiate magistrate judge contempt authority from that of article III judges, who may impose theoretically unlimited terms of imprisonment or fines upon entities who commit contumacious acts. 18 U.S.C. §401. By contrast, this bill would impose limits on the penalties magistrate judges could order in contempt situations.

*Judges' Firearms Training Program (Sec. 405)*

The Judicial Conference strongly recommends the enactment of Section 405 which directly relates to the personal safety of federal judicial officers. Threats against judges, and judge's families, has risen significantly over the past ten years. The security of judges, judiciary employees, and federal courthouses is a priority matter.

Section 405 would accomplish two highly desirable goals. First, many federal judicial officers currently carry concealed firearms because of safety concerns. They do so by obtaining licenses from state and/or local authorities, as any citizen is entitled to do so. Currently, 41 States allow licensees to carry concealed firearms.

The enactment of Section 405 would mean that judges who carry firearms would effectively be required to successfully participate in a training and safety program. The Judiciary would rely on the United States Marshal Service for expertise in establishing the firearms training program. Failure on the part of judges to participate in the training program would mean such judges who carry firearms would be acting in a manner contrary to statute.

The second problem relates to the fact that judges often travel outside of their district or circuit on official, professional, or personal business. When they cross State lines, the firearms license from their home state loses its' effect. Because of this, judges in travel status often are not able to be armed. Clearly, if a judge is in danger, the fact that he or she is in one state or the other does not eliminate the danger.

Therefore, the enactment of Section 405 would provide that federal judges are, in most circumstances, exempted from state and local firearms laws and regulations. This same treatment is afforded to federal law enforcement agents and federal probations officers who

routinely carry concealed firearms and travel in interstate commerce. The proposal contained in this Bill reflects the cooperation and assistance of the Department of Justice which has worked with key federal judges to arrive at a legislative solution.

The balance of the bill is discussed below. An asterisk follow each provision which was passed as part of H.R. 2294 in the last Congress.

Digitized by  Google

Original from
PURDUE UNIVERSITY

25

*Section 101—Parties' Consent to Bankruptcy Judge's Findings and Conclusions of Law*

Section 157(c)(1) of title 28 of the United States Code provides that the district court may refer to a bankruptcy judge, for hearing and final determination, certain "non-core"[1] related proceedings when all parties to the proceeding consent to the referral. The present statute does not specify whether the consent must be express or whether it may be implied.

In the interest of avoiding jurisdictional controversies, the judiciary has interpreted the statute restrictively, and the Federal Rules of Bankruptcy Procedure require express consent, as set out in Bankruptcy Rules 7008(a) and 7012(b). In the absence of this consent, a bankruptcy judge is limited to filing proposed findings of fact and conclusions of law, which must be presented to a district judge for review and entry of a final order or judgment, *even when all parties agree to what the bankruptcy judge has proposed* or *when the defendant is in default.* Accordingly, the Federal Courts Study Committee in 1990 recommended enactment of an implied consent mechanism, and this principle was endorsed by the Judicial Conference in 1992.

Section 101 of the bill provides that, unless the party files a timely objection to the bankruptcy judge's proposed findings of fact and conclusions of law, that party will be deemed to have consented to them and they will become final. This proposal is intended to avoid unnecessary delay and expense to the parties, and unnecessary use of judicial resources when no issue of fact or law needs to be resolved.

*Section 201—Reimbursement of Judiciary for Civil and Criminal Forfeiture Expenses\**

The courts must be given adequate resources to provide qualified counsel to indigent defendants pursuant to the Criminal Justice Act (CJA). In three of the past seven Fiscal Years, the CJA program has experienced budget shortfalls that led to the suspension of payments to private "panel" attorneys. Without sufficient funding to cover the basic elements of the program, the CJA's mission is jeopardized.

The use of asset forfeiture by the Department of Justice adds to the financial burden on the courts by requiring the judiciary to appoint counsel for otherwise financially secure defendants without providing compensating resources for that responsibility. When the Department of Justice seizes the assets of a defendant, that person is often left without sufficient funds to cover the costs of retaining private counsel. Consequently, the Defender Services appropriation must bear the costs of representing the defendant against criminal charges. The courts are not reimbursed.

Representation and costs are in addition to the costs of hearings conducted by the courts in processing forfeiture actions. Other entities of the federal government, or state and local governments, are reimbursed for costs related to seizures and forfeitures of assets based upon their participation in these actions. The courts receive no similar reimbursement. It would be more equitable if the expenses to the Defender Services appropriation, and those of the judiciary generally, were offset by provisions for appropriate sharing of the funds that accrue to the federal government through seized and forfeited assets. At a minimum, the judiciary should be authorized to recover the direct additional costs charged to the Defender Services appropriation when a defendant's assets are seized and legal counsel is provided at government expense. Section 201 of H.R. 2294 would authorize the reimbursement of the judiciary from the Asset Forfeiture Fund for costs arising from the forfeiture of assets of defendants. To avoid even the appearance of a conflict of interest on the part of counsel compensated from the Defender Services appropriation, the reimbursement of that appropriation would be limited to the extent to which the courts are already authorized by subsection (f) of the CJA to order reimbursement from a defendant for the costs of representation provided under the Act. We estimate that reimbursement for the costs of defense representation would be approximately $21.2 million annually.

*Section 202—Transfer of Retirement Funds\**

Section 202 allows the judiciary's contributions, and accrued interest, to the Civil Service Retirement and Disability Fund to be paid back to the judiciary when bank-

---

[1] Although the statue does not specifically define "non-core proceedings," courts have defined such proceedings "as those that do not involve a substantive right provided by the title 11 or that, by their very nature, generally arise outside the context of a bankruotcy case" *Diamond Mortage Corp. of I llnois* v. *Sugar*, 913 F.2d 1233, 1239 (7th Cir. 1990).


Digitized by Google

Original from
PURDUE UNIVERSITY

26

ruptcy and magistrate judges, for whom the contributions were made, elect to transfer from the Civil Service Retirement System or the Federal Employees' Retirement System to the judicial retirement system established under the Retirement and Survivors' Annuities for Bankruptcy Judges and Magistrates Act.[2] The contributions of bankruptcy and magistrate judges to the Federal Employees' Retirement System and the Civil Service Retirement Systems, as well as the Judiciary's contributions to those systems, are paid to the Office of Personnel Management. When a judge separates from office or elects to participate in the Judicial Retirement System, the judge may withdraw his or her retirement contributions. The Judiciary's contributions are not refunded. Currently, when a bankruptcy or magistrate judge elects to transfer to the Judicial retirement system, that judge's contribution to the Civil Service Retirement System is returned. However, the judiciary's contributions made on behalf of the same judges are not returned to the judiciary. These contributions should be returned because the judiciary, not the Civil Service Retirement and Disability Fund, is responsible for paying the judges' retirement benefits if they transfer into the judicial retirement system. It is estimated that the judiciary has already contributed about $6 million to the Civil Service Retirement and Disability Fund on behalf of judges who subsequently transferred into the judicial retirement system.

*Section 203—Judiciary Information Fund\**

Section 203 of the bill would eliminate uncertainty created by the passage of the Information Technology Management Reform Act of 1996 (ITMRA) and repeal of the Brooks Automatic Data Processing Act. Under the ITMRA, the Office of Management and Budget was charged with management policy and oversight of information technology resources for the *executive branch* through the budget and appropriations management process. The Judiciary Information Technology Fund statute was amended to replace the requirement that procurements comply with the Brooks Act with a requirement that the procurement of information technology be conducted in compliance with "the provisions of law, policies, and regulations applicable to executive agencies under the Information Technology Management Reform Act." The potential reach of this language is so broad that it could be read to apply to many statutes with varying implications, e.g. Administrative Procedures Act, Contract Disputes Act, Small Business Act, to which the judiciary is not subject, to a single activity of the judiciary, *i.e.* procurement of information technology equipment under the Fund. Management and reporting features equivalent to those instituted under ITMRA are already in place for these resources in the judicial branch and the language added by ITMRA should be deleted. This amendment would clarify that the judiciary's Fund is not subject to laws that would not otherwise apply to the federal judiciary.

*Section 204—Bankruptcy Fees\**

In 1986, Congress passed Public Law No. 99–554, 100 Stat. 3088 (1986) which authorized the Judicial Conference to establish bankruptcy administrator programs, in lieu of the U.S. Trustee program, in six judicial districts in the states of Alabama and North Carolina.

Currently, debtors in the United States trustee and bankruptcy administrator districts pay the same fees *when filing* for bankruptcy, but chapter 11 debtors in bankruptcy administrator districts are not subject to the additional *fees on quarterly disbursements* that are subsequently levied on chapter 11 debtors in United States trustee districts.

In *St. Angelo* v. *Victoria Farms, Inc.,* 38 F.3d 1524 (9th Cir. 1994), a regional United States trustee objected to the bankruptcy court's calculation of the quarterly fees to be paid by the debtor under 28 U.S.C. § 1930(a)(6). On appeal, the debtor for the first time argued that the trustee's claim should be denied because the quarterly fees do not apply uniformly in all judicial districts. The debtor argued that the bifurcated system violates the Uniformity Clause of the Constitution, which authorizes Congress to enact "uniform laws on the subject of bankruptcies throughout the United States."

The court agreed, determining that the United States trustee system is more costly for debtors than the bankruptcy administrator program and there is no legislative history justifying the difference. As indicated above, this issue was first raised on appeal. Jurisdiction over the bankruptcy administrator districts was also lacking.

At its March 1996 proceeding, the Judicial Conference determined that implementing the establishment of chapter 11 quarterly fees in the bankruptcy administrator districts would eliminate any *Victoria Farms* problem and by providing that the judiciary could retain the fees much-needed revenues could be used to offset the

---

[2]28 U.S.C. § 377. (Public Law No. 100-659).

Digitized by Google

Original from
PURDUE UNIVERSITY

27

cost of operating the bankruptcy administrator program. If a quarterly fee were implemented in the bankruptcy administrator districts through which the judiciary could retain the fees, any surplus exceeding the costs of the bankruptcy administrator program would be dedicated to the judiciary to offset costs of the judicial system.

Thus, the proposed language authorizes the Judicial Conference to implement fees in the bankruptcy administrator program in the judicial districts in the states of Alabama and North Carolina similar to those currently imposed by 28 U.S.C. §1930(a)(6). In addition, the language also provides that these new fees shall be deposited into a fund established under 28 U.S.C.

§1931 for the operation and maintenance of the federal judiciary, including the bankruptcy administrator program.

### Section 205—Disposition of Miscellaneous Fees*

This provision responds to a directive from congressional appropriations committees that the Judiciary identify ways to increase offsetting receipts. This provision would allow the judiciary to retain any additional offsetting receipts derived from increases in miscellaneous fees charged in the federal courts of appeals, district courts, bankruptcy courts, the Court of Federal Claims, and the Judicial Panel on Multidistrict Litigation. The miscellaneous fees schedules include fees for services such as record searches, reproduction of records, and returned checks. Typically, the Judicial Conference acts to raise such fees to reflect increases in inflation. The additional amounts collected would be deposited into the special judiciary fund in the Treasury and these receipts would be available to offset funds which are appropriated by Congress for the operation and maintenance of the courts.

### Section 206—Repeal of Statute Setting Court of Claims Filing Fee

By repealing section 2520 of title 28, United States Code, this provision would eliminate an unnecessary statutory requirement which has been superceded by authorization of the Judicial Conference for a miscellaneous fee schedule for the United States Court of Federal Claims.

### Section 207—Renumbering of Bankruptcy Court Fee Schedule*

This section would continue the existing structure of the Bankruptcy Court Fee Schedule by requiring that fees established prior to the enactment of the legislation establishing the judiciary fund in 28 U.S.C. §1931, with the exception of noticing fees, be deposited into the General Treasury. This provision would retain the current structure and allow for the renumbering of the Bankruptcy Fee Schedule that is required due to the repeal of outdated fees.

### Section 208—Increase in Fee for Converting a Chapter 7 or Chapter 13 Bankruptcy Case to a Chapter 11 Case.

This provision would correct the inconsistency that occurs when a petitioner files a case under chapter 7 for $175 or chapter 13 for an initial fee of $160 and then converts the case to a chapter 11 case for a conversion fee of $400. In those instances, the total amount paid ($575 and $560, respectively) is less than the $800 fee for originally filing a case under chapter 11. This section addresses that inconsistency by making the conversion fee equal to the $800 fee for originally filing a case under chapter 11.

### Section 209—Increase in Chapter 9 Bankruptcy Filing Fee

This provision would increase the filing fee for filing bankruptcy petitions under chapter 9 (debt adjustment for municipalities) from $300 to the fee for filing petitions under chapter 11 (reorganization), which is $800. This increase more accurately reflects the judicial resources required to process chapter 9 cases.

### Section 210—Creation of Certifying Officers in the Judicial Branch*

This provision establishes statutory authority for the judicial branch to create certifying officers similar to those established in the executive branch under the Certification Act of 1941 (31 U.S.C. §3528). That Act was enacted to create pecuniary liability for those officers and employees in the executive branch whose duty it is to certify as to the propriety of a payment made through disbursing officials. These certifying officials are assigned definite responsibilities for verifying receipt of goods or services and ensuring funds are available. Certifying officials are also held personally liable for the propriety of payments which they certified. This provision will enhance financial accountability and improve the utilization of administrative resources in the judicial branch.

Digitized by Google

Original from
PURDUE UNIVERSITY


# EXHIBIT 2

(Rev. 8/23/18)

**Agenda E-3 (Summary)**
**Bankruptcy Administration**
**September 2018**

## SUMMARY OF THE

## REPORT OF THE JUDICIAL CONFERENCE

## COMMITTEE ON THE ADMINISTRATION OF THE BANKRUPTCY SYSTEM

The Committee on the Administration of the Bankruptcy System recommends that the Judicial Conference:

1. a. Recommend to Congress that no existing bankruptcy judgeship be statutorily eliminated, and

   b. Advise the appropriate circuit judicial councils to consider not filling vacancies that currently exist or may occur because of resignation, retirement, removal, or death, until there is a demonstrated need to do so in the following districts: Alaska, South Dakota, Iowa-Northern, California-Northern, Maine, Oklahoma-Northern, Oregon, California-Central, New York-Western, Iowa-Southern, Ohio-Southern, Illinois-Central, California-Eastern, Oklahoma-Western, Ohio-Northern, California-Southern, Virginia-Western, Michigan-Western, Washington-Western, Pennsylvania-Eastern, and Texas-Western ................ pp. 3-6

2. a. Approve a request from the Third Circuit Judicial Council to designate Wilmington as the official bankruptcy judge duty station for the two new temporary judgeships in the District of Delaware, and

   b. Approve a request from the Sixth Circuit Judicial Council to designate Flint as the official bankruptcy judge duty station for the new bankruptcy judgeship in the Eastern District of Michigan ......................................................................... pp. 7-9

3. Approve a request from the Seventh Circuit Judicial Council to redesignate the official bankruptcy judge duty station in the Central District of Illinois from Urbana to Rock Island, in accordance with 28 U.S.C. § 152(b)(1), and designate Urbana as a place of holding court ............................................................................................................ pp. 9-10

4. Approve the proposed revisions to the ad hoc and extended service bankruptcy judge recall regulations regarding authorization of chambers staff for recalled judges, as set forth in the Appendix ............................................................................................. pp. 10-12

5. Approve expanding the bankruptcy judgeship vacancy pilot project to allow up to five long-standing vacancies to be filled and the judge lent to a district that has an emergency need for an additional judgeship through the use of an intercircuit assignment designation and an agreement between participating circuit councils ...................................... pp. 20-22

---

**NOTICE**
NO RECOMMENDATIONS PRESENTED HEREIN REPRESENT THE POLICY OF THE JUDICIAL CONFERENCE
UNLESS APPROVED BY THE CONFERENCE ITSELF.

(Rev. 8/23/18)

     The remainder of the Report is submitted for the record and includes the following items for the information of the Judicial Conference:

- Funding for Fiscal Year 2020 ..........................................................................................p. 2
- Bankruptcy Judgeships .................................................................................... pp. 3, 6-7
- Cost-Containment ............................................................................................ pp. 12-14
- Bankruptcy Administrator Matters ....................................................................... pp. 14-16
- Judiciary Strategic Planning ...............................................................................p. 16
- Bankruptcy Judge Quarterly Reporting of Matters Under Advisement ............... pp. 16-17
- Revised Preliminary Application and Disclosure Statement for Bankruptcy Judge Nominees ............................................................................................................ pp. 17-18
- Quarterly Fees in Large Chapter 11 Cases in Bankruptcy Administrator Districts............................................................................................................ pp. 18-20
- Other Matters ................................................................................................. pp. 22-23

Agenda E-3
Bankruptcy Administration
September 2018

## REPORT OF THE JUDICIAL CONFERENCE

## COMMITTEE ON THE ADMINISTRATION OF THE BANKRUPTCY SYSTEM

## TO THE CHIEF JUSTICE OF THE UNITED STATES AND MEMBERS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES:

The Committee on the Administration of the Bankruptcy System met on June 14-15,

2018. All members participated except Judge John E. Waites (Bankr. D.S.C.). Judge Leslie

Joyce Abrams (M.D. Ga.) participated by telephone. At the invitation of the Chair, the following

individuals also attended the meeting: Judge Stuart M. Bernstein (Bankr. S.D.N.Y.),

representing the Advisory Committee on Bankruptcy Rules; Chief Judge Michael E. Romero

(Bankr. D. Colo.), President of the National Conference of Bankruptcy Judges (NCBJ); Judge

Thomas J. Catliota (Bankr. D. Md.), Chair of the Administrative Office's (AO) Bankruptcy

Judges Advisory Group (BJAG); Judge Catherine Peek McEwen (Bankr. M.D. Fla.), Bankruptcy

Judge Observer to the Judicial Conference; Bill Miller (Bankr. M.D.N.C.), Bankruptcy

Administrator Committee Liaison; and JC Guerrero (Bankr. M.D. Ala.), Bankruptcy Clerk of

Court Committee Liaison.

Administrative Office support for the meeting was provided by Michele Reed, Chief of

the Judicial Services Office (JSO); Daniel J. Isaacs-Smith and Dana Y. Elliott, JSO Senior

Attorneys; and William T. Rule, JSO Senior Economist. Also attending the meeting from the

AO were Gary E. McCaffrey, Chief of the Court Operations Division of the Court Services

Office; and Kevin A. Lee, Deputy Budget Officer. Other AO staff participated in certain

NOTICE
NO RECOMMENDATIONS PRESENTED HEREIN REPRESENT THE POLICY OF THE JUDICIAL CONFERENCE
UNLESS APPROVED BY THE CONFERENCE ITSELF.

portions of the meeting. Elizabeth C. Wiggins, Senior Research Associate, represented the Federal Judicial Center (FJC).

## FUNDING FOR FISCAL YEAR 2020

The Committee considered and agreed to recommend to the Committee on the Budget the following fiscal year (FY) 2020 budget request for bankruptcy judgeship resources and the Bankruptcy Administrator (BA) program: (a) $1.7 million for up to 30 recalled bankruptcy judges and their staffs; (b) $3.5 million for temporary bankruptcy law clerks; (c) $6.3 million for 48.2 authorized work units for the BA program, based on application of the Conference-approved staffing formula (JCUS-SEP 14, pp. 21-22); (d) $80.6 million for salaries and benefits for 351 authorized bankruptcy judgeships; and (e) $89.7 million for salaries and benefits for chambers staff for bankruptcy judges. These recommendations reflect the following changes from the FY 2019 assumed level: an increase of $1.0 million for recalled bankruptcy judges and their staffs, a reduction of $0.2 million for the BA program, a reduction of $4.1 million for bankruptcy judges salaries and benefits, and a reduction of $6.3 million for chambers staff for bankruptcy judges salaries and benefits.[1] The temporary bankruptcy law clerk request is the same as the FY 2019 request.

The total budget request by the Bankruptcy Committee (mandatory and discretionary) for FY 2020 is $181,825,000, which includes funding for active bankruptcy judges and chambers staff. The total budget request is an increase of 2.6 percent over the FY 2019 assumed funding level, and thus does not exceed the Budget Committee's guidance for FY 2020 that budgets not increase by more than 3.0 percent over the FY assumed level.

---

[1] The reduction in bankruptcy judge and chambers staff salaries and benefits results from a greater number of vacancies due to declines in bankruptcy filings.

## BANKRUPTCY JUDGESHIPS

The Committee was briefed on the number of authorized bankruptcy judgeships, recalled bankruptcy judges, intercircuit and intracircuit assignments, bankruptcy judgeship vacancies, and existing temporary bankruptcy judgeships. The Committee also discussed the continuing need survey process and procedures. As of March 31, 2018, there were 351 authorized bankruptcy judgeships, 35 of which were temporary judgeships; 30 recalled bankruptcy judges; and 29 bankruptcy judgeship vacancies.

### *Temporary Judgeships, Vacancies, and Related Matters*

Of the 35 temporary judgeships, seven judgeships have not been filled and are not currently at risk of lapsing because lapse dates occur five years from the appointment date of the judge named to fill the positions. This includes four new temporary judgeships authorized by the Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72. One temporary judgeship passed its lapse date on May 1, 2011, and will be lost when the next vacancy occurs in that court. Thirteen temporary judgeships passed their lapse dates on May 25, 2017, and will be lost when the next vacancies occur in those courts. The remaining 14 temporary judgeships were extended by the Bankruptcy Judgeship Act of 2017 for a period of five years from the date of enactment of that bill, October 26, 2017, and thus have lapse dates of October 26, 2022. The four new temporary judgeships and 14 extensions are in the same districts that the Judicial Conference recommended for new judgeships and conversion to permanent status, respectively, in its 2017 bankruptcy judgeship request. JCUS-MAR 17, p. 6.

### *Continuing Judgeship Need Survey*

Under 28 U.S.C. § 152(b)(3), the Judicial Conference must assess the continuing need for all authorized bankruptcy judgeships every two years and report its recommendations to Congress regarding "any authorized position which can be eliminated when a vacancy exists by reason of resignation, retirement, removal, or death" by December 31 of each even-numbered

year. Since 1994, after each of the previous continuing judgeship need surveys, the Conference has approved the Bankruptcy Committee's recommendation that no bankruptcy judgeship be statutorily eliminated. The Conference has also advised several circuit judicial councils to consider not filling bankruptcy judgeship vacancies occurring in districts by reason of resignation, retirement, removal, or death, unless there is a demonstrated need to do so, particularly if filling the vacancy would result in a weighted caseload per remaining judgeship(s) of fewer than 1,000 weighted filings. JCUS-SEP 94, pp. 44-45; JCUS-SEP 96, pp. 50-51; JCUS-SEP 98, pp. 44-45; JCUS-SEP 00, pp. 42-43; JCUS-SEP 02, pp. 39-40; JCUS-SEP 04, pp. 8-9; JCUS-SEP 06, p. 8; JCUS-MAR 09, p. 5; JCUS-SEP 10, p. 8; JCUS-SEP 12, p. 8; JCUS-SEP 14, pp. 6-7; and JCUS-SEP 16, p. 7.

In accordance with the statute and the schedule and procedures approved by the Committee at its December 2017 meeting, staff identified districts where the elimination of a bankruptcy judgeship would result in fewer than 1,000 weighted filings per judgeship for the remaining positions, based on data for calendar year 2017.[2] The chair of the Committee sent a letter to the chief bankruptcy judges for each affected district and their respective chief circuit judge offering an opportunity to submit additional information for consideration by the Committee. Five circuit chief judges with affected districts submitted information related to the nature and mix of the district's case types, historical caseload data and filing trends, geographic issues, current economic data, and specific demographics.

Using updated weighted caseload data for the twelve-month period ending March 31, 2018, the following 27 districts (listed from lowest to highest weighted filings per authorized judgeship) had weighted caseloads lower than the 1,000-per judgeship threshold after the caseloads were recalculated based on one less bankruptcy judgeship in the district:

---

[2] Districts with one authorized judgeship are not included in the continuing need survey.

(Rev. 8/23/18)

| 1. Alaska | 10. Iowa-Southern | 19. Michigan-Western |
|-----------|-------------------|----------------------|
| 2. South Dakota | 11. Ohio-Southern | 20. New York-Northern |
| 3. Iowa-Northern | 12. Illinois-Central | 21. Washington-Eastern |
| 4. California-Northern | 13. California-Eastern | 22. Washington-Western |
| 5. Maine | 14. Oklahoma-Western | 23. Pennsylvania-Eastern |
| 6. Oklahoma-Northern | 15. Ohio-Northern | 24. New Mexico |
| 7. Oregon | 16. California-Southern | 25. Pennsylvania-Middle |
| 8. California-Central | 17. Virginia-Western | 26. Massachusetts |
| 9. New York-Western | 18. North Carolina-Middle | 27. Texas-Western |

Based on information provided on behalf of the affected districts and by AO staff, the Committee recommended that the Judicial Conference recommend to Congress that no existing bankruptcy judgeship be statutorily eliminated. The Committee also recommended that the Conference should advise the appropriate circuit judicial councils with respect to 21 districts identified by the judgeships subcommittee to consider not filling vacancies that currently exist or may occur because of resignation, retirement, removal, or death, until there is a demonstrated need to do so.

The Committee did not include three districts in its final recommendation—the Middle District of North Carolina, the Northern District of New York, and the Middle District of Pennsylvania—because the next vacancy occurring in those districts will result in the lapse of a temporary judgeship (and thus there will be no vacancy to recommend holding open) and the resulting weighted caseload calculation does not fall below the 1,000-per-judgeship threshold. Three districts—the Eastern District of Washington, the District of New Mexico, and the District of Massachusetts—submitted additional information that led the Committee to conclude that filling the next vacancy in those districts would be justified, at the discretion of the relevant court of appeals.

**Recommendations:** That the Judicial Conference—

a.   Recommend to Congress that no existing bankruptcy judgeship be statutorily eliminated, and

(Rev. 8/23/18)

b.  Advise the appropriate circuit judicial councils to consider not filling vacancies that currently exist or may occur because of resignation, retirement, removal, or death, until there is a demonstrated need to do so in the following districts: Alaska, South Dakota, Iowa-Northern, California-Northern, Maine, Oklahoma-Northern, Oregon, California-Central, New York-Western, Iowa-Southern, Ohio-Southern, Illinois-Central, California-Eastern, Oklahoma-Western, Ohio-Northern, California-Southern, Virginia-Western, Michigan-Western, Washington-Western, Pennsylvania-Eastern, and Texas-Western.

### *Additional Judgeship Need Survey Process*

Along with the continuing need survey, the Judicial Conference is tasked with assessing

the need for additional bankruptcy judgeships. This requirement is contained in 28 U.S.C.

§ 152(b)(2), which states:

> The Judicial Conference shall, from time to time, submit recommendations to the Congress regarding the number of bankruptcy judges needed and the districts in which such judges are needed.

In 1991, the Judicial Conference determined that additional judgeship surveys would be

conducted biennially. JCUS-MAR 91, pp. 12-13. At its September 1996 session, the

Conference approved a change in the schedule for completing the biennial surveys so that

recommendations for additional bankruptcy judgeships would be considered by the Conference

in March, rather than September, of odd-numbered years. JCUS-SEP 96, p. 50. This schedule

permits the judiciary to advocate, when appropriate, for additional bankruptcy judgeships

throughout the full two-year congressional term.

The Committee approved the schedule and procedures for the 2019 additional judgeship

need survey process. Any on-site surveys needed to examine the judgeship needs for a district

will be conducted in September-November 2018. The Committee will consider requests for

additional judgeships at its December 2018 meeting and make recommendations to the

Conference for consideration at its March 2019 session.

### *Judicial Resources Surveys*

At its December 2015 meeting, the Committee approved a process for selecting districts to receive on-site surveys, based in part on anticipation of the district's need for judicial resources. The intent was to minimize the need to survey multiple districts within the short time frame available to complete the biennial additional judgeship needs review. These surveys provide the Committee with information beyond raw caseload and weighted caseload data that may be relevant to Committee decisions, including geographic, population, and other relevant economic data. At its June 2017 meeting, the Committee selected six districts to survey before its June 2018 meeting. Two of these surveys were completed prior to the Committee's December 2017 meeting, and the remaining four were completed prior to the Committee's June 2018 meeting. The Committee selected two additional districts to survey before its June 2019 meeting.

## DUTY STATIONS AND PLACES OF
## HOLDING COURT FOR BANKRUPTCY JUDGES

### *Designation of Duty Stations for New Temporary Judgeships*

In addition to extending the authorization of 14 existing temporary judgeships, the Bankruptcy Judgeships Act of 2017, Pub. L. No. 115-72, §§ 1002-03, 131 Stat. 1224, 1229-32, authorized four new temporary judgeships: two in the District of Delaware, one in the Eastern District of Michigan, and one in the Middle District of Florida. Of those, the Committee considered requests to designate duty stations for three of those positions. The Middle District of Florida indicated that it does not intend to request that this position be filled at this time, and prefers to maintain the flexibility to designate the duty station in the future when it intends to fill the position.

The Committee considered a request from the Third Circuit Judicial Council that the Judicial Conference designate Wilmington as the duty station for the two new temporary

judgeships in the District of Delaware. With the two new temporary judgeships, the District of Delaware has eight authorized bankruptcy judgeships. The six existing judgeships are all designated to Wilmington, the district's only duty station and place of holding court. The Committee noted the size and nature of the district with respect to its sole duty station and place of holding court and that any adjustments to accommodate the two new judgeships will be made within the circuit's existing space footprint, so there will be no impact on the Judicial Conference "No Net New" policy that requires any increase in square footage within a circuit be offset by an equivalent reduction in square footage within the same fiscal year. JCUS-MAR 18, p. 11; *Guide to Judiciary Policy* (*Guide*), Vol. 3, Ch. 15, §§ 1520.30(b)(2)(B), (D), (E), and (F). It thus recommended that the Conference approve the request.

The Committee also considered a request from the Sixth Circuit Judicial Council that the Judicial Conference designate Flint as the duty station for the new temporary judgeship in the Eastern District of Michigan. With the new temporary judgeship, the Eastern District of Michigan has six authorized bankruptcy judgeships. The duty stations of the existing judgeships are follows: three in Detroit, one in Bay City, and one in "Flint or Detroit" (the current occupant is sitting in Detroit). There is a fifth judge currently serving in Detroit on a five-year intercircuit assignment from the Northern District of Iowa through the Committee's Bankruptcy Judgeship Vacancy Pilot program. The Committee noted that the bankruptcy court already has chambers and courtroom space in Flint, so there is no cost associated with this request; that Flint has the caseload to support a resident judge; and that approving this request will result in a more even distribution of cases among the judges in the district. JCUS-MAR 18, p. 11; *Guide*, Vol. 3, Ch. 15, §§ 1520.30(b)(2)(B), (D), (E), and (F). It thus recommended that the Conference approve the request.

**Recommendations:** That the Judicial Conference—

a.    Approve a request from the Third Circuit Judicial Council to designate
      Wilmington as the official bankruptcy judge duty station for the two new
      temporary judgeships in the District of Delaware, and

b.    Approve a request from the Sixth Circuit Judicial Council to designate
      Flint as the official bankruptcy judge duty station for the new bankruptcy
      judgeship in the Eastern District of Michigan.

### Redesignation of Duty Station in the Central District of Illinois

The Committee considered a request from the Seventh Circuit Judicial Council that the

duty station for the vacant judgeship in the Central District of Illinois be redesignated from

Urbana to Rock Island. The Seventh Circuit Judicial Council requested the change due to space

concerns. Neither Urbana or Rock Island has adequate chambers or courtroom space to

accommodate a bankruptcy judge. The General Services Administration is in the process of

seeking replacement leased space for the court in Rock Island. The existing Rock Island court

space is located in a building owned by the U.S. Post Office, and the building suffers from

significant building, maintenance and management, and security deficiencies. In the current

facility, visiting judges use a hearing room or share the district judge's courtroom when holding

proceedings in Rock Island. The Asset Management Planning business rules—the guidelines

adopted by the Judicial Conference when building a program of requirements for new space—do

not allow the court to seek space equivalent to the hearing room in the replacement lease as it is

not tied to a resident judge. JCUS-MAR 08, p. 26.

Moving the duty station from Urbana to Rock Island will allow the new leased space in

Rock Island to include chambers and a courtroom for a bankruptcy judge. Absent this

redesignation, the new courthouse in Rock Island would only have one courtroom that would be

shared by the resident district judge, visiting district judges, the visiting magistrate judge, and the

visiting bankruptcy judge. Changing the designation of the bankruptcy judge duty station from

Urbana to Rock Island would allow the new facility to include an additional courtroom and

provide flexibility for not only the bankruptcy court, but for visiting district and magistrate judges as well. Ensuring that chambers and courtroom space are available now will save the judiciary the cost of having to find or construct chambers space in the future if bankruptcy filings increase and the circuit council elects to fill the current vacancy. It thus recommended that the Conference approve the request. If this request is approved, it is also recommended that the Conference designate Urbana as a place of holding court.

**Recommendation:** That the Judicial Conference approve a request from the Seventh Circuit Judicial Council to redesignate the official bankruptcy judge duty station in the Central District of Illinois from Urbana to Rock Island, in accordance with 28 U.S.C. § 152(b)(1), and designate Urbana as a place of holding court.

## BANKRUPTCY JUDGE RECALL REGULATIONS

AO staff periodically review the *Guide* to ensure that Judicial Conference regulations and guidelines are clear, complete, accurate, and up-to-date. Recently, staff identified portions of the bankruptcy judge recall regulations that should be revised to achieve this goal. The changes concern the regulations for ad hoc (*Guide*, Vol. 3, Ch. 9) and extended service (*Guide*, Vol. 3, Ch. 10) recall of bankruptcy judges.

The proposed revisions (a) specify the caseload standards for authorizing staff for a recalled bankruptcy judge; (b) make it clear that a circuit judicial council and the Committee may authorize a greater or lesser number of chambers staff for a recalled bankruptcy judge than provided for in the caseload standards after consideration of all relevant factors (but no more than two full-time chambers staff per recalled bankruptcy judge); and (c) require that the Committee authorize chambers staff annually for recall appointments that are longer than one year and one day (extended service recall regulations only).

With respect to the proposed revision to specify the caseload standards for authorizing staff for a recalled bankruptcy judge, the regulations currently use percentages of a full-time bankruptcy judge workload to determine the appropriate number of chambers staff positions

(75 percent of a full-time bankruptcy judge workload for authorizing two chambers staff positions, and 40 percent of a full-time bankruptcy judge workload for authorizing one chambers staff position). However, the regulations do not specify how a full-time bankruptcy judge workload is defined, or how that figure is determined.

A full-time bankruptcy judge workload of 1,100 weighted filings was established following the FJC's 1988-1989 case weights study. Although there have been subsequent case weights studies, the Committee has consistently applied the 1,100 weighted filings standard. The proposed revised regulations specify the weighted filings level to determine the appropriate number of chambers staff positions—825 weighted filings for authorizing two full-time chambers staff positions, and 440 weighted filings for authorizing one full-time chambers staff position. These numbers represent 75 percent and 40 percent of a full-time bankruptcy judge workload. The workload percentages are the same as in the current regulations but are expressed in raw figures instead of percentages. This specific guidance will assist bankruptcy judges and circuit judicial councils when considering staffing requests for recalled bankruptcy judges. Because all relevant factors may be considered along with the workload standards, there remains flexibility for the circuit judicial councils and the Committee to address unique staffing needs.

Additionally, the proposed revisions make it clear that the Committee may approve a greater or lesser number of (but no more than two total) chambers staff than specified under the caseload standards after considering factors other than weighted filings. This proposed revision would provide flexibility for circuits to certify, and the Committee to approve, a greater or lesser number of chambers staff in appropriate circumstances.

Finally, under the proposed revisions, the Committee would be required to authorize staff annually for recall appointments that are longer than one year and one day. Previously, the Committee authorized chambers staff for the entire term of recall regardless of the length of the

recall term. This proposed revision would enable the Committee to provide greater oversight

regarding the costs of the bankruptcy judge recall program.

The Committee reviewed the proposed revisions to the regulations and recommended that

the Conference approve the revisions, as set forth in the Appendix.

**Recommendation:** That the Judicial Conference approve the proposed revisions
to the ad hoc and extended service bankruptcy judge recall regulations regarding
authorization of chambers staff for recalled judges, as set forth in the Appendix.

## COST-CONTAINMENT

### *CACM Cost-Containment Subcommittee*

At the request of the Budget Committee, the Committee on Court Administration and

Case Management (CACM) is leading a multi-committee initiative to evaluate alternative

organizational models that might contain administrative costs. To carry out this initiative, the

CACM Committee established the CACM Subcommittee on Cost-Containment (CACM

Subcommittee), which includes members from six Judicial Conference committees, including the

Bankruptcy Committee.

The CACM Subcommittee has worked over the past three years to analyze organizational

concepts for managing the administrative functions of courts. An initial report, which was

presented to the Budget Committee in July 2017, as well as to the September 2017 Judicial

Conference, emphasized a need for additional data and analysis before conclusions could be

drawn about cost savings and the efficacy of the different shared services models, and included

recommendations for longer-term analysis and investigation. The Budget Committee discussed

the initial report at its July 2017 meeting and expressed appreciation for the subcommittee's

work to date. It provided its views to the CACM Committee, including the belief that it is sound

to assume that some savings will occur with alternative shared services models, and the CACM

Committee should therefore focus its efforts on providing assistance and resources to courts

interested in moving to alternative organizational models, including identifying the practical mechanisms for, and obstacles to, implementing the models.

At its September 2017 meeting, the CACM Subcommittee discussed the Budget Committee's suggestions, and drafted a second report documenting its progress and findings. The second report includes a revised action plan focused on providing feasible alternative organizational models for the courts to consider while incorporating more limited cost-benefit analyses. *See* Report of the Committee on Court Administration and Case Management at Agenda E-6 for additional information on the work of the subcommittee. After this Committee's December 2017 meeting, the chair sent a letter to the chair of the CACM Committee setting forth the Committee's comments on the report, agreeing with the subcommittee's revised approach, but disagreeing with the Budget Committee's suggestion that the subcommittee should presume savings.

At its March 2018 meeting, the CACM Subcommittee considered and endorsed a completed draft of its report on vertical consolidation of district and bankruptcy clerks' offices, and endorsed several revisions to the report. The CACM Subcommittee asked that the report be presented to each of the involved Conference committees for discussion. The Committee endorsed the revised draft of the vertical consolidation report with no comments or proposed substantive changes. After the vertical consolidation report is finalized, it will be provided to the Budget Committee and the Executive Committee, and appended to the CACM Committee's report to the Judicial Conference at its September 2018 session.

### *Horizontal Consolidation Pilot*

The Bankruptcy Committee is proceeding with implementing the horizontal consolidation pilot program approved by the Conference in March 2016. Two courts (the Bankruptcy Courts for the Northern and Southern Districts of Iowa) entered into a memorandum of understanding in 2016 and the pilot period formally began following the retirement of one of

the two clerks of court in July 2017. Two additional courts (the Bankruptcy Courts for the
Districts of North Dakota and South Dakota) entered into a memorandum of understanding to
participate in the pilot in April 2018 and the pilot period formally began following the retirement
of one of the two clerks of court in May 2018. The Committee continues to work to identify an
additional pair of courts to fulfill the goal of having up to three court pairs. The FJC, in
consultation with the Committee's subcommittee on resource sharing, has also developed a
detailed protocol for evaluating the pilot project and plans to host a meeting in September 2018
to bring together administrative staff from the four participating courts to assist with its study of
the pilot.

## BANKRUPTCY ADMINISTRATOR MATTERS

### *Bankruptcy Administrator Program Review and Executive Committee Inquiry*

In January 2014, the Director of the AO requested a comprehensive review of the BA
program. Several factors led to this review—no review of the program had been performed since
its establishment in 1986; AO staff support of the program changed in 2013 to the newly
established Court Services Office; and negative audit findings in some BA districts had raised
concerns. The goal of the review was to ensure the BA program was being effectively supported
and managed and that the program served the needs of the public. Later, in August 2014, the
Executive Committee asked the Committee to examine and recommend, in consultation with
other Conference committees, whether the BA program should continue to exist as a judiciary
responsibility. The Committee deferred action on the Executive Committee's request pending
completion of the program review.

The program review has been completed and the final report was referred by the AO
Director to the Committee for consideration at its December 2017 meeting. The Committee
reviewed the report and recommended that the Director provide the report to the chief judges of
the bankruptcy courts and BAs in Alabama and North Carolina to give them an opportunity to

provide feedback to the Committee. The responses from five of the six bankruptcy courts, as well as the BA Advisory Group, indicate the unanimous belief that the BA program should continue to exist as a judiciary responsibility. The responses highlighted many of the positive findings in the report, including cleaner audits than those of U.S. trustee districts; overwhelming support from local attorneys; the efficiency and flexibility of the BA program as compared to its U.S. trustee counterparts relating to the BAs themselves, caseload, staff, and supervision; and the overall experience and preference of judges, attorneys, and trustees for the BA program over the United States Trustee Program (USTP).

The Committee's Estate Administration Subcommittee considered the report and the responses from the bankruptcy courts and the BA Advisory Group and, in addition to echoing many of the findings in the report discussed above, noted the efficiency of the BA program and the lower cost of the BA program relative to the USTP in recommending that the BA program continue to exist as a judiciary responsibility. Consistent with the Executive Committee's request, before making its final recommendation, the Committee is seeking the views of the Committees on Audits and AO Accountability, the Budget, and Judicial Resources regarding whether the BA program should continue to exist as a judiciary responsibility. Subject to the feedback received from those committees, a draft response will be considered by the Committee at its December 2018 meeting and transmitted to the Executive Committee in early 2019.

### *Horizontal Restructuring of Bankruptcy Administrator Offices*

During the Bankruptcy Committee's 2017 meeting with the Economy Subcommittee of the Budget Committee, there was discussion about exploring the possibility of horizontally restructuring BA offices. At its December 2017 meeting, the Committee divided its analysis of the areas where horizontal restructuring of BA offices may result in cost savings into two categories: (1) management and oversight and (2) other operational and administrative roles/functions. The Committee referred this matter to its Estate Administration Subcommittee

to develop, in consultation with its BA liaison, a report on whether there may be areas where restructuring or further sharing within BA offices may result in cost savings. Following the Committee's December 2017 meeting, the Committee's BA liaison provided the Estate Administration Subcommittee with information related to the BA program and existing levels of sharing done by the BAs with one another and with other court units.

The Committee agreed with the Estate Administration Subcommittee's conclusion that the BA offices within the judiciary are already sharing many of their administrative functions with one another and other court units, and therefore, formal consolidation would not produce additional cost savings. The chair sent letters to the CACM and Judicial Resources Committees seeking their views.

## JUDICIARY STRATEGIC PLANNING

The Committee was asked by Chief Judge Carl E. Stewart, the judiciary's planning coordinator, to provide an update on the strategic initiatives that it is pursuing to implement the *Strategic Plan for the Federal Judiciary*. The Committee was also asked to consider whether any changes to its strategic initiatives were warranted, based on strategic planning priorities or other judiciary initiatives. Following the June 2018 meeting, the chair provided a report to Chief Judge Stewart on the information requested.

## BANKRUPTCY JUDGE QUARTERLY REPORTING OF MATTERS UNDER ADVISEMENT

In March 1985, the Judicial Conference adopted a policy requiring circuit executives to collect quarterly reports from bankruptcy (as well as district and magistrate) judges on matters held under advisement for over 60 days. JCUS-MAR 85, pp. 11-12; *Guide*, Vol. 18, Ch. 5, § 560. Subsequently, the Civil Justice Reform Act of 1990 (CJRA), Pub. L. No. 101-650, was enacted imposing reporting requirements on pending matters for district and magistrate judges (the CJRA did not apply to bankruptcy judges) but only required semiannual reporting. The

Conference determined that the CJRA reporting requirements were sufficiently similar to its previously adopted requirements and agreed to adopt the semiannual reporting for district and magistrate judges, but did not change the bankruptcy judge reporting requirement. JCUS-SEP 91, pp. 45-46.

On November 15, 2017, all circuit executives in circuits with bankruptcy judges agreed to request a change to the reporting requirements for bankruptcy matters held under advisement for over 60 days from quarterly to semiannually to bring bankruptcy judge reporting requirements in line with the reporting requirement for other judge types. The Bankruptcy Judges Advisory Group unanimously agreed that the Committee should recommend approval of the change. The proposed changes are not intended to prevent circuit executives from requiring more frequent reporting. Volume 18, Ch. 5, § 560 of the *Guide* and the reporting form, AO-413, would need to be modified to reflect semiannual instead of quarterly reporting.

The Committee requested that the CACM Committee recommend that the Judicial Conference approve changing the frequency of the reporting requirements for bankruptcy matters held under advisement for over 60 days. The CACM Committee has recommended the change to the September 2018 Judicial Conference, to begin with the reporting period ending March 31, 2019. *See* Report of the Committee on Court Administration and Case Management at Agenda E-6.

## REVISED PRELIMINARY APPLICATION AND DISCLOSURE STATEMENT FOR BANKRUPTCY JUDGE NOMINEES

At their March 2018 semiannual meeting held immediately after the Judicial Conference session, the chief circuit judges and circuit executives discussed the effect of the current sample application and disclosure statement for bankruptcy judge positions. Some chief judges and circuit executives expressed concern that the current sample application and disclosure statement

do not elicit enough information early enough in the process to allow proper consideration prior to the background investigations required for appointment.

To address the concerns, at its June 2018 meeting, the Committee discussed proposed revisions to the sample bankruptcy judgeship application and disclosure statement, the sample vacancy notices, and the *Regulations for the Selection, Appointment, and Reappointment of Bankruptcy Judges*. The Committee will seek the views of the chief circuit judges and circuit executives on proposed revisions at their September 2018 meeting. The changes will then be considered by the Committee and the Judicial Conference, as appropriate.

## QUARTERLY FEES IN LARGE CHAPTER 11 CASES IN BANKRUPTCY ADMINISTRATOR DISTRICTS

The application of chapter 11 quarterly fees in districts under the USTP is set forth in 28 U.S.C. § 1930(a)(6). The fee does not apply to chapter 11 cases in BA districts.

In 1994, the Ninth Circuit issued an opinion in *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), holding that excluding the BA districts from the fees charged in USTP districts was unconstitutional under the Uniformity Clause of the Constitution. The Ninth Circuit found that the chapter 11 quarterly fees required in courts served by the USTP but not assessed in BA districts resulted in a non-uniform application of bankruptcy law and unequal treatment of creditors. As a result, in March 1996, the Judicial Conference adopted a recommendation from the Committee to seek legislation providing authority to collect chapter 11 quarterly fees in BA districts. JCUS-MAR 96, p. 10. On November 13, 2000, the Federal Courts Improvement Act of 2000, Pub. L. No. 105-518, § 105, 114 Stat. 2410, 2412, was signed into law, and 28 U.S.C. § 1930 was amended to add subsection (a)(7), permitting the Judicial Conference to impose fees in BA districts in amounts equal to those listed in 28 U.S.C. § 1930(a)(6). Subsection (a)(7) further requires the judiciary to deposit all chapter 11 quarterly fees collected in BA districts as offsetting receipts to the fund established under 28 U.S.C. § 1931.

In September 2001, the Judicial Conference approved the Committee's recommendation that quarterly fees for chapter 11 cases in BA districts be imposed "in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time." JCUS-SEP/OCT 01, pp. 45-46.

The Bankruptcy Judgeship Act of 2017 revised subsection (a)(6) to add a new subsection (B), which provides that, during each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund (Fund) as of September 30 of the most recent full fiscal year is less than $200 million, the quarterly fee payable for a calendar quarter in which disbursements equal or exceed $1 million shall be the lesser of one percent of such disbursements or $250,000. This would be a substantial increase over the fees currently charged, which range from $6,500 to $30,000 for disbursements exceeding $1 million. The Fund is used for the operation of the USTP, and it does not apply to the BA districts. *See* 28 U.S.C. § 589a.

To ensure nationwide uniformity, the BAs requested that the Committee recommend that the Conference approve similar fees in BA districts. The Committee noted the following issues with the quarterly fees generally, and the possibility that increasing the fees would exacerbate such problems: (1) whether imposing the quarterly fee has had a chilling effect on large chapter 11 case filings and (2) whether imposing the quarterly fee has precluded certain large chapter 11 debtors from successfully reorganizing (and compelling those debtors to instead dismiss or convert to chapter 7).[3] The Committee will further consider these issues and consider whether the Conference should make a recommendation to Congress regarding whether to reenact revised subsection (a)(6)(B).

---

[3] The Committee also noted the following issues with interpreting the relevant statutes: (1) whether certain payments constitute "disbursements" for purposes of calculating the quarterly fee (specifically payments made by a chapter 11 debtor to its post-petition lender in connection with a revolving line of credit) and (2) whether a chapter 11 debtor is obligated to pay the quarterly fee after confirmation of a chapter 11 plan.

(Rev. 8/23/18)

Notwithstanding the concerns outlined above, the Committee agreed that the quarterly fee calculation changes in 28 U.S.C. § 1930(a)(6)(B) should apply in BA districts beginning in the first quarter of fiscal year 2019 (that is, for any chapter 11 case filed on or after October 1, 2018, and not for cases then pending). The Committee additionally endorsed ensuring that debtors receive proper notice before imposing a higher fee on them. To allow the BAs and bankruptcy courts in Alabama and North Carolina time to provide sufficient notice, the Committee asked the Executive Committee to act on an expedited basis on behalf of the Conference. The Executive Committee approved the Committee's request at its August 9-10, 2018, meeting. *See* Agenda E-1.

## BANKRUPTCY JUDGESHIP VACANCY PILOT

At its June 2014 meeting, the Committee recommended that the Judicial Conference approve a pilot project that would allow no more than two districts with long-standing bankruptcy judgeship vacancies to be filled and the selected judges to be assigned to districts with emergency needs for additional bankruptcy judgeship resources through an intercircuit assignment. On September 16, 2014, the Judicial Conference approved the bankruptcy judgeship vacancy pilot. JCUS-SEP 14, p. 7. The pilot was implemented with the United States Bankruptcy Courts for the Middle District of Florida and the Eastern District of Michigan as the initial borrowing districts, and the District of South Dakota and Northern District of Iowa as the lending districts. The participating courts and circuit judicial councils negotiated memoranda of understanding (MOU) implementing the pilot and, in 2016, the selected judges were appointed.

Shortly after the Committee's December 2017 meeting, a vacancy occurred in the Middle District of Florida that was subsequently filled by the pilot judge from the District of South Dakota, Judge Roberta Colton. The Bankruptcy Court for the Middle District of Florida advised that it no longer needed the additional bankruptcy judgeship, and as a result, the lending arrangement between the District of South Dakota and the Middle District of Florida terminated

when Judge Colton began her new 14-year term in December 2017. The FJC's study of the lending agreement between the District of South Dakota and the Middle District of Florida will continue until a final report is presented to the Committee.

The District of South Dakota, with the support of the Eighth Circuit Judicial Council, agreed to continue to participate as a lending district for another round of the pilot, with the Northern District of Mississippi, with the approval of the Fifth Circuit Judicial Council, as the next borrowing district. The Fifth and Eighth Circuit Judicial Councils entered into an MOU in December 2017 to govern their participation in the pilot program. The Eighth Circuit sought applications for a bankruptcy judge in the District of South Dakota with a duty station in Sioux Falls, South Dakota, but who will serve in Aberdeen in the Northern District of Mississippi for the first five years of the fourteen-year appointment via a long-term intercircuit assignment. Interviews were conducted and an initial selection made in accordance with the agreement between the circuit councils. The candidate is undergoing the FBI and IRS background investigations.

The Committee noted the positive feedback received to date about the pilot and the existence of other long-standing bankruptcy judgeship vacancies that could be utilized to better manage existing judgeship resources across the country. The Committee further noted that the FJC's study would benefit from additional participation in the pilot, particularly from courts in different circuits participating as the lending districts. Subject to Judicial Conference approval of the expansion of the pilot and the approval of the appropriate circuit judicial councils, the Committee has identified at least one other vacancy that it believes may be a good candidate for participation in the program. It thus recommended that the Judicial Conference approve expanding the pilot to allow up to five long-standing bankruptcy judgeship vacancies to be filled and the judges lent through the use of intercircuit assignments and agreements between volunteer circuits, to districts that have emergency needs for additional bankruptcy judgeships.

**Recommendation**: That the Judicial Conference approve expanding the bankruptcy judgeship vacancy pilot project to allow up to five long-standing vacancies to be filled and the judge lent to a district that has an emergency need for an additional judgeship through the use of an intercircuit assignment designation and an agreement between participating circuit councils.

## OTHER MATTERS

Staff updated the Committee on the work of a task force established at its December 2017 meeting to explore options for improving the judiciary's management of unclaimed funds attributable to bankruptcy courts. The task force is comprised of judges, clerks of court, a bankruptcy administrator, and AO staff, as well as representation from the Department of Justice Executive Office for United States Trustees. The task force considered a number of proposals related to (1) improving trustee efforts to locate creditors prior to depositing unclaimed funds with the bankruptcy court, (2) improving the database that consolidates unclaimed funds data, (3) improving bankruptcy court management of unclaimed funds, and (4) various proposals related to escheatment, fees, the *cy pres* doctrine, and the possibility of creditors disclaiming their interests in unclaimed funds. The task force discussed and agreed on proposals (both short- and long-term) to develop and further research.

The Committee received a report from its working group on diversity in bankruptcy practice and discussed an event the working group organized with the University of San Diego Law School, which was held the day before the Committee meeting. Law students from the University of San Diego, externs with federal judges, and local federal judges were invited to attend. The event included roundtable discussions among judges and law students. Law students had the opportunity to learn and ask questions about bankruptcy practice, judicial clerkships, and judicial service.

The Committee received a report from its working group on interpreting services in bankruptcy courts regarding progress made on identifying strategies for making interpreting services available in courts in need of such services, and identifying potential funding sources.

The Committee is waiting for a legal opinion from the AO's Office of General Counsel regarding payments to providers of interpreting services before proceeding.

The Committee received a report from FJC staff regarding the FJC's ongoing projects for the Committee, including evaluations of the Committee's vacancy and horizontal consolidation pilots and its study of bankruptcy judge time usage to aid development of new bankruptcy case weights, as well as work relating to various educational initiatives.

The Committee received status reports from the Bankruptcy Clerk of Court Committee Liaison, the Bankruptcy Administrator Committee Liaison, the Advisory Committee on Bankruptcy Rules Liaison, the Chair of the Bankruptcy Judges Advisory Group, and the President of the National Conference of Bankruptcy Judges. The Committee also received briefings from several AO offices.

Respectfully Submitted,

Karen E. Schreier

Karen E. Schreier, Chair

Leslie J. Abrams
Christine M. Arguello
John P. Bailey
Sara Darrow
Pedro A. Delgado Hernandez
Paul Engelmayer
Mary P. Gorman
Catharina Haynes

Barbara J. Houser
Thomas L. Ludington
Eduardo C. Robreno
Brendan L. Shannon
Erithe A. Smith
N. Randy Smith
John E. Waites

Appendix - Proposed Revisions to the Ad Hoc and Extended Service Bankruptcy Judge Recall Regulations